Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY GARCIA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>J2 GLOBAL, INC., VIVEK SHAH, NEHEMIA ZUCKER, and R. SCOTT TURICCHI,<br><br>Defendants. | No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

Plaintiff Jeffrey Garcia ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding J2 Global, Inc. ("J2 Global" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded J2 Global securities between October 5, 2015 and June 29, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district

so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered, the subsequent damages took place in, and the Company maintains locations in this judicial district.

6.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

8.     Defendant J2 Global, through its subsidiaries, purports to provide Internet services worldwide. The Company operates through three segments: Fax and Martech; Voice, Backup, Security, and Consumer Privacy and Protection; and Digital Media. The Company is incorporated in Delaware and its head office is located at 700 South Flower Street, Suite 1500, 15th Floor, Los Angeles, CA 90017. J2 Global's securities trade on the NASDAQ under the ticker symbol "JCOM."

9.     Defendant Vivek R. Shah ("Shah") has served as the Company's Chief Executive Officer ("CEO") since January 2018.

10.     Defendant Nehemia Zucker ("Zucker") served as the Company's Chief Executive Officer ("CEO") from May 2008 until December 2017.

2

11.     Defendant Robert Scott Turicchi ("Turicchi") has served as the Company's President and Chief Financial Officer ("CFO") throughout the Class Period.

12.     Defendants Shah, Zucker, and Turicchi are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

17.     On October 5, 2015, the Company announced in a press release that it had completed nine acquisitions in the third quarter of 2015, including the intellectual property of "VDW (Netherlands)."

18.     On February 29, 2016, J2 Global filed with the SEC its annual report for the period ended December 31, 2015 (the "2015 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2015 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zucker and Turicchi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 2015 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination

4

trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2015, 2014 and 2013.***

(Emphasis added.)

20.     The 2015 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared

5

to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. *We completed the required impairment review for the years ended December 31, 2015, 2014, and 2013 and noted no impairment. Consequently, no impairment charges were recorded.*

(Emphasis added.)

21.   As to transactions with related parties and the independence of the Board of Directors, the 2015 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2015 Proxy Statement."

22.   On March 23, 2016, the Company filed its 2015 Proxy Statement with the SEC.

23.   The 2015 Proxy Statement stated that "[a]ll of our directors are independent directors as defined in the Nasdaq listing standards and as determined by j2 Global's Board of Directors."

24.   The 2015 Proxy Statement stated that "[d]uring 2015, j2 Global was not a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K."

25.   On March 1, 2017, J2 Global filed with the SEC its annual report for the period ended December 31, 2016 (the "2016 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2016 10-K were SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

control over financial reporting and the disclosure of all fraud.

26.     The 2016 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:
> - significant underperformance relative to expected historical or projected future operating results;
> - significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.
>
> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2016, 2015 and 2014.***
>
> (Emphasis added.)

27.     The 2016 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

7

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2016, 2015, and 2014 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

28.    As to transactions with related parties and the independence of the Board of Directors, the 2016 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2017 Proxy Statement."

29.    On March 23, 2017, the Company filed its 2017 Proxy Statement with the SEC.

30.    The 2017 Proxy Statement stated that "j2 Global's Board of Directors

8

has determined that all of our directors are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

31.     The 2017 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2017 Proxy Statement stated that "[s]ince January 1, 2016, j2 Global has not been a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K."

32.     On March 1, 2018, J2 Global filed with the SEC its annual report for the period ended December 31, 2017 (the "2017 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2017 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

33.     The 2017 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:
> - significant underperformance relative to expected historical or projected future operating results;

9

- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2017, 2016 and 2015.***

(Emphasis added.)

34.     The 2017 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2017, 2016, and 2015 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

35.    As to transactions with related parties and the independence of the Board of Directors, the 2017 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2018 Proxy Statement."

