**ROCHE CYRULNIK FREEDMAN LLP**
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842
Email: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

*Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY GARCIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>J2 GLOBAL, INC., VIVEK SHAH, NEHEMIA ("HEMI") ZUCKER, and R. SCOTT TURICCHI<br><br>Defendants. | Case No.: 2:20-cv-06096<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

**"Oh! What a tangled web we weave when first we practice to deceive."**
**Sir Walter Scott, Marmion (1808).**

Lead Plaintiff Jonathan Espy ("Espy" or "Lead Plaintiff"), individually and on behalf of all others similarly situated hereby bring this Consolidated Class Action Complaint (the "Complaint") against J2 Global, Inc. ("J2" or the "Company"), Vivek Shah ("Shah"), Nehemia ("Hemi") Zucker ("Zucker"), and R. Scott Turicchi ("Turicchi") (collectively, "Defendants"). The allegations herein are based on Lead Plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by J2; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former employees of the Company; and information obtainable on the Internet. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants, or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired J2 common stock during the period from October 5, 2015 to June 29, 2020, inclusive (the "Class Period"), and were damaged thereby. The action is brought against J2 and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. J2 purports to be a leading Internet information and services company consisting of a portfolio of brands in its two divisions: Digital Media and Cloud Services. It also purports to be an active acquirer of businesses in media, technology, and Internet services, having deployed approximately $3 billion of acquisition capital to acquire 186 businesses since its founding in 1995. J2 relies primarily on acquisitions for growth, and its success requires paying fair market value or less to acquire companies and for those companies to continue to be at least as profitable as when J2 values and acquires them. In other words, J2 is in the business of buying companies that are already generating revenue and combining them with companies in similar or the same industry to effectuate synergies and/or cost savings; J2 is not in the business of buying undervalued companies and adding value to, or otherwise organically operating and growing, those individual companies.

3. However, Defendants have misled investors about the strength of J2's core business of acquiring and integrating companies. Many of J2's acquisitions actually just enriched insiders, including "independent" board members and senior executives, by tens of millions of dollars, all to the detriment of J2's shareholders.

4. Furthermore, Defendants obfuscated the terms of those acquisitions as well as any of the individual acquired companies' ongoing value and growth – or lack thereof. Normally, a company publicly reports goodwill as an asset in relation to an acquisition or other business segment. If that acquisition or segment subsequently suffers and loses value, the company would report an impairment to the goodwill. J2, however, does not break out the goodwill for each of its hundreds of acquisitions individually and instead reports a single consolidated goodwill for each of its two divisions, without any impairments. In fact, J2 has *never* taken a goodwill impairment.

5. Meanwhile, Defendants portrayed J2's aggressive acquisition strategy as consistently successful. Through this scheme—*i.e.*, concealing losses associated with

individual acquisitions, while publicly touting the success of its zealous acquisition strategy, all while failing to disclose the insider nature of some of these transactions—Defendants misrepresented J2's true health as a business and, in turn, artificially inflated its stock price. In reality, most of its acquisitions involved overpaying for stagnant, hollow, or otherwise unprofitable companies. Simply put, J2 has touted a strategy of acquiring solid companies capable of independent organic growth and succesfully integrating them with companies in the same or similar industry, whereas the truth is that J2 frequently acquired junk, to enrich Defendants, corporate insiders and other of their associates tied to that junk.

6. The Class Period starts on October 5, 2015, when J2 announced in a press release that it had completed nine acquisitions in the third quarter of 2015 ("3Q15"), including the intellectual property of "VDW (Netherlands)" (the "VDW Acquisition"). What J2 failed to disclose was that the VDW Acquisition was of an 11-month-old consulting business registered to the personal residence of a long-time corporate insider, former Vice President ("VP") of Corporate Development Jeroen **v**an **d**er **W**eijden, and had no other employees, but cost J2 approximately $900,000. In May 2014, van der Weijden had become a director of J2 Global UK Ltd. ("J2 UK"), an arm of J2 Global Ireland Limited ("J2 Ireland"), which was ultimately owned by J2. He started VDW just six months later and proceeded to orchestrate the VDW Acquisition ten months later, while working for J2. No conflict was disclosed. As subsequently revealed, van der Weijden sourced and handled dozens of acquisitions by J2 – to the tune of over 135 of J2's 186 Mergers and Acquisitions ("M&A") transactions. But his incentive package was based on the number of deals he closed, rather than on the substance. Consequently, he was incentivized to close deals. Regardless of whether J2 overpaid, the acquisition enriched van der Weijden at J2's expense, or was otherwise bad for J2's business. While Defendants touted a strategy of successful acquisitions of profitable companies posing organic growth, van der

Weijden focused solely on the number of deals, as well as insider transactions for personal profit.

7. But van der Weijden was just one component of J2's rampant, improper insider dealings. In 2017, J2's Board of Directors (the "Board") authorized the use of shareholder funds to invest $200 million in a fund associated with Orchard Capital Corp. ("Orchard Capital").[1] Orchard Capital is an investment venture founded by Richard S. Ressler, J2's Board Chairman. It has also paid Brian Kretzmer, a J2 Board member and chair of its Audit Committee ("AC"), to do M&A work. As part of the deal, J2 provided nearly 77% of the fund's equity. Yet Ressler remains Orchard Capital's majority equity owner and has "continue[d] to oversee companies in which Orchard" Capital or its affiliates invest. Furthermore, J2 paid an Orchard Capital affiliate – the principals of whom are Defendant Zucker, Ressler and Zohar Loshitzer (J2's Executive Vice President ("EVP") of Corporate Strategy) – over $65 million in management fees across 2018 and 2019. Multiple J2 insiders enriched themselves in connection with Orchard Capital and that transaction with J2.

8. Yet, there was no business justification for J2's investment. The Orchard Capital affiliate that received $65 million was in the same business as J2—investing in and acquiring companies—but it had a thin investing record comprised of primarily failed companies. And those companies also had Defendant Zucker, Ressler, Loshitzer and/or their associates in executive or Board positions. J2's transaction, therefore, had no observable benefit to J2's shareholders but enriched J2 insiders.

9. In addition to obfuscating the web of related parties who stood to benefit from its acquisitions, J2 has concealed the underperformance of acquired assets – particularly international ones. J2's goodwill should rise and fall with the value of those acquired businesses, yet J2 steadfastly refuses to take impairments or otherwise

[1] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); (J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).

disclose the underperformance of those acquired businesses in its financial statements – notwithstanding how they perform. The lack of impairments misleadingly signals to investors that the acquisitions were properly valued and are performing well.

10. For example, J2 Ireland took a €22.1 million charge in 2015 and subsequently saw its revenue decline 27% over the following three years, with operating income plummeting from €5.2 million to ***negative*** €11.5 million.[2] Yet J2, as the parent company, has taken no related goodwill charge and has made no related disclosures in its financial statements. Instead, Defendants maintain that J2's"organizational approach to M&A is very solid" and its "track record has been remarkable," and have not conveyed to investors that the acquisitions integrated into J2 Ireland were bad deals that are hurting J2's bottom line.

11. Similarly, the revenue of J2's largest acquisition ever – Everyday Health Group ("Everyday Health") – tanked over 32% in the first year after being acquired, from $254 million to $171 million. It has yet to reach pre-acquisition levels despite five subsequent acquisitions – and their revenues – being folded into the division. But J2 still has not written off any of the $27 million in now worthless goodwill that it recorded at the time of the Everyday Health acquisition.

12. Instead of providing the truth owed to investors, J2 has obscured the real performance of acquired companies and, in turn, the holes in J2's acquisition system. Using writeoffs, divestures, and acquisitions at the subsidiary or division level, J2 has concealed information about the specific performance of any individual acquisition, leaving the market in the dark about the true strength of J2's acquisition system – touted by Defendant Shah as the Company's "single great competitive advantage."[3]

---

[2] Hindenburg Research, J2 Global: Troubling Related Party Transactions, Looing Impairments And A Suspicious History Of Insider Enrichment Spanning Decades (June 30, 2020), https://hindenburgresearch.com/j2-global/ (last visited Nov. 18, 2020).

[3] YouTube, Vivek Shah talks about what he looks for when searching for a successful acquisition (Feb. 13, 2020), https://www.youtube.com/watch?v=g5hakF4CABQ&feature=youtu.be&t=232 (last visited Nov. 18, 2020).

Indeed, what Defendants portrayed as a strong system of vetting, acquiring and integrating organically growing businesses was actually a scattershot approach of purchasing anything for any price while enriching insiders and banking on the success of enough of the acquired companies to conceal the enormous failure of the others. This actual strategy was never disclosed to investors.

13. The truth began to be revealed when, before the market opened on March 10, 2016, Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)!" (the "Citron Report").[4] The Citron Report revealed that J2, among other issues, (i) "no longer wants acquisitions, it needs acquisitions" (emphasis in original) (ii) "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or usless assets that have all been acquired with terms undisclosed;" and (iii) "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating."

14. On this news, shares of J2 plummetted $14.09 per share, or nearly 20%, to close at $56.90 per share on March 10, 2016 on unusually heavy trading, damaging investors.

15. Then, before the market opened on June 30, 2020, Hindenburg Research published a report entitled "J2 Global: Troubling Related Party Transactions, Looming Impairments and A Suspicious History of Insider Enrichment Spanning Decades" (the "Hindenburg Report").[5] The Hindenburg Report revealed that J2 had, among other issues: (i) misrepresented and/or failed to disclose that its "opaque acquisition approach has opened the door to egregious insider self-enrichment,"

---

[4] Citron Research, *Citron Exposes Dirty Secrets of j2 Global (JCOM)!* (Mar. 10, 2016), https://citronresearch.com/wp-content/uploads/2016/03/JCOM-final-b20.pdf?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link (last visited Nov. 18, 2020).

[5] *Supra* note 2.

including Defendant Zucker, and "found obvious red flags" which called into question "every one of the 135 deals" that van der Weijden oversaw; (ii) "masked" the underperformance of acquisitions by utilizing "tricky accounting" such as "multiple material goodwill impairments [in subsidiary filings] that don't appear to coincide with parent financials" and "[o]bfusact[ing]" the financials of J2's largest acquisition, Everyday Health "Through A Series of Acquisitions and Divestures;" and (iii) failed to disclose "decades of intertwined financial interests between board members and executives," which called their "independence into question."

16. On this news, shares of J2 fell $6.29 per share, or over 9%, to close at $63.21 per share on June 30, 2020 on unusually heavy trading, damaging investors.

17. Throughout the Class Period, Defendants made materially false and misleading statements regarding J2's business, operations and internal controls. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) J2 has been engaging in a secret pattern of enriching corporate insiders, including Defendant Zucker, through its acquisitions, of which approximately 73% were sourced and handled by a corporate insider whose only incentive was the number of deals – not their quality or suitability; (ii) J2 has been hiding unsuccessful acquisitions by not taking impairment charges related to them on its financial statements, even when they have materially underperformed, thereby allowing Defendants to mislead investors about the strength of its acquisition system; (iii) since several so-called independent members of J2's Board and audit committee were not disinterested, multiple acquisitions were approved that were overvalued and/or did not line up with the Company's publicly stated goals; and (iv) as a result of the foregoing, J2's public statements were materially false and misleading at all relevant times.