36.    On March 23, 2018, the Company filed its 2018 Proxy Statement with the SEC.

37.    The 2018 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

38.    The 2018 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2018 Proxy Statement stated that the Company had entered into the following related party transaction:

On September 25, 2017, the Board of Directors authorized the

11

Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In February 2018, the Company received a capital call notice from the management of OCV for approximately $12.2 million, inclusive of certain management fees.

39.     On March 1, 2019, J2 Global filed with the SEC its annual report for the period ended December 31, 2018 (the "2018 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2018 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

40.     The 2018 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

**We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2018, 2017 and 2016.**

(Emphasis added.)

41.   The 2018 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a

13

qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.

In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2017 and 2016 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

42.    As to transactions with related parties and the independence of the Board of Directors, the 2018 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2019 Proxy Statement."

43.    On March 22, 2019, the Company filed its 2019 Proxy Statement with the SEC.

44.    The 2019 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

45.     The 2019 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2019 Proxy Statement stated that the Company had entered into the following related party transaction:

> On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In 2018, the Company received six capital call notices from the management of OCV for approximately $36.8 million, inclusive of certain management fees.

46.     On March 1, 2020, J2 Global filed with the SEC its annual report for the period ended December 31, 2019 (the "2018 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2019 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

47.     The 2019 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:
> - significant underperformance relative to expected historical or projected future operating results;
> - significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.
>
> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2019, 2018 and 2017.***

(Emphasis added.)

16

48.    The 2019 10-K stated the following concerning its accounting treatment of business combinations, goodwill and purchased intangible assets:

> We apply the acquisition method of accounting for business combinations in accordance with GAAP, which requires us to make use of estimates and judgments to allocate the purchase price paid for acquisitions to the fair value of the assets, including identifiable intangible assets and liabilities acquired. Such estimates may be based on significant unobservable inputs and assumptions such as, but not limited to, revenue growth rates, gross margins, customer attrition rates, royalty rates, discount rates and terminal growth rate assumptions. We use established valuation techniques and may engage reputable valuation specialists to assist with the valuations. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. Fair values are subject to refinement for up to one year after the closing date of an acquisition as information relative to closing date fair values becomes available. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.
>
> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the

17

fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.

In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2019, 2018 and 2017 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

49.     As to transactions with related parties and the independence of the Board of Directors, the 2019 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2020 Proxy Statement."

50.     On March 26, 2020, the Company filed its 2020 Proxy Statement with the SEC.

51.     The 2020 Proxy Statement stated that "J2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

52.     The 2020 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2020 Proxy Statement stated that the Company had entered into the following related party transaction:

18

On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In 2019, the Company received nine capital call notices from the management of OCV for approximately $29.6 million, inclusive of certain management fees. The also Company received approximately $10.3 million in distributions from OCV in 2019.

53.   The statements referenced in ¶¶17-52 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) J2 Global engaged in undisclosed related party transactions; (2) J2 Global used misleading accounting to hide requisite impairments and underperformance in acquisitions; (3) several so-called independent members of the Company' board of directors and audit committee were not disinterested; and (4) as a result, Defendants' public statements were

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

materially false and/or misleading at all relevant times.

## **THE TRUTH EMERGES**

54.     On June 30, 2020, before the market opened, Hindenburg Research published a report (the "Report") explaining that J2 Global had, among other issues: (i) failed to disclose questionable transactions with related parties; (ii); utilized misleading accounting to hide underperformance and impending impairments; and (iii) failed to disclose a lack of board independence.

55.     The Report noted the following, in pertinent part, regarding J2 Global's undisclosed related party transactions:

**Related Party Transactions:** J2 and its executives have a several decades long history of related party acquisitions and undisclosed self-dealing, including:

1.     Using what we estimate to be $20 million in shareholder capital to acquire a newly-formed entity set up by J2's then VP of Corporate Development. The entity was headquartered at his personal residence in the Netherlands, and the conflict was never disclosed.