18. As a result of Defendants' false and/or misleading statements, J2 common stock traded at inflated prices during the Class Period. After disclosure of Defendants'

false and misleading statements and/or materialization of Defendants' concealed risks, J2 stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Lead Plaintiff and the Class.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, J2 is headquartered in this Judicial District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

23. Lead Plaintiff Espy acquired J2 common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged disclosures and/or materialization of Defendants' concealed risk.

24. Defendant J2 is incorporated in Delaware and headquartered in Los Angeles, CA. J2's common stock trades on the NASDAQ under the ticker symbol "JCOM."

25. Defendant Shah has served as the Company's Chief Executive Officer ("CEO") since January 2018. Prior to being promoted, he had been the CEO of Ziff Davis LLC, J2's digital media business. Prior to J2's acquisition of Ziff Davis, LLC ("Ziff Davis") in 2012, Shah had partnered with a private equity firm to purchase it himself. He holds a Bachelor of Arts degree in political science from Tufts University.

26. Defendant Zucker co-founded the company in 1996. He served as the Company's CEO from May 2008 until December 2017. Prior to that he had served in various management roles including as J2's President, Chief Operating Officer ("COO"), CMO and Chief Financial Officer ("CFO") –. During his tenure, Zucker purportedly executed over 160 acquisitions, making J2 one of the U.S.'s most acquisitive tech companies and growing J2's revenue to over $1.1 billion. He holds a Bachelor of Arts degree in Economics from Tel Aviv University.

27. Defendant Turicchi joined J2 in March 2000 as EVP of Corporate Development. Since August 2014, he has served as the Company's President and CFO. Prior to that, he held various management roles at J2, including CFO, co-president and president. Turicchi holds a bachelor's degree in Mathematics and Economics from Claremont McKenna College. During the Class Period, he oversaw all of J2's finance, M&A activity, and public matters.

28. Defendants Shah, Zucker, and Turicchi are collectively referred to hereinafter as the "Individual Defendants."

29. Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about J2's business, operations, operational trends, controls, markets, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, including the Executive Committee.

30. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, controls, growth, products and present and future business prospects as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and/or misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

31. As officers and controlling persons of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products, markets, management, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information. Defendants' false and/or misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. The Individual Defendants, because of their positions of control and authority as Officers and Directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements

pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance or had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

33. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of J2 shares by disseminating materially false and/or misleading statements and/or concealing material adverse facts.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

34. J2 purports to be a leading Internet information and services company consisting of a portfolio of brands across its two divisions: Digital Media and Cloud Services.[6]

35. The Cloud Services business entails business that offer services like online fax, online backup, e-mail, encryption and other subscription-based cloud services. The Digital Medial business focuses on advertising and sponsorships, subscription and usage fees, performance marketing and licensing fees.

36. J2 also purports to be an active acquirer of businesses in media, technology and Internet services, having deployed approximately $3 billion of acquisition capital to acquire 186 businesses since its founding in 1995.[7]

37. Because J2's business model relies heavily on acquisitions for growth, its success requires paying fair market value to acquire companies and for those companies to continue to be at least as profitable as when J2 values and acquires them.

---

[6] J2 Global, Inc., Quarterly Report (Form 10-Q), at 16 (May 11, 2020).
[7] J2 Global, Inc., https://www.j2global.com/about/ (last visited Nov. 18, 2020).

As Defendant Shah stated on February 6, 2018, "[b]eing able to acquire established brands at attractive prices is a main component of our M&A program." In other words, J2 is not the business of buying undervalued companies and adding value, or otherwise organically growing, those companies.

38. Despite conducting unrelenting acquisitions since 1995, J2 has *never* taken a goodwill impairment related to any of its acquisitions, thereby indicating to investors that it has either never overvalued goodwill at the time of purchase and/or the aquired assets have never underperformed their expectations.

### B. Relevant Accounting Policies and Principles

#### *1. GAAP requirements generally*

39. Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

40. The SEC requires public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

41. Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. § 210.10-01(a).

### *2. Materiality*

42. As a publicly traded company, how J2 should apply materiality to its financial statements is guided by SEC Staff Accounting Bulletin: No. 99 – Materiality ("SAB 99"). Materiality is based on whether a reasonable person relying upon J2's public statements would have been changed or influenced by the inclusion or correction of the information at issue. According to SAB 99, qualitative and quantitative factors should be considered in determining materiality.

43. The Financial Accounting Standards Board ("FASB") Amendments to Statements of Financial Accounting Concepts No. 9 ("Concept No. 9") issued in August 2018 clarified the concept of materiality. Concept No. 9 states that "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

### *3. Related party transactions*

44. J2 was required, under GAAP and SEC Regulation S-X, to make specific disclosures pertaining to related party transactions.

45. SEC Regulation S-X requires:

> (1) ***Related party transactions…should be [identified and the amounts] stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows***.[8]
>
> (2) In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries[, separate disclosure shall be made in such statements of the amounts in the related consolidated financial statements which are (i) eliminated and (ii) not eliminated. Also,] any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.

---

[8] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

17 C.F.R. § 210.4-08(k).

46. In addition, FASB Accounting Standards Codification ("ASC") 850 applies. Related parties are said not to be acting at arm's length because of the special inherent relationship between them. Because this special relationship can create a conflict of interest that can benefit related parties, withholding information about material related party transactions makes financial statements unreliable and prevents the true picture of an entity from being represented. Thus, disclosure is required so users of financial statements can evaluate the significance of these transactions and make an informed decision

47. FASB ASC 850, requires companies to disclose the following for material related party transactions:

- The nature of the relationships involved;
- A description of the transactions, including transactions where no amounts or nominal amounts are involved, for each of the reporting periods where income statements are presented; additionally, other information deemed necessary to gain an understanding of the effects of the transactions on the financial statements should be disclosed;
- The dollar amounts of the transactions for each of the reporting periods where income statements are presented along with the effects of any change in the method of establishing the terms of the transactions when compared to the method used in the preceding reporting period;
- Amounts due to or from related parties as of each financial statement date and, if not otherwise apparent, the terms and manner of settlement related to those amounts.

**C. Statements by a Former Employee**

48. Former Employee ("FE") 1, joined J2 as a General Manager in January 2015 and was made Managing Director, Australia & New Zealand at the end of 2015,

which he remained until he left in April 2017. FE1 was based in Melbourne, Australia and initially reported to VP of International Marketing & GM, Tim McLean, until McLean was forced out. FE1 then reported to Defendant Zucker for a short time before reporting to Harmeet Singh who was made President of Cloud Services.

49. FE1 met and worked with van der Weijden when van der Weijden came to Australia for meetings. FE1understood that van der Weijden "was responsible for globally identifying potential acquisitions to add on the core business" and "head[ed] the M&A function."

50. FE1 was also informed that van der Weijden had an incentive package that was based on the number of deals he brought in that closed; the deals did not have to be good or make sense, but they had to be approved by the Board. FE1 had held a similar role at another company and explained that out of 20 deals you look at, one might be of value, so if you chase after the other 19, the company will end up buying "stupid things." FE1 stated that van der Weijden's incentives did not always line up with J2's goals as a company, but it was well known around the Company that this was his role and he was doing exactly what Defendant Zucker wanted him to do.

51. FE1 stated that this incentive structure was concerning because at J2, information flow from acquisition to integration was limited and the practice was to just hand the acquired company to the person responsible for that area. In FE1's opinion, J2 was "atrocious" about buying businesses and not integrating them at the global level. FE1 confirmed that J2 followed some of the methods and approaches of private equity firms when acquiring companies, but not when it came to the integration. So, people in similar roles as van der Weijden at private equity firms are typically required to take more of an operating role in the newly acquired company so that they are involved in the integration, ensuring the knowledge obtained while conducting due diligence on the business and competition is retained by the new

business. But at J2, van der Weijden did not have to be around to clean up the mess if an acquisition did not work out.

52. J2 acquired at least three businesses in the Australia/New Zealand market, the first of which was Web24.[9] Based on FE1's knowledge of the hosting industry and experience actively acquiring hosting firms for six years prior to joining J2, it was FE1's opinion that J2 paid too much for Web24. The second acquisition was of a small Sydney-based hosting company, AUSweb, for under a million dollars.[10] FE1 believed van der Weijden overvalued the deal because the income van der Weiden reviewed at the time he was vetting the deal was several months out of date as the company had been moving its customer base, and the income was not re-reviewed at the time of the acquisition. FE1 was just told the deal was done and to integrate it, which FE1 did and only then learned that revenues were not what van der Weijden said they were. FE1 made the decision to shut down the AUSweb brand after tracking customer revenues and subscription revenues for 12 months, and integrated everything into Web24. Based on FE1's understanding, the financial integration was done at the J2 Australia subsidiary level and even though J2 Australia was reported into the United States, there was no visibility or transparency outside of J2 as to specific transactions.

53. FE1 was told not to talk publicly about new acquisitions, how much was paid for them, or how they were performing. FE1 was further told that not publicly talking about new acquisitions was intentional and deliberate by the Board because

[9] Press Release, Business Wire, *J2 Global Acquires Web24 Group Pty Ltd.* (Sept. 22, 2014), https://www.businesswire.com/news/home/20140922005050/en/j2-Global-Acquires-Web24-Group-Pty-Ltd. (last visited Nov. 18, 2020).

[10] Press Release, Business Wire, *J2 Global® Completes Four Acquisitions in Q4 of 2015 – 24 Acquisitions in FY 2015* (Jan. 14, 2015), https://www.businesswire.com/news/home/20160114005016/en/j2-Global%C2%AE-Completes-Four-Acquisitions-in-Q4-of-2015- (last visited Nov. 18, 2020).

then, analysts could not track individual entities, they would have to track the consolidated entity.

54. On October 12, 2017, J2 announced the sale of its Australian hosting business, which had integrated AUSweb and other small hosting companies into Web24.[11] Because the terms of these acquisitions have never been disclosed to the market, investors have no idea how successful J2's integration efforts were and what savings and synergies, if any, were created by J2.

55. Without providing more information about how J2 Australia has been performing in J2's financial statements, the market has been unable to accurately gauge the strength of J2's acquisition system or strategy.

**D. Acquisitions Enriching J2 Insiders**

***1. The Pre-Class Period Jump Acquisition***

56. Based on his LinkedIn page, van der Weijden was the VP of Corporate Development of J2 from September 2009 to August 2018. During his tenure, he purportedly "[m]anag[ed] client relationships at the ***C-level***, including the identification and pursuit of new business opportunities via existing networks, as well as through developing new relationships and providing technical valuation advice."[12]

57. Van der Weijden also purportedly "[s]ourc[ed] and handl[ed] over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow-up and reporting."[13] Based on J2 having purportedly acquired 186 businesses since 1995, van der Weijden has sourced and handled nearly 73% of the Company's acquisitions.