2.     Committing $200 million of shareholder cash to the J2 Chairman's newly-formed VC firm despite a consistent track record of prior investment failures. J2 expects to commit an additional $100 million, for a total of $300 million.

3.     One of the earliest investments made by the VC vehicle, an estimated $12 million, was to an entity whose incorporation documents list J2 Chairman Richard Ressler's nephew and lawyer – an indirect related party transaction. We discuss this entity in more detail below.

4.     J2 Chairman's track record includes the initial backing, majority ownership, directorship and affiliated executive role in publicly traded biotech company called Presbia that itself **operated a newly-formed entity out of the exact same personal residence owned by J2's VP of Corporate Development.** That company has seen its stock fall ~99% in the last 5 years.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

5.     Previously, J2 had acquired yet another entity based out of the same employee's personal residence back in 2004.

To reiterate**: J2's former VP of Corporate Development had formed 3 entities out of his house that were then acquired/operated by J2 and another company headed by J2's Chairman that cost/incurred losses totaling an estimated $30 million.**

That same VP of Corporate Development was responsible for 135 M&A transactions at J2, according to his LinkedIn profile. That number represents ~73% of the acquisitions in the company's history.

J2 has historically provided limited disclosure to investors on its acquisition portfolio, raising the prospect of broader malfeasance given 1) this individual's oversight of these transactions and 2) the close ties he had with the company's Chairman.  He was also integral in J2's European expansion, helping J2 acquire dozens of businesses. Contrary to sell-side perception, many of these businesses have shown significant fundamental deterioration and warrant further impairment testing.

*     *     *

**The Company Completely Failed to Disclose the Clear Conflict (And Barely Disclosed the Deal at All)**

In October 2015, J2 announced in a press release that it had acquired 9 businesses. Among the acquisitions, listed under "Intellectual Property" on the press release, was a company called VDW (Netherlands).

2's 2015 annual report did not mention the transaction by name or give any more color on it. Since the press release tucking it in with eight other acquisitions was the only evidence we could find of the transaction, it was easy to miss.

The company only reported the initials of the entity, "VDW". Its full name, according to Dutch corporate records, is actually **V**an **d**er **W**eijden M&A Consultancy BV. It was set up 11 months earlier, in December 2014, in the name of long-time J2 employee Jeroen **van d**er **W**eijden, according to the same records. Perhaps that is why the company thought "VDW" was a better choice for its disclosures.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

The company was registered to Van der Weijden's personal residence in Amsterdam (at Pieter Pauwstraat 2A-H), according to the same corporate records, and listed a total of zero employees.

[image omitted]

Dutch real estate records confirm that the residence belonged to Jeroen.

[image omitted]

And here is a picture of the residence, via Google Maps:

[image omitted]

The company never disclosed the purchase price for VDW, but based on an analysis of the price of the other transactions that quarter we estimated the number.[2] We emailed the company asking to provide the number and had not received a response as of publication.[3]

Following publication, the company disclosed the purchase price. It also stated that Jeroen was a consultant not an employee, contrary to the representation on his LinkedIn profile.

We urge the company to provide shareholders and its auditors full detail on this transaction along with any additional conflicted transactions.

As we will show, this personal residence housed four different businesses: (1) J2 Global NV (2) VDW (3) Presbia (discussed below), and (4) a business run by Jeroen's brothers.

\*       \*       \*

**The Acquired Entity Was Dissolved Shortly After the Employee Left the Firm**

Jeroen left J2 in 2018, according to his LinkedIn profile. The Netherlands Chamber of Commerce registry for VDW says that the corporation had been dissolved shortly thereafter, effective October 18, 2019.

Given that Jeroen was already working for J2 as an M&A advisor, per his Linkedin Profile, we found it tremendously odd that the company

22

acquired his M&A advisory consultancy firm, without disclosing the obvious conflict, then just dissolved the entity shortly after he left. In the company's response post-publication, it stated the dissolving corporate entities following acquisition is normal.