---

[11] Press Release, Business Wire, *J2 Global Completes Two Acquisitions in Q3 2017; Announces Two Additional Divestitures; Updates 2017 Guidance* (Oct. 12, 2017), https://www.businesswire.com/news/home/20171012005480/en/j2-Global-Completes-Acquisitions-Q3-2017-Announces (last visited Nov. 18, 2020).

[12] Jeroen van der Weijden, LINKEDIN, https://www.linkedin.com/in/jeroen-van-der-weijden-2331a7/ (last visited Nov. 18, 2020.)

[13] *Id.*

58. In March 2004, J2 paid $1 to $2 million to acquire Jump B.V., a Netherlands-based provider of fax-to-email and unified messaging services founded by van der Weijden.[14]

59. In March 2014, Jump was reorganized as J2 Global (Netherlands) B.V. and registered to van der Weijden's personal residence (Pieter Pauwstraat 2 A-I 1017ZJ Amsterdam). Dutch real estate records confirm that the 400 square feet residence belonged to van der Weijden.

***2. The VDW Acquisition***

60. During 3Q15, J2 then acquired the intellectual property of "VDW (Netherlands)," at which time van der Weijden was its sole employee[15] and was barely in the process of commencing its licensing program. J2's only disclosure regarding the VDW Acquisition was a press release on October 5, 2015 announcing the acquisition of nine business which "will grow the Company's global customer base, provide access to new markets and expand j2's product lineup." The press release simply listed "VDW (Netherlands)" under "Intellectual Property."[16] There was no mention of the conflict.

61. J2's Form 10-K for fiscal year ("FY") 2015 did not identify, provide the purchase price, or otherwise give any additional color on the VDW Acquisition. In its June 30, 2020 response to the Hindenburg Report ("J2 Response")—*i.e.*, five years after the acquisition—J2 for the first time confirmed that it had paid van der Weijden

---

[14] J2 Global Communications, Inc. Quarterly Report (Form 10-Q), at 8 (Aug. 9, 2004); The Globe and Mail, *J2 Global to acquire Electric Mail* (Jan. 22, 2004), https://www.theglobeandmail.com/technology/j2-global-to-acquire-electric-mail/article20427196/#:~:text=22%20%2D%20The%20Electric%20Mail%20Company,Global%20will%20pay%20to%20Electric (last visited Nov. 18, 2020).

[15] *Supra* note 4.

[16] Press Release, BusinessWire, *J2 Global Raises Guidance* (Oct. 5, 2015), https://www.businesswire.com/news/home/20151005005526/en/j2-Global%C2%AE-Raises-Guidance (last visited Nov. 18, 2020).

approximately $900,000 for his "Intellectual Property."[17]

62. Based on Dutch corporate records, the full name of the company was Van der Weijden M&A Consultancy BV and it had been set up just eleven months earlier (December 2014) under van der Weijden's name and registered to his personal residence (Pieter Pauwstraat 2 AH 1017ZJ Amsterdam). Those same records confirm the company had zero "Working people," *i.e.*, employees, that its activities included the "[m]anagement and operational management consultancy," and that it was dissolved in October 2019, shortly after van der Weijden left J2.[18]

63. Approximately one month after the VDW Acquisition, van der Weijden purchased a "Studio City Hills Estate" in California for $2.5 million which came with a solar heated saltwater pool, tennis court, gym and steam room.[19]

64. Despite van der Wieijden's LinkedIn profile and the Dutch corporate records demonstrating otherwise, J2's Response on June 30, 2020 claimed that van der Weijden was a consultant for J2 from 2004 until his consulting business was acquired by J2 in 2015, after which time he became a full-time employee of J2. Coincidentally, 2004 was when J2 acquired Jump.[20]

65. Furthermore, publicly available documents in the UK show that from May 2014 to January 2016, van der Weijden was a director of J2 UK, an arm of J2 Ireland, which was ultimately controlled by J2.[21] Indeed, van der Weijden signed the

---

[17] Press Release, Business Wire, *J2 Global Responds to False Claims and Distortions in Short-Seller "Research" Report* (June 30, 2020), https://www.businesswire.com/news/home/20200630006133/en/J2-Global-Responds-False-Claims-Distortions-Short-Seller (last visited Nov. 18, 2020).

[18] Van der Weijden M&A Consultancy BV, https://www.oozo.nl/bedrijven/amsterdam/de-weteringschans/frederikspleinbuurt/1066039/van-der-weijden-m-a-consultancy-b-v (last visited Nov. 18, 2020).

[19] Zillow, https://www.zillow.com/homedetails/11920-Laurel-Hills-Rd-Studio-City-CA-91604/20030283_zpid/ (last visited Nov. 18, 2020).

[20] *Supra* note 17.

[21] Steve Goldstein, Market Watch, *Under attack from short seller, J2 Global says it bought company from a consultant – documents indicate there's more to the story* (July 7, 2020),

company's statement of director responsibilities on March 6, 2015 "on behalf of the board" of J2 UK.[22]

66. Thus, indisputable public records show that van der Weijden set up his consulting company just six months after becoming a director of a J2 subsidiary, and that—just 11 months later— and while still a director of that J2 subsidary, sold that new business, with no employees, and no office, to J2 for $900,000.

67. Because, *inter alia*, Defendants chose to disclose the VDW Acquisition, they had a duty to fully disclose that a related party was involved in the transaction. But they failed to do so.

### *3. The $200 Million Investment in Orchard Capital*[23]

68. Ressler has been the Board Chairman and a director of J2 since 1997. He also served as J2's CEO from 1997 to 2000.

69. Ressler is the majority equity holder of the investment fund OCV Fund I, LP's ("the Fund") General Partner, OCV I GP, LLC ("OCV I"). He is also the majority equity holder of the Fund's manager, OCV Management, LLC ("OCV") located at 4700 Wilshire Blvd., Los Angeles, CA 90010.[24]

70. Ressler is also the founder and President of Orchard Capital, an investment fund, and uses OCV as an affiliate through which he oversees companies in which Orchard Capital or its affiliates invest.

---

(https://www.marketwatch.com/story/under-attack-from-short-seller-j2-global-says-it-bought-company-from-a-consultant-documents-indicate-theres-more-to-the-story-2020-07-06?mod=newsviewer_click (last visited Nov. 18, 2020).

[22] J2 Global UK Limited, *Abbreviated Financial Statements*, **Accounts for a small company** made up to 31 December 2013 (Mar. 25, 2015), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=1 (last visited Nov. 18, 2020).

[23] For the Court's convenience Plaintiff has appended a summary of the long and complex relationships between these allegedly "independent directors" and incorporates it herein. *See* **Appendix A.**

[24] Bloomberg, OCV Management LLC, https://www.bloomberg.com/profile/company/1491771D:US (last visited Nov. 18, 2020); OCV Team, http://ocvpartners.com/team/ (last visited Nov. 18, 2020).

71. On September 25, 2017, the Board and AC authorized J2 to invest $200 million in the Fund ("Orchard Investment"). At that time, Defendant Zucker was J2's CEO, Ressler was J2's Board Chairman, and Loshitzer was an EVP at J2.[25] J2 made paltry limited disclosures that Ressler and Zucker held significant equity and management powers in OCV and OCV 1 GP. As detailed below, however, these disclosures were nowhere near sufficient, failed to disclosue the true extent of the relationships, the board's lack of independence, and the true extent of the plan to eventually take this money for themselves.

72. Loshitzer has served as J2's EVP of Corporate Strategy since 2001 and had served as J2's Chief Information Officer from 1997 to 2001. Loshitzer has also been a principal of OCV since 2005.[26]

73. Just three days after J2 made the Orchard Investment, on September 28, 2017, J2 named Defendant Shah CEO of J2 and announced that Defendant Zucker would be joining OCV as a co-managing principal – both effective January 1, 2018.[27] Shah's incredible compensation, granted nearly simultaneously with the $200 million being diverted from J2 to insiders, is a major red flag. Specifically, inaddition to Defendant Shah's $1 million annual salary, the Company's Compensation Committee established the "Shah Equity Award", awarding Mr. Shah an upfront long-term equity award, consisting of 400,000 stock options, 400,000 performance-based restricted shares, and 200,000 time-based restricted shares "to incentivize Mr. Shah during his tenure as [CEO]." Through this promotion, Defendant Shah realized a ***total***

---

[25] J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).

[26] Presbia.com, *Zohar Loshitzer, Executive Chairman and Executive Officer*, https://presbia.com/presbia-team/#direct (last visited Nov. 18, 2020).

[27] Press Release, Business Wire, *J2 Global Announces Vivek Shah to Become Chief Executive Officer in January 2018* (Sept. 28, 2017), https://www.businesswire.com/news/home/20170928005358/en/j2-Global-Announces-Vivek-Shah-Chief-Executive (last visited Nov. 18, 2020); J2 Global, *Vivek Shah, Chief Executive Officer*, https://www.j2global.com/about/leadership/vivek-shah/ (last visited Nov. 18, 2020).

***compensation of more than $45 Million*** for 2018. For perspective, Defendant Zucker only saw a total compensation of just over $5 Million for 2017.

74. Pursuant to an agreement between J2 and the Fund (the "Investment Agreement"), the Fund has purportedly invested in or acquired other companies on behalf of J2 – using the funds provided by J2.[28] As detailed below, many of these subsequent investments and acquisitions have involved insiders, but contained none of the required disclosures. In essence then, J2's commitment of $200 million to OCV (where there was some limitted, but deficient disclosure) appears to have been a patent attempt to hide how that $200 million account would later be used to enrich insiders. Defendants rationale being, apparently, that once the money left J2 in the OCV transaction, subsequent use of the money wouldn't be scrutinized.

75. In addition to this $200 million "investment," J2 has been required to pay OCV millions of dollars in management fees each year pursuant to an agreement between J2 and OCV. Specifically, J2 paid OCV over $36 million in 2018 and $29 million in 2019.[29]

76. The AC, comprised of Chairman Kretzmer and committee members Stephen Ross, Jon Miller, and Scott C. Taylor, approved the Investment Agreement. Kretzmer and Ross, published by J2 to be "independent" directors, both had multiple overlapping business relationships with Ressler and each other.[30]

77. Kretzmer was elected to the Board in July 2007 and held out as an "independent" director. *Id*. Despite this alleged "independence," his firm, Kretzmer

---

[28] J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).

[29] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); OCV Fund I, L.P., *Second Amended and Restated Limited Partnership Agreement, Exhibit 10.9*, https://www.sec.gov/Archives/edgar/data/1084048/000108404818000001/jcom20171231ex-109.htm (last visited Nov. 18, 2020).

[30] Press Release, Business Wire, *J2 Global Names Two Additional Independent Directors* (July 30, 2007), https://www.businesswire.com/news/home/20070730005210/en/j2-Global-Names-Additional-Independent-Directors (last visited Nov. 18, 2020); Mai Systems Corp., Schedule 14C, at 9 (Mar. 24, 2004).