Lastly, and perhaps most troubling, Jeroen held key responsibility for the 135+ acquisitions he oversaw while at J2. We only went through a fraction of the deals (largely because of J2's opaque disclosures) and found obvious red flags. Per Jeroen's LinkedIn profile, he managed:

*"Sourcing and handling over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow up, and reporting."*

Note that J2 has completed 186 acquisitions, suggesting that Jeroen, who was apparently the beneficiary and key participant in an undisclosed related-party transaction, was involved in over 73% of J2's acquisitions. Given that the audit committee nor the head of M&A appear to be functioning appropriately, it is our view that independent and external parties should conduct investigations on each and every one of the 135 deals that Jeroen oversaw.

\*       \*       \*

**J2 Chairman Richard Ressler's Track Record Includes a Slew of Failures, Along With Signs of Other Undisclosed Related-Party Dealings**

Given that the newly-formed OCV had no track record, we explored Ressler's track record outside of J2 in order to understand whether the massive diversion of resources to his firm was the best possible use of investor capital.

We found that Ressler's other venture investments comprised a remarkable string of investment failures, marred by signs of related-party transactions and forms of self-enrichment. A brief case study of his investment in a company called Presbia follows. (In Appendix A we break down Ressler's track record – in summary, 10/12 investments were 0s or near 0s.)

Other venture investors seem to have come to the same conclusion on Ressler's track record. In January 2018 (shortly after J2's massive

allocation to OCV was signed), J2's CFO, Scott Turicchi, stated that OCV would raise a further $100m+ dollars from other investors – predominantly on the back of Ressler being a "savvy investor". [Pg. 20]

That interest never seemed to materialize however. Per OCV's 2020 ADV filing with the SEC, it manages around $240 million, meaning that J2's commitment likely will make up almost 85% of the firm's gross assets.

---

**Transcript from the William Blair Conference**

Q: It still doesn't make sense to me for a company that is an operating company and is successful at operating businesses, to turn into a passive investor along with (50) billion dollars, private equity dollars that are out there chasing deals, why can't you just stick to what you do?

A: Well, I think it's just another means for us to invest our capital. So I understand there may not be an agreement on that, but...

Q: Why do you think you'll be better than the other [private equity funds]?

A: It's not us by the way. It's not us. It's our capital though entrusted to particularly our Chairman, who has been a very savvy investor over a very long timeframe and the team that he's built around it under a company called OCV. So look it's a business decision that the company has made. We think it will pay off over time. We'll have to see.

Q: So why couldn't he have raised the funds himself?

A: He could. He did raise some funds independent of us.

Q: So why has this happened?

---

\*       \*       \*

**Why Are J2 and its Related Individuals Acquiring Multiple Entities Based Out of the Same Residence?**

In 2004, J2 paid roughly $1 million to $2 million to acquire Jump B.V. [Pg. 8, Pg. 1], an entity based in the Netherlands founded by its eventual VP of Corporate Development, Jeroen Van der Weijden (for context, this ~$1-2m was 1-2% of the then JCOM revenue). Per J2's

filings, Jump was described as a provider of fax-to-email and unified messaging services, which fits with J2's primary focus at the time.

Per Dutch corporate records, Jump was later reorganized as J2 Global Netherlands, and was based at the exact same residential apartment that later J2 acquisition VdW was registered (along with the subsidiary of Presbia mentioned earlier):

**Location**

| | |
|---|---|
| Location number | 000017889847 |
| Trade names | J2 Global (Netherlands) BV |
| | j2 Global NL |
| visiting address | Pieter Pauwstraat 2 A-I, 1017ZJ AMSTERDAM |
| Fax number | 0847102425 |
| Internet address | www.jumpservices.com |
| E-mail address | jeroen@jumpservices.com |
| Date of settlement | 01-12-2001 |
| Activities | SBI code: 620201 - Hardware consultancy |
| | SBI code: 620202 - Software consultancy |
| | The IT services |
| Working people | 4 |

We reiterate: Why did J2 and its related individuals acquire multiple entities run by the same individual based out of the same residence?