Consulting, did M&A consulting for Orchard Capital between 2016 and 2017. That work consisted of identifying acquisition opportunities and assisting with acquisition due diligence/agreements. Further, in February 2018, mere months after approving the Orchard Investment, Kretzmer became an independent director for CIM Real Estate Finance Trust Inc., a company founded by Ressler.[31] None of this was ever disclosed by J2.

78. Kretzmer also shared a long business history with Ressler, Loshitzer, and Ross. Specifically, Kretzmer was the CEO of MAI Systems Corporation ("MAI") from 1999-2006 while Ressler was Chairman and Loshitzer and Ross were directors. This wasn't disclosed by J2.

79. Ross, also held out to be "independent," wasn't either. Beyond being a director at MAI, Ross also chaired a special committee that approved a reverse stock split deal which explicitly benefited Ressler. The deal increased Orchard Capital's ownership in MAI at the expense of public investors by decreasing liquidity. Further, when the reverse stock split deal was approved, Ross's son, Avidan Ross, was employed at CIM Group, Inc. ("CIM Group"), another company co-founded by Ressler. After the approval, Ross's son became CIM Group's Chief Technology Officer. CIM Group manages CIM Commercial Trust Corp. ("CMCT"), where Ressler is the Chairman, two J2 Directors (Douglas Bech and Robert Cresci) are also directors, and its headquarters are registered to the same address as Ressler's other company, OCV (4700 Wilshire Blvd., Los Angeles, CA, 90010).[32] Unsuprisingly, J2 has never disclosed these relationships either.

---

[31] Mai Systems Corp., Annual Report (Form 10-K), at 19 (Apr. 15, 2002).

[32] Mai Systems Corp., Schedule 14C, at 9 (Mar. 24, 2004); OCV Management, LLC, Contact, http://ocvpartners.com/contact/, (last visited Nov.18, 2020).

80. As principals of OCV, Defendant Zucker, Ressler, and Loshitzer have, and continue to, profit handsomely from the management fees J2 pays OCV each year.[33]

81. There was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies, so investing in another private equity company doesn't seem to serve much purpose.

82. That's expecially the case since OCV had a sparse, indeed poor, track record of investing in companies – many of which, unsuprisingly continued the incestuous pattern of self-enrichment described above. Indeed, OCV had just been formed a year prior to J2's $200 million funding commitment.

83. For example, one of the companies Orchard Capital had invested in was Universal Telecom Services, Inc. ("Universal Telecom"). Universal Telecom, however, had already been dissolved by December 2016. Further, Defendant Zucker was the failed company's President and CEO, Loshitzer was an officer, and Kretzmer's consulting firm had consulted for it.[34] Another example is Orchard Capital's investment in Presbia PLC ("Presbia"), which went public in 2015,[35] but filed for delisting and registration termination in 2019. Unsuprisgingly, Presbia's board included Ressler and Loshitzer as well as Cresci (a J2 board member) and Mark Yung (OCV's managing principal). It didn't end there. Defendant Zucker was a board member and the CEO of Presbia's parent company (Presbia Holdings). And Loshitzer was the CEO of two entities related to Presbia: (i) PresibiBio, LLC, (which had the

---

[33] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); OCV FUND I, L.P., Second Amended and Restated Limited Partnership Agreement (Exhibit 10.9), at 2 (Jan. 19, 2018).
[34] *Supra* note 2.
[35] Nasdaq, *Presbia prices IPO at $10, below the range* (Jan. 20, 2015), https://www.nasdaq.com/articles/presbia-prices-ipo-10-below-range-2015-01-29 (last visited Nov. 18, 2020).

same address as J2); and (ii) Presbia Coopertief, U.A., (which used van der Weijen's personal residence at its address).[36]

84. As a final example, Orchard Capital invested approximately $12M into Red Carpet Home Cinema ("Red Carpet"). Unsurprisingly, Red Carpet was a new startup formed by Ressler's nephew (Benjamin Black) where both Defendant Zucker and Ressler served as board members. Even more strikingly, however, is that Orchard Capital's substantial investment was made on the same day Red Carpet was founded and before it had any revenue at all.[37] This violated OCV Fund's own guidelines, which states that it invests $5 million to $20 million in companies that "***[d]emonstrate revenue traction of $5+ million*** with unique intellectual property for information technology, e-commerce, media and telecommunications, and clean technology."[38] Red Carpet's business strategy targets a very narrow market, is quite questionable, and two prior companies offering similar services (Screening Room and Prima Cinema) have failed.[39] Predictably, it likely needed more capital. Which would explain why the first capital call from OCV fund to J2 coincided with Black working for OCV as a Principal and then leaving to be Red Carpet's CFO.[40]

85. One look at OCV's current "portfolio"[41] demonstrates this insider dealing and enrichment hasn't slowed. For example, OCV's "portfolio" of companies include: Techstyle Fashion Group which has Don Ressler as one its Co-CEOs; By

---

[36] Presbia Brochure, https://presbia.com/media/LBL-50-009-F-MICROLENS-PATIENT-BROCHUREOUS-ENGLISH-compressed.pdf (last visited Nov. 18, 2020).

[37] Secretary of State, *Application to Register LLC*, https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=201827510259-24932229 (last visted Nov. 18, 2020); Red Carpet Home Cinema, https://www.redcarpethomecinema.com/how-it-works (last visited Nov. 18, 2020); J2 Global, Inc., Quarterly Report (Form 10-Q), at 45 (May 10, 2018).

[38] OCV Strategy, http://ocvpartners.com/strategy/ (last visited Nov. 18, 2020).

[39] Brandon Katz, Observer, *Will Hollywood Ever Allow Us to Stream New Theatrical Releases at Home? (Apr. 18, 2019)*, https://observer.com/2019/04/streaming-vs-movies-box-office-screening-room/ (last visited Nov. 18, 2020).

[40] J2 Global, Inc., Quarterly Report (Form 10-Q), at 45 (May 10, 2018).

[41] http://ocvpartners.com/portfolio/

Heart, SafeBreach, and Social Native which all include Defendant Zucker on their board of directors. Red Carpet Home Cinema has both Zucker and Ressler on its board.

86. Accordingly, unbeknownst to investors, the Orchard Investment heavily benefitted Defendant Zucker and corporate insiders Ressler and Loshitzer through the millions of dollars in management fees J2 has been required to pay as well as the continued funding of Defendant Zucker, Ressler, and Loshitzer's ventures.

87. Because Defendants chose to disclose the Orchard Investment and were paying OCV millions of dollars in management fees, they had a duty to fully disclose that related parties were involved not only in the Orchard Investment, but that related parties were involved in the companies OCV was investing in. Their failure to do so appears to have been a clear attempt to siphon off a fund of $200 million into a personal slush fund that would not be subject to the transparency required of J2's funds. Plaintiff has attached a chart reflecting the web of related parties to this complaint as **Appendix B** and incorporates it herein.

**E. Hiding Underperforming Acquisitions**

88. J2 has been able to hide underperforming acquisitions – particularly international ones – by not taking impairment charges related to them on its financial statements even after the acquired assets failed to generate the financial results that were expected of them at the time of purchase.

89. J2 has been able to get away with this scheme for years because as Defendants well know, the market can only analyze what they have disclosed, which is the Company's consolidated, rolled up financials. Any potentially impaired assets or losses on any individual acquisition may not technically be material on its own and thus would not be disclosed.

90. As an investor relations representative of J2 informed Hindenberg Research, "[a]ll these tuck in acquisitions, they kinda just get shoved in to the broader

J2 umbrella, within the business unit, within the division – and they don't really get tracked anymore. It's impossible to track the revenue that derives from 'Acquisition Y' versus what was there before. And the costs of course get blended together. It's really hard to track some of these tuck-in M&A."

### *1. The material underperformance of J2 Ireland*

91. On May 15, 2014, while van der Weijden resided in the Netherlands, he was appointed to be a director of J2 UK, an arm of J2 Ireland, which was ultimately controlled by J2.[42] He remained a director until January 13, 2016.[43]

92. Based on international filings, J2 Ireland was a wholly owned subsidiary of J2 Holdings, which was an Irish company ultimately controlled by J2.

93. In 2015, J2 Ireland took a €22.1 million charge, but J2 Holdings took zero impairments that year. Nor did J2 disclose anything regarding this goodwill impairment charge in its financial statements for 2015.

94. Subsequently, J2 Ireland showed significant declines in both revenue and operating income from 2016 to 2018:

| **J2 Ireland** | **2016** | **2017** | **2018** |
|---|---|---|---|
| Total Revenue ($USD)[44] | $101,693,900 | $103,806,820 | $82,379,151 |
| *y/y growth* | | *2.1%* | *(20.6%)* |
| Operating Income | $5,556,217 | ($11,879,064) | ($13,298,722) |

[42] J2 Global UK Ltd., **Appointment** of Jeroen Clemens Maria Van Der Weijden as a director (June 13, 2014), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=2 (last visited Nov. 18, 2020).

[43] J2 Global UK Ltd., **Termination** of Jeroen Clemens Maria Van Der Weijden as a director (Jan. 13, 2016), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=1, (last visited Nov. 18, 2020).

[44] Converted to US dollars from Euros.

95. This decline in revenue and operating income reflects the deterioration in value of European assets in subsidiaries of J2 Ireland:

| Revenue - $USD | 2016 | 2017 | 2018 |
|---|---|---|---|
| Livedrive | $25,388,640 | $25,588,840 | $23,838,984 |
| Comendo | $8,474,978 | $6,303,502 | $4,799,112 |
| Callstream | $7,348,775 | $10,065,193 | $8,354,168 |
| WeCloud | $4,915,197 | $5,878,372 | $3,614,333 |
| Stay Secure | $4,589,518 | $4,019,575 | $4,699,162 |
| City Numbers | $4,054,081 | $4,279,035 | $4,641,225 |
| Keepitsafe | $1,589,128 | $1,012,470 | $740,162 |

96. Yet as of December 31, 2018, J2 Holdings still had a goodwill balance of $4.3 million (calculated based on the cost of goodwill being $24.6 million with a provision for diminution in value of $20.3 million). J2 Holdings has not disclosed what, if any, of that goodwill is associated with assets of J2 Ireland's subsidiaries. Nor has J2 made any disclosures about the material underperfomance of J2 Ireland from 2016 to 2018.

97. Without providing more information about how J2 Ireland had been performing in J2's financial statements, the market has been unable to accurately gauge how successful J2's acquisitions have been in Europe.

### ***2. The material underperformance of Everyday Health***

98. In December 2016, J2 made its largest acquisition ever – Everyday Health for $493 million. Everyday Health is a digital media company which owns various websites and produces content relating to health and wellness.

99. As of September 30, 2016, Everyday Health's revenue over the prior twelve months ("LTM") had been $254 million. But in the first year after J2 acquired Everyday Health, that division's revenue declined precipitously by approximately

25% to $171 million. Everyday Health's revenue slightly improved to $175 million in 2018 and then to $211.3 million in 2019, but has still not reached pre-acquisition levels despite J2 folding five subsequent acquisitions – and their revenues –into the division.