56.     The Report noted the following, in pertinent part, regarding J2 Global's misleading accounting:

**Undisclosed Goodwill & Intangible Impairments:** Whereas J2 hasn't recognized goodwill impairments at its parent level, audits at J2's subsidiaries show a slew of goodwill impairments. We have also found signs that multiple acquisitions are clearly underperforming and likely necessitate obvious impairments that haven't been taken.

1.     As one example, a key J2 subsidiary recorded an €22 million impairment despite zero goodwill impairment recognized at the parent corporation.

2.     Of J2's 14 "feature" web-based brands, 9 have seen Alexa traffic rankings plummet in the past several years, making them obvious candidates for goodwill impairments.

3.     Trouble with the perfect acquisition machine:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

o      Everyday Health, J2's largest acquisition, saw an immediate post-acquisition revenue drop of ~25%, yet no impairment was recorded. Instead, J2 went on a spree of asset disposals/acquisitions that obfuscated the entity's financial position.

o      J2's key European subsidiary has seen its revenue decline 27% in the past 3 years, with operating income swinging from €5.2 million to negative €11.5 million.

4.      VDW, a dissolved undisclosed related-party transaction that should likely be a full write-off.

5.      The VC vehicle J2 has invested in has an asset that appears to be a conflicted related party. A former employee we spoke with said the operations are currently dormant and its staff have been laid off. (Note that another of the VC vehicle investments is down 50% since IPO which will reflect on the financials on a mark-to-market basis.)

Even though the company has completed $2bn of acquisitions since 2012, mostly in digital media (and cloud services businesses), J2's predominant legacy fax segment still represented 64% of LTM operating income. Last quarter, it accounted for 83% of operating income despite the time, cash, and assumed debt through J2's acquisition spree.

Approximately ~$700m of acquisitions for which we have visibility are seeing revenue declines, appear to be underperforming, or have been outright dissolved.  That is approximately 1/3 of acquisitions completed since 2012 (of $2bn) – yet we have seen no impairment of goodwill to date. We estimate $155 million in impairments across this subset based on our review. If extrapolated across the acquisitions for which we have zero to little visibility the picture likely worsens.

The disproportionate underperformance of the marquee Everyday Health acquisition should round-out the need for investigation. The opaque nature of J2's M&A program has also left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of the underlying businesses.

*      *      *

26

**J2's Largest Acquisition, Everyday Health, Was Acquired in 2016 for $493 Million. It Saw an Immediate Annual Revenue Decline of ~25%.**

**J2 Has Yet to Record An Impairment. Instead, Everyday's Financials Have Been Obfuscated Through A Series of Acquisitions And Divestitures**

In December 2016, J2 acquired Everyday Health for $493.7 million, its largest-ever acquisition. [Pg. 75]

At the time, Everyday Health was a portfolio of health-focused online properties that included consumer and professional oriented brands such as Mayo Clinic Diet, MedPage Today, and What to Expect.

A chart from J2's March 2020 analyst day presentation shows consistent rising revenue at Everyday Health Group, suggesting that the acquisition has been a raging success:

[image omitted]

The public financials of Everyday Health show that LTM revenue up until September 2016 (months before the acquisition) was $254 million [Pg. 2, Pg. 2, Pg. 2, Pg. 31]. The 2017 numbers declined precipitously (to $171 million), but rather than recognizing the underperformance and taking a goodwill impairment, J2 went on a spree of divestitures and acquisitions in the division that effectively obfuscated the reported metrics.

The company explained the 2017 dip by calling it a period of "shrink to grow" where it was divesting assets.