100. Despite Everyday Health's material underperformance, J2 has still not taken a goodwill impairment. Instead, J2 has made two divestitures and five acquisitions in its Everyday Health division, effectively obfuscating the true value of the Everyday Health acquisition as profits and losses of six acquisitions have been commingled in the division and two parts of the original Everyday Health company have been sold off. Currently, approximately one-third of Digital Media's goodwill balance relates to the Everyday Health purchase.

101. While J2 explained the 2017 drop in revenue by characterizing it as a period of "shrink to grow" where it was divesting assets from the Everyday Health division, even after factoring the two divestures from 2017, year-over-year ("YOY") revenue in the division declined by an estimated $65 million, or 25%.

102. Rather than disclosing that J2 overpaid for Everyday Health by taking a goodwill charge, Defendants have done nothing but defend the success of the Everyday Health acquisition.

**F. "Interested" Board Members**

103. J2's Board Chairman and multiple "independent" board members, including the chairs and members of the AC, compensation committee ("CC") and corporate governance committee ("CGC"), had and continue to have numerous overlapping business interests outside of J2:

| | Richard Ressler | Brian Kretzmer | Stephen Ross | Douglas Bech | Robert Cresci |
|---|---|---|---|---|---|
| **Role at J2** | Independent Board Chair, 1/1997-Now | Independent Director & AC Chair, 7/2007-Now | Independent Director & AC Member, 7/2007-Now | Independent Director, CGC Chair & CC Member, 11/2000-Now | Independent Director, 1998-Now |
| **Presbia** | Director, 1/2015-Now | | | | Director. 3/2015-Now |
| **MAI** | Board Chair, 1/1995-2006 | CEO, 1999-2006; CFO, 1993-1996 &1999-2000 | Director, 5/2001-2006 | | |
| **Universal Telecom** | Board Chair, 1999-2016 | Former Consultant | | | |
| **CIM Group** | Co-Founder & Principal, 1994-Now | Independent Director, 2/2018-Now | | | |
| **CMCT** | Board Chair, 12/2017-Now | | | Independent Director, CGC Chair & AC & CC Member, 3/2014-Now | Director & AC Chair, 4/2014-Now |

104. Because Ressler has chaired and/or founded companies in which Ross, Kretzmer, Bech and Cresci have all been paid for their various roles in or associated with those companies, they cannot be relied upon to protect the interests of J2 shareholders above their own when faced with a deal that Ressler wanted the Board to approve.

105. Kretzmer, Ross, Bech and Cresci are all beholden to Ressler as a result of positions they have held (and compensation received) at Ressler controlled companies, including J2.

106. J2's directors were not appointed without Ressler's approval. In fact, Kretzmer, Ross, Bech and Cresci received their appointments only because of their prior associations with Ressler at other Ressler controlled companies, and Ressler rewarded their loyalty with appointments to J2's Board.

107. AC chair Kretzmer and AC member Ross joined the Board on the same day and have the majority on the AC, but cannot be relied upon to carry out the Board's audit function because they have conflicts of interest as a result of working together for years at MAI and Universal Telecom, as well as Kretzmer profiting off work peformed for Orchard Capital, and Ross's benefit from having his son obtaining a C-level position at another Ressler company—all before serving on the board of J2.

108. This conflict of interest was not disclosed to investors. In fact, it appears that Kretzmer even attempted to hide his role at OCV by removing that job history from his personal website. It was only through reviewing web archives, that Hindenberg was able to determine that Kretzmer worked on prior merger and acquisitions for OCV.

109. At the time the Board voted on the Orchard Investment, Ressler and Cresci had a vested interest in receiving money from J2 as directors of Presbia, as the company was failing and would file for delisting and registration termination in 2019.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS[45]

110. Defendants should have made additional disclosures about the VDW Acquisition and the Orchard Investment as related party transactions and the underperformance of J2 Ireland and Everyday Health because such information would have had an impact on the decision making of J2 investors. In addition, Defendants should have made additional disclosures about how van der Weijden was compensated based on the number of deals versus their quality when touting any acquisition that he had sourced and managed. The only basis for Defendants not to have made additional disclosures is if they had concluded that information about the related parties and the underperformance would have had ***no*** impact on investors' decision-making with respect to their ownership interests.

---

[45] For ease of reference, Plaintiffs have attached hereto a chart of the statements alleged to be false and/or misleading as **Appendix C**. The particular portions of the statements alleged to be false and misleading are bold and italicized herein as well as in **Appendix C**.

111. The Class Period begins on October 5, 2015 when J2 announced in a press release that it had completed nine acquisitions in the third quarter of 2015 ("3Q15") that "will grow the Company's global customer base, provide access to new markets and expand j2's product lineup," including the "***Intellectual Property***" of "***VDW (Netherlands)***."

112. The statement referenced in ¶111 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, which was known to Defendants or recklessly disregarded by them, that the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2.

113. On November 3, 2015, during J2's third quarter 2015 ("3Q15") earnings call, Turicchi stated that "[w]e're extremely proud of the accomplishments of our teams during this outstanding quarter where ***a number of records were set***…***this continues to validate our overall strategy***" and that "***part of the art of the teams that we have built is that whether the markets are strong or weak or the economy is strong or weak, [we know] where to look to find the right kind of deals that will fit our model***."

114. The statements referenced in ¶113 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he

closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (iii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iv) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

115. In addition during the 3Q15 call, Turicchi stated "[o]ur IP Licensing revenue was roughly flat at $1.1 million. Our contribution of 57% in terms of EBITDA margin I would note that as we've talked about it in the past ***we continue to make investments in some additional portfolios of intellectual property, which are now actually in the process of commencing their licensing program***."

116. The statement referenced in ¶115 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, which was known to Defendants or recklessly disregarded by them, that the intellectual property purchased as part of the VDW Acquisition for $900,000 was of an 11-month-old consulting business which had no employees and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2.

117. On February 10, 2016, during J2's fourth quarter 2015 ("4Q15") earnings call, Turicchi stated that "fiscal year 2015 provided stellar operating results, ***validating our business strategy of…utilizing M&A to more rapidly build these***

***businesses to scale***" and that "[o]ur ***M&A strategy continued to drive both revenue and margin expansion***."

118. The statements referenced in ¶117 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (iii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iv) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

119. Defendant Turicchi further stated on the 4Q15 call that:

> [Y]ou heard us talk about for several quarters after we bought Web24 that we've been attempting to do a small follow-on acquisition consistent with what we did, we bought KeepItSafe and with that matter when we got Campaigner out of protest. And it took a little longer than we would have liked, but ***the idea is to do a small transaction that is financially inconsequential. So it's very tiny in terms of its revenue, recall that Web24 itself is only about $5 million of revenue, so it's not very big.***
>
> ***But that transaction closed and it's important in that it allows us the opportunity to go through as we do in each new business segment or business unit.*** What are the real stress points or issues in integration? Because for our

> model – the way our model works, there is a lot of key variables, but one of them is what is a fair expectation for the time of integration.
>
> If it's 30 days versus a year that may very well influence, what you are willing to pay for the business and your ultimate return on invested capital. ***So having the Web24 business under our ownership for about a year or over a year, we're able to finally acquire an asset. It is in the process of being integrated*** as we speak in fact likely by the end of this fiscal quarter if not early Q2, it should be integrated.

120. The statements referenced in ¶119 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) J2 had overpaid for Web24; and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability.

121. In addition, during the 4Q15 call, Defendant Zucker stated that "[w]e have a ***healthy acquisition pipeline***," and that "J2 ***from an M&A standpoint*** and from media acquisitioning versus the market ***will do very good in stress environment or economy***."

122. The statements referenced in ¶121 about J2's "healthy acquisition pipeline" and "M&A" doing "very well in stress environment or economy" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

123. On February 29, 2016, J2 filed with the SEC its annual report for the period ended December 31, 2015 (the "2015 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2015 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zucker and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

124. The statement referenced in ¶123 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24; and (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

125. The 2015 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2015, 2014 and 2013.***

126. The statement referenced in ¶125 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them: the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming.

127. The 2015 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2015, 2014, and 2013 and noted no impairment. Consequently, no impairment charges were recorded.***

128. The statement referenced in ¶127 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known

to Defendants or recklessly disregarded by them: the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming.

129. As to transactions with related parties and the independence of the Board, the 2015 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2015 Proxy Statement."

130. J2 subsequently filed its 2015 Proxy Statement with the SEC on March 23, 2016, which stated that "***[a]ll of our directors are independent directors*** as defined in the Nasdaq listing standards and as determined by j2 Global's Board of Directors."

131. The statement referenced in ¶¶129-130 was were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them: (i) that Ressler and Cresci were both Directors of Presbia; (ii) that Ressler was a principal and Kretzmer was an Independent Director of CIM Group, and CIM Group managed CMCT, of which Bech and Cresci were both Directors; and (iii) that Kretzmer has previously done M&A consulting work for Orchard Capital.

132. The 2015 Proxy Statement also stated that "***[d]uring 2015, j2 Global was not a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K***."

133. The statement referenced in ¶132 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of

commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; and (ii) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

134. On May 5, 2016, during the first quarter 2016 ("1Q16") earnings call, Defendant Turicchi stated that "Q1 2016 continued to provide ***outstanding operating results, which continue to validate our overall business strategy of***…***utilizing M&A to more rapidly build these businesses to scale***."

135. The statement referenced in ¶134 about J2's "outstanding operating results" validating its use of "M&A to more rapidly build these businesses to scale" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

136. In addition, during the 1Q16 call, Defendant Zucker stated: "The ***M&A***

***pipeline for this business and for the Backup business continues to be healthy*.**"

137. The statement referenced in ¶136 about the "M&A pipeline" being "healthy" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

138. During the second quarter 2016 ("2Q16") earnings call on August 3, 2016, Defendant Zucker stated that, "[s]o ***basically our Rolodex of M&A helps us***. And ***sometimes the prices that we see are very attractive because we do know the business, we don't know the people, we can promise them a fast transaction and reliable transaction without whole base***."

139. The statement referenced in ¶138 about the "Rolodex of M&A" helping them obtain "attractive pricing" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

140. In addition, Defendant Zucker stated during the 2Q16 call that "***we have bought a company called Web24 in Australia***, which is web hosting. ***We have not done other deals so far***."

141. The statements referenced in ¶140 about Web24 and J2 not having other deals in Australia were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) J2 had overpaid for Web24; and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability.

142. During the fourth quarter 2017 earnings call on February 9, 2017, Defendant Turicchi stated that "[o]ur ***M&A strategy was critical to the overall success of this year***. As you know, we completed ***22 acquisitions in 2016***, spent nearly $600 million, although the crown jewel of the M&A program this year was the acquisition of Everyday Health in December."

143. The statement referenced in ¶142 about J2's "M&A strategy" being "critical to the overall success" in 2016 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) J2's deals were not performing well and thus keeping the M&A strategy was only "critical to the overall success" because it allowed J2, in combination with misleading accounting, to keep up a false appearance

of good performance.

144. In addition, Defendant Zucker stated during the 4Q16 earnings call that "2011 to 2016, our last five years, ***we achieved approximately 20% compounded revenue growth***, and in the Digital Media division and combined, ***achieved 70% compounded EBITDA growth***. We believe that ***this validates our strategy of*** focusing on EBITDA, EBITDA generation, ***utilizing our organic and M&A to build our business***."