But even after factoring the 2 divestitures from that year, year over year revenue in the division declined by an estimated $65 million, or 25%.[5]

Revenue in the Everyday Health division still has not reached its pre-acquisition levels despite the 5 subsequent acquisitions folded into the subsidiary.

Such a steep revenue decline seems to clearly warrant a goodwill impairment, yet the company has taken none to date.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Once again, this is J2's largest acquisition and shows clear signs of impairment. Rather than addressing it, a slew of new M&A deals have simply papered over the issue.

\*      \*      \*

**Tricky Accounting: A Wholly Owned Subsidiary of J2 Reported €36 Million (~$50 Million USD) in Impairments, Yet the Parent Reported None. (This Shouldn't Be Possible)**

For example, subsidiary **J2 Global Holdings** is the 100% owner of entity **J2 Global Ireland**. [Pg. 25] The parent shows zero impairments in 2015, but the latter—a wholly owned subsidiary— shows €22 million in impairments in the exact same year. This shouldn't be possible.

\*      \*      \*

Cumulatively, we found 36 million Euro (~US$50 million) of impairments at the subsidiary level that did not seem to make it to J2 Ireland's parent. J2 Ireland's parent shows no impairments (or diminution) to its investments as of our latest data for the year ended 2018. Inclusive of vdW, we have identified four dissolutions of acquired entities at the subsidiary level.

\*      \*      \*

Filings across multiple European subsidiaries shows several acquisitions have had significant revenue declines. These European acquisitions and entities look to have been supervised by Jeroen – the key man in a series of suspicious transactions described earlier.

All told, it seems that multiple J2 European assets are deteriorating, yet we have seen no goodwill impairments recorded at the parent level.

(Emphasis added.)

57.     The Report noted the following, in pertinent part, regarding J2 Global's lack of board independence:

The current situation at J2 has been enabled by a corporate governance vacuum. The Chairman and multiple "independent" board

28

members, including the chairs of the audit and compensation committees, have numerous overlapping business interests, calling their actual independence into question.

## Conflicts Among "Independent" Board Members

| Company | End Result/Increase (Decrease) in Value | Richard Ressler | Brian Kretzmer | Stephen Ross | Doug Bech | Robert Cresci |
|---|---|---|---|---|---|---|
| J2 Global Position | | Independent Chairman | Independent Director/ Audit Cmte Chair | Independent Director/ Audit Cmte | Independent Director/ Comp Cmte Chair | Independent Director |
| J2 Global | TBD | ✔ | ✔ | ✔ | ✔ | ✔ |
| Presbia | (99.9%); (Delisted) | ✔ | | | | ✔ |
| MAI Systems Corp. | (99.9%) | ✔ | ✔ | ✔ | | |
| Universal Telecom Services, Inc. | Dissolved | ✔ | ✔ | | | |
| CIM Group | ~3.8% Annl Rtn | ✔ | ✔ | | ✔ | |

1.     **"Independent" Chairman Richard Ressler** has outside business ties with much of the board, along with multiple J2 executives. As noted above, Ressler's new investment firm Orchard Capital Ventures ("OCV"), which itself is staffed with senior J2 executives, received a $200 million commitment from J2's shareholders, with the expectation that it will increase to $300 million. [ 21] The transfer was approved by J2's audit committee [Pg. 22], which is Chaired by long time Ressler associate Brian Kretzmer.

**2. "Independent" director and audit committee chair, Brian Kretzmer**, has a work history with J2 Chairman Richard Ressler dating back nearly three decades.

Most importantly, Kretzmer consulted for the OCV affiliate Orchard Capital. This is a flagrant conflict of interest, given that as chair of the audit committee Kretzmer then approved the $200 million commitment of J2 Capital to OCV.