145. The statements referenced in ¶144 about J2's growth "validatin[ing] our strategy" which included "utilizing our organic and M&A to build our busiess" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; amd (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

146. Defendant Zucker specifically stated during the 4Q16 call that "all the acquisitions were of a relatively smaller companies, ***when we eliminated a number one cost***, which is the platform and the engineers. Therefore, ***we are generating high margins***. Also we have – our service is very fully featured. So most of the time when we acquire a company, they are exposed to the new features. And once we take them, the marginal cost to us is not very high."

147. The statements referenced in ¶146 about J2 "eliminated" costs and "are generating high margins" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

148. Defendant Zucker also stated during the 4Q16 call that "we are eliminating negative margin revenues as we did in the past. ***If we don't believe a certain revenue has good margin potential, we will just walk away from it and focus on the profitable parts of the business.*** We've already reduced the combined workforce of Ziff Davis and Everyday Health by 7%. We have been steadily terminating or restructuring vendor agreement, which will add several points to the margin already now in 2017. ***We are undertaking many positive and profit-enhancing changes that we will continue to talk about in the next quarters***."

149. The statements referenced in ¶148 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it

had generated the prior year.

150. Defendant Turicchi further stated during the 4Q16 call that:

> [W]e're not going to be breaking out Everyday Health just as we don't break out IGN or the tech vertical or Ookla. But what I will say is – and remember, this is very important on the Shrink to Grow concept, it has nothing to do with Cambridge and Tea Leaves. ***So if you looked at Everyday Health in its totality, it had a revenue guidance/expectation last year around $250 million. We will be shrinking that revenue base by up to about $20 million based on some of the comments Hemi made earlier, where we're not finding that there is either any margin in some of those revenue streams or margins consistent with our approach***.... [W]e would expect that ***off of that reset lower base to experience close to double digit growth with that set of assets***.

151. The statements referenced in ¶150 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year.

152. On March 1, 2017, J2 filed with the SEC its annual report for the period ended December 31, 2016 (the "2016 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2016 10-K were SOX certifications signed by Defendants Zucker and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

153. The statement referenced in ¶152 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW

Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (v) Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

154. The 2016 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2016, 2015 and 2014.***

155. The statement referenced in ¶154 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

156. The 2016 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2016, 2015, and 2014 and noted no impairment. Consequently, no impairment charges were recorded.***

157. The statement referenced in ¶156 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

158. As to transactions with related parties and the independence of the Board, the 2016 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2016 Proxy Statement."

159. J2 subsequently filed its 2016 Proxy Statement with the SEC on March 23, 2017, which stated that its "Board of Directors has determined that ***all of our directors are independent*** within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

160. The statement referenced in ¶¶158-159 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them: (i) that Ressler and Cresci were both Directors of Presbia; (ii) that Ressler was a principal and Kretzmer was an Independent Director of CIM Group, and CIM Group managed CMCT, of which Bech and Cresci were both Directors; and (iii) that Kretzmer has previously done M&A consulting work for Orchard Capital.

161. In addition, the 2016 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2017 Proxy Statement further stated that "[s]ince January 1, 2016, ***j2 Global has not been a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K***."

162. The statements referenced in ¶161 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an

11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; and (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

163. During J2's first quarter 2017 ("1Q17") earnings call, Defendant Zucker stated that "[w]e also successfully launched disaster recovery service and ***we have a strong M&A pipeline***."

164. The statement referenced in ¶163 about the "strong M&A pipeline" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

165. In addition, Defendant Zucker stated during the 1Q17 call that "[a]t our newest properties, ***Everyday Health***, Media Page Today and What to Expect, we had very productive quarter with new product launches and features. Focus on productivity and profitability, ***we continued execution of our shrink to grow strategy***. This is done by ***eliminating negative margin activities and eliminating low potential activities***. ***This will result in higher EBITDA against reduced revenue***."

166. The statement referenced in ¶165 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse

fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year.

167. Likewise, Defendant Turicchi stated during the 1Q17 call that:

> [W]***e would be in line to slightly ahead of our plans in terms of cost reduction***. . . . Then there's a second piece, which is a little bit less tangible or less quantifiable, and that is evolving the understanding of how the business is going to operate on a going-forward basis. And I'd say that's a process that takes time. . . . I'd say in the second – or the second piece of it, ***we're probably tracking, but it's something that takes – it takes months.***

168. The statements referenced in ¶167 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

169. Further, Defendant Turicchi stated during the 1Q17 call that:

> [I]n terms of our mix of M&A, it is correct. The last few quarters, with the exception of Everyday Health, most of the businesses we have bought have been very small. Part of that, I'd say, in the last five or six months has been a function that ***larger transactions, which we've looked at outside of Everyday Health, have been too expensive. And a lot of that has to do with the correlation to the***

***stock markets either approaching or at all-time highs. So we've tended to focus on smaller deals."***

170. The statement referenced in ¶169 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the "focus on smaller deals" was to avoid disclosures about the specific transaction and hide underperforming assets as (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.and (ii) J2 regularly overvalued acquisitions so with larger transactions, any underperformance would have a more material impact on its financials.

171. Defendant Turicchi also stated during the 1Q17 call that:

> Generally ***in the cloud, it is the goal not to grow the revenues***. In fact, as Hemi will talk about or has talked about, ***there'll be cases where we'll actually shrink the revenues or we know there'll be revenue decline because of either expected customer attrition or customer attrition upon migration***.
>
> ***In the Digital Media business, it usually is the concept of taking the asset, initially shrinking it down to its core, and then from that point growing its revenues***.

172. The statements referenced in ¶171 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the shrink to grow concept conveniently explained away underperforming assets that J2 ineveitably purchased due to the deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he

closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

173. During the second quarter 2017 ("2Q17") earnings call, Defendant Zucker stated that "Email security and email marketing.... We are seeing in this business the ***renewed organic growth, increasing margins and M&A***."

174. The statements referenced in ¶173 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

175. Defendant Zucker also stated during the 2Q17 earnings call, "[t]he ***integration of Everyday Health and the execution of our strategy remains on target***. We are continuing to develop products and building capabilities across the 3 core businesses."

176. The statement referenced in ¶175 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

177. In addition, analyst Walter Pritchard of Citi and Defendant Zucker had the following exchange during the 2Q17 call:

> Pritchard: [Y]ou entered Australia in the Backup market. That market is, organically, not really growing. As we think about sort of your confidence and it feels like you are buying more, maybe not at the rate you were a year ago there, but is that market a market you think can organically grow for the company?
>
> Zucker: So ***on the M&A side, we had*** . . . ***2 to 3 companies, each of them were $10 million revenue and they were bought by prices that we would never think are in our range***.

178. The statements referenced in ¶177 about J2 acquiring companies in Australia at "prices that we would never think are in our range" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that (i) J2 had overpaid for Web24 and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability and who had caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

179. Defendant Turiccihi added during the 2Q17 call that:

> [**I**]***n the Cloud Backup business***, we're – it's an art, not a science. But $50 million to $60 million away and the view and ***the premise has been that, that will come from M&A***. ***So there's been less an emphasis on the organic growth potential of that business or of that space and a much heavier focus on M&A***. If you go back just a few quarters, I think ***from September of 2015 through probably Q3 of 2016, the Backup business had at least a dozen transactions around the world that acquired and then was in the process of integrating***.

180. The statements referenced in ¶179 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were

known to Defendants or recklessly disregarded by them, that (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) J2 had overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden.

181. Defendant Turicchi also stated during the 2Q17 call that "[t]he ***Everyday Health business, as you know, is in sort of in a shrink to grow mode*** so the numbers are really not comparable because you'd have to go back and pro forma into Q2 of 2016 revenue streams that we've now eliminated. So I'd say ***it's down a little bit on an actual year-over-year basis, but on a pro forma basis, would be up. And I think that once we finished the shrink to grow there and we get it down to the core, then we view it as being a consistent grower*** with the rest of Ziff Davis.

182. The statements referenced in ¶181 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

183. During the third quarter 2017 earnings call on November 2, 2017 ("3Q17"), Defendant Turicchi stated that "the M&A in Q3 was rather light. A lot of our focus not that we weren't focused on M&A, but ***the divestitures of Web24 and Tea Leaves were very important*** even though Tea Leaves actually closed in the fourth

fiscal quarter, a lot of the work was done in Q3. So, the ***M&A transactions on the Cloud side that were done in Q3 will offset to a very modest way some of that $35 million***."

184. The statements referenced in ¶183 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) J2 had overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden.

185. In response to analyst Jon E. Tanwanteng of CJS Securities, Inc. asking during the 3Q17 call, "[c]ould you just talk about the investment rationale in OCV. Do you think you can get a better return there that you can otherwise get in your core M&A strategy, just a little bit more about the decision to go that route?" Defendant Zucker responded:

> ***[T]here was an opportunity through this related entity called OCV for us to make an investment and with Hemi moving over into that capacity to also give us confidence of two things, that one, there would be a focus as I'm sure that would have been anyway on delivering high returns and returns consistent with the returns that we are used to experiencing at j2, but giving us greater diversity in terms of the types of transactions that we invest in***.
>
> * * *
>
> We think that there's going to be – it will occur of course over time because their investments will have different maturity timeframes, but I think, yes ***we're going to get those kinds of similar returns and we're going get exposure to other types of transactions that j2 would not find appropriate to do within the j2 structure.***

186. The statements referenced in ¶185 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; (ii) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

187. Defendant Turricchi added during the 3Q17 call that the Orchard Investment is:

> [G]oing to be funded as OCV finds transactions and makes capital calls. So although it's an eight-year fund, ***we have assumed the more front-end loaded amount of funding you know in the tune of $50 million to $60 million dollars a year on average over the next call it four years to five years***. That would exhaust the $200 million commitment. So ***we look at our estimated free cash flows, obviously looking out a couple of years, the dividend, and feel comfortable that that given the cash balances we already have, will be sufficient to make those capital calls and still do our M&A program***.

188. The statements referenced in ¶187 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving

related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (ii) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

189. In addition, Defendant Zucker stated during the 3Q17 call that "***[w]e made cash-on-cash more than 20% a year on the Web24. So all in, it was a profitable test***."

190. The statements referenced in ¶189 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 could have been more profitable when it divested of the Web24 Division if it had not overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden.

191. Defendant Turicchi also stated during the 3Q17 call that "***all of the smaller businesses in the Cloud***, but led by the Backup have been premised on and ***they've been tasked with almost a purely M&A driven growth***," but "there's been a very little M&A done for the Cloud Backup."

192. The statements referenced in ¶191 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures;.

193. During the fourth quarter 2017 ("4Q17") earnings call on February 6, 2018, Defendant Shah stated that: "[o]ur ***track record has been remarkable***, given the number of deals we've done" and "[o]ur ***organizational approach to M&A is very***

***solid***" as "[t]his design allows for a ***very robust pipeline across the enterprise***, while ***ensuring we maintain our discipline***."

194. The statements referenced in ¶193 regarding J2's "remarkable" track record of deals and "solid" approach to M&A that allowed J2 to keep a "very robust pipeline" while "ensuring we maintain our discipline," were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

195. In addition, Defendant Shah stated during the 4Q17 call that:

> [W]e will be getting quarterly updates from OCV as to their activity, and that will be available – or at least some of that will be available directly on their website, which you can access. I think ***in the scheme of j2, it's actually a relatively small investment***. So, if you've heard us talk about these 12 business units, the revenue they're driving and the EBITDA, that's where our focus and attention is going to be as it relates to updates. But there will be information available from time-to-time on the various investments that they are making.

196. The statements referenced in ¶195 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders,

that would be continuing; and (ii) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

197. On March 1, 2018, J2 filed with the SEC its annual report for the period ended December 31, 2017 (the "2017 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2017 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

198. The statement referenced in ¶197 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (v) Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

199. The 2017 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2017, 2016 and 2015.***

200. The statement referenced in ¶199 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

201. The 2017 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon

intangible assets. ***We completed the required impairment review for the years ended December 31, 2017, 2016, and 2015 and noted no impairment. Consequently, no impairment charges were recorded.***

202. The statement referenced in ¶201 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

203. As to transactions with related parties and the independence of the Board, the 2017 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2017 [sic] Proxy Statement."

204. J2 subsequently filed its 2017 Proxy Statement with the SEC on March 23, 2018, which stated that its "Board of Directors has determined that ***all of our directors, other than our Chief Executive Officer,*** Mr. ***Shah, are independent*** within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

205. The statements referenced in ¶¶203-204 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them: (i) that Ressler and Cresci were both Directors of Presbia; (ii) that Ressler was a principal and Kretzmer was an Independent Director of CIM Group, and CIM Group managed CMCT, of which Bech and Cresci were both Directors; and (iii) that Kretzmer has previously done M&A consulting work for Orchard Capital.

206. The 2017 Proxy Statement further stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2017 Proxy Statement stated that J2 had entered into the following related party transaction:

> On September 25, 2017, ***the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition,*** Mr. ***Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder***. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.*** In February 2018, the Company received a capital call notice from the management of OCV for approximately $12.2 million, inclusive of certain management fees.

207. The statements referenced in ¶¶206 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der

Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2, (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures;, (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (iv) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

208. During the second quarter 2018 ("2Q18") earnings call on August 9, 2018, Defendant Turicchi stated that:

> … ***for the most part we do the tuck-in deals***. I wouldn't say, they are completely immune, but I would say ***they are more or less immune from the market dynamics, because often there are other drivers that are influencing the sale of the assets, and there is intangible benefits that the sellers want beyond just the economic dollars, it may be an asset in a portfolio that isn't performing to the PE or VC's liking***. And so, for them to be able to get it out of their portfolio of stock allocating time and money to it, is a real benefit, beyond just what's the highest bid, and we've won deals like that, where we're not necessarily the highest bidder, we're still in obtain market multiples, but we are bringing in intangible value to the equity owners.

209. The statements referenced in ¶208 regarding J2's "tuck-in deals" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden

and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) because J2 did not disclose the terms of its small acquisitions, it was able to, and did, utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

210. In addition, Mr. Turicchi stated during the 2Q18 call:

> …***we're looking at the M&A a little bit differently maybe that we did in the past***, where we are looking into portfolios where we can bring unique and differentiated value to the table, either as it relates to the seller and or is it relates to how we integrated within our existing business units. And so, we can extract value that is unique to us. so, we're not paying a bad multiple from the seller's perspective, it's just we're synergizing it down to that five times EBITDA multiple when the work is done

211. The statement referenced in ¶210 regarding J2's "looking at the M&A a little bit differently maybe that we did in the past" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) because J2 did not disclose the terms of its small acquisitions, it was able to, and did, utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

212. Defendant Turicchi also stated during the 2Q18 call that "On the Cloud side, ***we divested Web24 which was our smaller web hosting business in Australia***. That had about $1.3 million in revenues in Q2 of 2017. So, combined for the company

as a whole, about $11.8 million of revenues from the divested assets were present in Q2, 2017 and not in 2018."

213. The statements referenced in ¶212 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 could have been more profitable when it divested of the Web24 Division if it had not overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden.

214. Before the market opened on November 6, 2018, J2 held its third quarter 2018 ("3Q18") earnings conference call. During the call, as part of his prepared remarks, Defendant Shah stated that:

> …***j2's approach has proven and will continue to prove to be our most important and sustainable competitive advantage***.
>
> * * *
>
> When we consider transactions, we look for fair businesses at great prices and great businesses at fair prices…***we typically look to improve the company's margins through our strength through our shrink to grow program, where we identify products, initiatives and activities that are either money losing or have little to no future profit potential. We generally either sunset or sell-off those money losing components.*** Once we get a business to its most profitable core, we look to develop new monetization streams consistent with what we've accomplished in our other businesses. With great businesses at fair prices, we're focused on helping those businesses accelerate sales and product development. ***Provide access to our capital for development and tuck in acquisitions and we help them leverage our marketing assets and customer basis***.

215. The statements referenced in ¶214 regarding its "proven" approach to acquisitions were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that (i) the shrink to grow concept conveniently explained away underperforming assets that J2 ineveitably purchased due to the deals

sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures and (ii) because J2 did not disclose the terms of its small "tuck-in" acquisitions, it was able to, and did, tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business.

216. Likewise, Defendant Turicchi during the 3Q18 call that:

> …***once we get through this period where we have got the shrink to grow on some of the assets of mid-single digit***. And then I think probably in equal or maybe somewhat greater amount, but on the margin of M&A for the digital media business. But as you know, ***a lot of those growth rates as it relates to M&A is really a function of the timing of deals and in which side of the two businesses they fall***.

217. The statements referenced in ¶216 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the shrink to grow concept conveniently explained away underperforming assets that J2 ineveitably purchased due to the deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

218. In addition, during the 3Q18 call, Defendant Shah stated that "[a] great illustration of ***how we create value is the Everyday Health acquisition we made almost two years ago to the date. We purchased the business for $465 million, then we sold off two non-core and marginally profitable assets for $120 million***."

219. The statements referenced in ¶218 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following

adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

220. In response to a question from analyst, Rishi Jaluria at DA Davidson, Shah further explained during the 3Q18 call that "I walk[ed] through in the prepared remarks, our experience with Everyday Health, because I thought it was important because I was beginning to get a sense from some shareholders and prospective shareholders that it was a feeling that Everyday Health wasn't working out well, and I couldn't disagree more. We are at 6.6 times EBITDA for a great asset in a great vertical, and we've done it with some real cyclical pressures. So from my point of view, ***the business has performed very, very well***."

221. The statements referenced in ¶220 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

222. Before the market opened on February 13, 2019, J2 held its fourth quarter ("4Q18") earnings conference call. In response to a question from analyst James Breen at William Blair & Co., Defendant Turicchi noted that "if you look at 2017

versus 2016 [cash flow], ***there was a big jump up in large part, because of Everyday Health***."

223. The statement referenced in ¶222 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

224. On March 1, 2019, J2 filed with the SEC its annual report for the period ended December 31, 2018 (the "2018 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2018 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

225. The statement referenced in ¶224 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24; (iv) a material number of deals were sourced and managed by van der

Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (v) Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues; (vi) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (iv) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

226. The 2018 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2018, 2017 and 2016.***

227. The statement referenced in ¶226 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

228. The 2018 10-K stated the following concerning its accounting treatment of goodwill and purchased intangible assets:

> In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2017 and 2016 and noted no impairment. Consequently, no impairment charges were recorded.***

229. The statement referenced in ¶228 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

230. As to transactions with related parties and the independence of the Board of Directors, the 2018 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2018 Proxy Statement."

231. J2 subsequently filed its 2018 Proxy Statement with the SEC on March 22, 2019, which stated that its "Board of Directors has determined that ***all of our directors, other than our Chief Executive Officer,*** Mr. ***Shah, are independent*** within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

232. The statements referenced in ¶¶230-231 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them: (i) that Ressler and Cresci were both Directors of Presbia; (ii) that Ressler was a principal and Kretzmer was an Independent Director of CIM Group, and CIM Group managed CMCT, of which Bech and Cresci were both Directors; and (iii) that Kretzmer has previously done M&A consulting work for Orchard Capital.

233. In addition, the 2018 Proxy Statement stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2018 Proxy Statement stated that J2 had entered into the following related party transaction:

> ***On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder.*** As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance***

> ***with the RPT Policy.*** In 2018, the Company received six capital call notices from the management of OCV for approximately $36.8 million, inclusive of certain management fees.

234. The statements referenced in ¶¶233 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2, (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (iv) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement

235. Before the market opened on May 8, 2019, J2 held its 1Q19 earnings conference call. In response to a question from analyst, Dan Ives at Wedbush Securities, Defendant Turicchi stated that "we've seen ***continuing strength and firmness out of everyday health***, which has a large chunk of display advertising in terms of its total monetization."

236. The statement referenced in ¶¶235 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

237. Before the market opened on August 7, 2019, J2 held its second quarter 2019 ("2Q19") earnings conference call. During the call, Shah touted:

> I'm not sure of how many companies can make that claim to have grown revenues for 23 consecutive years. Yet, in the seven years that I've been here, and in the 20 years Scott's been here, we still get questioned about the viability of our model, questioned about our ability to sustain the j2 acquisition system, and therefore, our overall growth. I believe ***the past 20 years should resolve for any rational observer these questions.*** My favorite indicator of our success is the five times ratio of our accumulative acquisition spend divided by our annual adjusted EBITDA.
>
> ***It demonstrates our ability to stand capital intently and wisely as well as the means to properly integrate these assets once they are in j2's portfolio.***

238. The statements referenced in ¶237 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

239. Defendant Shah also stated during the 2Q19 call that, "***we're certainly willing to entertain offers that value these businesses in excess of what the market may be valuing and where we may not feel it's strategic or where we way may not feel we have future growth opportunities or where we may not feel we can execute the M&A program*** as well. So we're open to it. We get calls from time to time. So we're certainly -- and ***I do think that's a little bit of a shift***."

240. The statement referenced in ¶239 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

241. Before the market opened on November 1, 2019, J2 held its third quarter 2019 ("3Q19") earnings conference call. In response to a question from analyst, James Breen at William Blair and Company, Defendant Shah states "we have a number of high-quality, organically growing businesses where we see runway…. It's ***our Everyday Health group, which continues to grow organically, high single digits, possibly low double digits*** on the corporate fax side, on VPN."

242. The statement referenced in ¶241 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to

Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

243. In addition, Defendant Shah stated during the 3Q19 call, "***Our ability to transact efficiently, transparently and reliably and to see and create value where others cannot has allowed us to succeed in an M&A environment that can at times seem frothy***."

244. The statement referenced in ¶243 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

245. On March 2, 2020, J2 filed with the SEC its annual report for the period ended December 31, 2019 (the "2019 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2019 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

246. The statement referenced in ¶245 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (v) Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues; (vi) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (iv) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

247. The 2019 10-K stated the following concerning its accounting treatment of long-lived and intangible assets:

> ***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2019, 2018 and 2017.***

248. The statement referenced in ¶247 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year

249. The 2019 10-K stated the following concerning its accounting treatment of business combinations, goodwill and purchased intangible assets:

> In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2019, 2018 and 2017 and noted no impairment. Consequently, no impairment charges were recorded.***

250. The statement referenced in ¶249 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the lack of impairments misleadingly signalled that the acquisitions J2 had conducted to date were properly valued and are performing well even though, for example, J2 Ireland took a €22.1

million charge in 2015 and was significantly underperforming, and Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

251. As to transactions with related parties and the independence of the Board, the 2019 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2019 Proxy Statement."

252. J2 subsequently filed its 2019 Proxy Statement with the SEC on March 26, 2020, which stated that its "Board of Directors has determined that ***all of our directors, other than our Chief Executive Officer,*** Mr. ***Shah, are independent*** within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

253. The statement referenced in ¶251-252 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them: (i) that Ressler and Cresci were both Directors of Presbia; (ii) that Ressler was a principal and Kretzmer was an Independent Director of CIM Group, and CIM Group managed CMCT, of which Bech and Cresci were both Directors; and (iii) that Kretzmer has previously done M&A consulting work for Orchard Capital.

254. The 2019 Proxy Statement further stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2019 Proxy Statement stated that J2 had entered into the following related party transaction:

> ***On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the***

> ***"Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 has become a co-managing principal of OCV and a significant equity holder.*** As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy***. In 2019, the Company received nine capital call notices from the management of OCV for approximately $29.6 million, inclusive of certain management fees. The also Company received approximately $10.3 million in distributions from OCV in 2019.

255. The statements referenced in ¶254 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2, (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the

Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing; and (iv) an interested Board had authorized the Orchard Investment and an interested AC had approved the Investment Agreement.

## VI. THE TRUTH WAS REVEALED

256. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members he represents.

257. The truth began to be revealed when, before the market opened on March 10, 2016, Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)!" (the "Citron Report"). The Citron Report revealed that J2, among other issues, (i) "no longer wants acquisitions, it needs acquisitions" (emphasis in original) (ii) "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or usless assets that have all been acquired with terms undisclosed;" and (iii) "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating."

258. On this news, shares of J2 plummetted $14.09 per share, or nearly 20%, to close at $56.90 per share on March 10, 2016 on unusually heavy trading, damaging investors.

259. The market attributed the March 10 stock drop to the Citron Report as seen in an article published on Nasdaq by the leading investment research firm, Zacks,

on March 11, 2016.[46] Notably, the article noted that the Company's recently acquired business is "making losses," and raised concern about how J2 does not reveal the terms and conditions of its acquisitions, "which has created quite a lot of uncertainity among investors."

260. Then, before the market opened on June 30, 2020, Hindenburg Research published a report entitled "J2 Global: Troubling Related Party Transactions, Looming Impairments and A Suspicious History of Insider Enrichment Spanning Decades" (the "Report") revealing, *inter alia*, that "[t]he opaque nature of J2's M&A program has…left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of underlying businesses." Specifically, the Report states that "J2's opaque acquisition approach has opened the door to egregious insider self-enrichment" to the tune of "$98 million to $128 million." One such acquisition was of "a newly formed entity based out of [J2's] own VP of Corporate Development's personal residence for $900 thousand" which had "undefined 'intellectual property' and no employees or apparent assets," yet "**[n]o conflict was disclosed**." (Emphasis in original). That VP "handled 135 of J2's acquisitions, representing ~73% of the company's acquisitions to date." In addition, the Report revealed that J2's recent commitment of "$200 million of shareholder cash" was "to a newly-formed investment vehicle run by its Chairman, who has a track record of venture investment failures," as well as "other J2 execs and insiders." "That investment vehicle, in turn, made its first investment of an estimated $12 million into a newly formed home video business established by the Chairman's nephew," but "**again, no conflict was disclosed**." (Emphasis in original). Further, the Report found it "uncanny that [Defendant] Shah was awared a ludicrous pay package" ($45 million in total

[46] Zacks, Nasdaq, *j2 Global: Citron Report Attacks Business Model, Stock Down* (Mar. 11, 2016), https://www.nasdaq.com/articles/j2-global%3A-citron-report-attacks-business-model-stock-down-2016-03-11 (last visited on Nov. 19, 2020).

compensation in 2018) "precisely when related party transactions diverted assets to other key insders."

261. Next, the Report noted that J2's "underperformance has been masked by tricky accounting," including "never tak[ing] a goodwill impairment, yet subsidiary filings report multiple material goodwill impairments that don't appear to coincide with parent financials." For example, "J2's European business (13% of revenue in 2016), which was overseen by the aforementioned VP of Corporate Development, has seen its revenue decline 27% in the subsequent 3 years with operating income swinging from $5.5 million to negative $13 million." And while "a key J2 subsidiary [in Europe] recorded an €22 million impairment," "zero goodwill impairment [was] recognized at the parent corporation." In addition, "Everyday Health, J2's largest acquisition, saw an immediate post-acquisition revenue drop of ~25%, yet no impairment was recorded. Instead, J2 went on a spree of asset disposals/acquisitions that obfuscated the entity's financial position." The Report estimated that in total, "[a]pproximately $700m of acquisitions for which we have visibility are seeing revenue declines, appear to be underperforming, or have been outright dissolved…yet we have seen no impairment of goodwill to date."

262. Lastly, the Report revealed that "[d]espite J2's proxy describing all but one of its board members as 'independent,' we found decades of intertwined financial interests between board members and executives, calling that independence into question." Specifically, J2's "audit committee simply cannot be relied upon, as a majority of the committee has worked together for years prior to serving on the board of J2 in roles that reveal conflicts of interest," including the AC chair, "long time Ressler associate Brian Kretzmer" who "has a work history with J2 Chairman Richard Ressler dating back nearly three decades." Kretzmer even "consulted for the OCV affiliate Orchard Capital," which "is a flagrant conflict of interest, given that as chair of the audit committee Kretzmer then approved the $200 million commitment of J2

Capital to OCV." Likewise, "'**[i]ndependent director and audit committee member, Stephen Ross**, has a 20-year history with J2 Chairman Ressler and director/audit committee chair Kretzmer." Yet they, along with the rest of the Board – the "majority of [whom] had multiple overlapping business ties with Ressler, were responsible for providing the approval of $200 million in J2 cash being directed into Ressler's newly-formed investment entity."

263. The Report then proceeded to provide substantial, detailed "evidence" supporting its claims regarding J2's (1) "Related Party Transactions and Insider Self-dealing," (2) "Tricky Accounting: J2's Public Entity Has Never Recognized Any Goodwill Impairments," (3) "Corporate Governance Vacuum", and (4) "Legacy Businesses In Decline."

264. On this news, shares of J2 fell $6.29 per share, or over 9%, to close at $63.21 per share on June 30, 2020 on unusually heavy trading, damaging investors.

265. The market recognized the Report's impact on J2's stock price as seen in the *Marketwatch* article titled, "*Under attack from short seller, J2 Global says it bought company from a consultant—documents indicate there's more to the story*."[47] The article noted that while the Company said Mr. van der Weijden was not a related party, "publicly available documents in the U.K., however, show that van der Weijden was a director of J2 Global UK Ltd…an arm of J2 Global Ireland, which ultimately is owned by J2 Global Inc."

## VII. LOSS CAUSATION

266. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members he represents.

---

[47] Steve Goldstein, Marketwatch, *Under attack from short seller, J2 Global says it bought company from a consultant—documents indicate there's more to the story* (July 7, 2020), https://www.marketwatch.com/story/under-attack-from-short-seller-j2-global-says-it-bought-company-from-a-consultant-documents-indicate-theres-more-to-the-story-2020-07-06 (last visited Nov. 19, 2020).

267. During the Class Period, Plaintiff and Class members purchased J2 common stock at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

268. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of J2 common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about J2's business, operations, and financial performance, as alleged herein.

269. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. Defendants made or caused to be made materially false and/or misleading statements about J2's financial results, internal controls and related financial metrics and the reliability of their reported results. These material misstatements and/or omissions had the cause and effect of creating in the market a false positive assessment of the Company and its financial performance, internal controls and related well-being, thus causing the Company's securities to be overvalued and the price of its common stock to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Plaintiff and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in part on March 10, 2016 and in full on June 30, 2020, causing the trading

price of J2 common stock to materially decline and removing the previously embedded artificial inflation.

## VIII.PLAINTIFF'S CLASS ACTION ALLEGATIONS

270. Plaintiff brings this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities that purchased or otherwise acquired J2 common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

271. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, J2 common stock was actively traded on the NASDAQ. As of November 4, 2020, there were over 45 million shares of J2 common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by J2 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

272. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

273. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

274. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of J2;

c. whether the Individual Defendants caused J2 to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of J2 common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

275. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

276. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. J2 common stock is traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold J2 common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

277. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

278. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

Violations of Section 10(b) of the Exchange Act and Rule 10b-5

*Against All Defendants*

279. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-278 as if fully set forth herein.

280. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

281. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of J2 common stock during the Class Period.

283. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of J2 were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of J2, their control over, and/or receipt and/or modification of J2's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning J2, participated in the fraudulent scheme alleged herein.

284. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the

material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other J2 personnel to members of the investing public, including Plaintiff and the Class.

285. As a result of the foregoing, the market price of J2 common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of J2 common stock during the Class Period in purchasing J2 common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

286. Had Plaintiff and the other members of the Class been aware that the market price of J2 common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased J2 common stock at the artificially inflated prices that they did, or at all.

287. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

288. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of J2 common stock during the Class Period.

## COUNT II

Violations of Section 20(a) of the Exchange Act

*Against the Individual Defendants*

289. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-278 as if fully set forth herein.

290. During the Class Period, the Individual Defendants participated in the operation and management of J2, and conducted and participated, directly and indirectly, in the conduct of J2's business affairs. Because of their senior positions, they knew the adverse non-public information about J2's current financial position and future business prospects.

291. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to J2's business practices, and to correct promptly any public statements issued by J2 which had become materially false or misleading.

292. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which J2 disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause J2 to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of J2 within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of J2 common stock.

293. Each of the Individual Defendants, therefore, acted as a controlling person of J2. By reason of their senior management positions and/or being directors of J2, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, J2 to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of J2 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

294. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by J2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: November 19, 2020

Respectfully Submitted,

**ROCHE CYRULNIK FREEDMAN LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

Kyle Roche (*pro hac vice forthcoming*)
Jason Cyrulnik (*pro hac vice forthcoming*)

99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Emails: kyle@rcfllp.com
jcyrulnik@rcfllp.com

*Lead Counsel for the Class*

**LABATON SUCHAROW LLP**
David J. Schwartz (*pro hac vice forthcoming*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7070
Email: dschwartz@labaton.com

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Movant Jonathan Espy*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 19, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By: *<u>/s/ Ivy T. Ngo</u>*
Ivy T. Ngo