This conflict was not disclosed to investors. Instead, it appears steps were taken to conceal it. Kretzmer removed his role at Orchard from his personal website, but we can see from an earlier Google cached version that Kretzmer worked on M&A for Orchard Capital:

[image omitted]

Beyond working for the predecessor entity of a $200 million related-party transaction that he "independently" approved, Kretzmer had additional ties to Ressler. Kretzmer was CEO of IT company MAI Systems Corp while Ressler was Chairman. [Pg. 19] Kretzmer was also a Director at investment company CIM Real Estate Finance

29

Trust, founded by Ressler. He also worked with telecommunications company Universal Telecom, one of Ressler's former portfolio companies.

**3. "Independent" director and audit committee member, Stephen Ross**, has a 20-year history with J2 Chairman Ressler and director/audit committee chair Kretzmer. Ross served as director at MAI Systems together with Ressler (Chairman) and Kretzmer (CEO & President). Ross's son was also employed at CIM Group, where Ressler was Chairman, eventually becoming CTO. [ 9]

Note again that the "independent" audit committee, whose chairman and majority of its members had multiple overlapping business ties with Ressler, were responsible for providing the approval of $200 million in J2 cash being directed into Ressler's newly-formed investment entity.

Years ago, while serving at MAI systems, Ross Chaired a special committee that approved a reverse stock split deal that explicitly benefited Ressler. [Pg. 9]

Kretzmer and Ross were hired to the J2 board on the same day 13 years ago.

**4. "Independent" compensation committee chair,** Douglas Bech, also serves as director/chairman of the corporate governance committee at CIM Commercial Trust, a business founded by J2 Chairman Richard Ressler.

**Corporate governance appears to be non-existent—Clear Conflicts Between the "Independent" Board Members and The Executives They Are Supposed to Be Overseeing**

[image omitted]

**The company's auditor, BDO**, has collected increasing audit fees while apparently staying silent on potential conflicts and clear looming write downs. Total audit fees that J2 Global has paid to BDO have more than doubled to $4.4 million in 2019 from $2.1 million in 2016.

58.    On this news, shares of J2 Global fell $6.29 per share, or over 9%, to close at $63.21 per share on June 30, 2020, damaging investors.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

59.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired J2 Global securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of J2 Global and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, J2 Global securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

62.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of J2 Global;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused J2 Global to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of J2 Global securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

done to them. There will be no difficulty in the management of this action as a class action.

66. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- J2 Global shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, J2 Global filed periodic public reports;

- J2 Global regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- J2 Global's securities were liquid and traded with sufficient volume during the Class Period; and

- J2 Global was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

67. Based on the foregoing, the market for J2 Global securities promptly digested current information regarding J2 Global from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

68. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- • engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of J2 Global securities during the Class Period.

73. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of J2 Global were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of J2 Global, their control over, and/or receipt and/or modification of J2 Global's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning J2 Global, participated in the fraudulent scheme alleged herein.

74. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other J2 Global personnel to members of the investing public, including Plaintiff and the Class.

75. As a result of the foregoing, the market price of J2 Global securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of J2 Global securities during the Class Period in purchasing J2 Global securities at prices that

35

were artificially inflated as a result of Defendants' false and misleading statements.

76.     Had Plaintiff and the other members of the Class been aware that the market price of J2 Global securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased J2 Global securities at the artificially inflated prices that they did, or at all.

77.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

78.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of J2 Global securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

79.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.     During the Class Period, the Individual Defendants participated in the operation and management of J2 Global, and conducted and participated, directly and indirectly, in the conduct of J2 Global's business affairs. Because of their senior positions, they knew the adverse non-public information about J2 Global's misstatement of revenue and profit and false financial statements.

81.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

with respect to J2 Global's financial condition and results of operations, and to correct promptly any public statements issued by J2 Global which had become materially false or misleading.

82.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which J2 Global disseminated in the marketplace during the Class Period concerning J2 Global's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause J2 Global to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of J2 Global within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of J2 Global securities.

83.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by J2 Global.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: July 8, 2020                              **THE ROSEN LAW FIRM, P.A.**

<u>/s/Laurence M. Rosen</u>
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS