**ROCHE FREEDMAN LLP**
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842
Email: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

*Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

JEFFREY GARCIA, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

J2 GLOBAL, INC., VIVEK SHAH, NEHEMIA ("HEMI") ZUCKER, and R. SCOTT TURICCHI,

Defendants.

Case No.: 2:20-cv-06096-FLA-MAA

**SECOND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

CLASS ACTION

JURY TRIAL DEMANDED

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ........ 1
II. JURISDICTION AND VENUE ........ 8
III. PARTIES ........ 8
IV. SUBSTANTIVE ALLEGATIONS ........ 11
 A. Company Background ........ 11
 B. Relevant Accounting Policies and Principles ........ 12
  *1.* GAAP requirements generally ........ 12
  *2.* Materiality ........ 13
  *3.* Related party transactions ........ 13
 C. Statements by Former Employees ........ 14
 D. Acquisitions Enriching J2 Insiders ........ 22
  *1.* The Pre-Class Period Jump Acquisition ........ 22
  *2.* The VDW Acquisition ........ 23
  *3.* The $200 Million Investment in Orchard Capital ........ 25
 E. Hiding Underperforming Acquisitions ........ 32
  *1.* The material underperformance of J2 Ireland ........ 33
  *2.* The material underperformance of Everyday Health ........ 34
V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 36
VI. THE TRUTH WAS REVEALED ........ 77
VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 80
VIII. LOSS CAUSATION ........ 92
IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS ........ 93
 COUNT I ........ 96
 COUNT II ........ 98
X. PRAYER FOR RELIEF ........ 99
XI. DEMAND FOR TRIAL BY JURY ........ 100

**"Oh! What a tangled web we weave when first we practice to deceive."**
**Sir Walter Scott, Marmion (1808).**

Lead Plaintiff Jonathan Espy ("Espy" or "Lead Plaintiff"), individually and on behalf of all others similarly situated hereby bring this Consolidated Class Action Complaint (the "Complaint") against J2 Global, Inc. ("J2" or the "Company"), Vivek Shah ("Shah"), Nehemia ("Hemi") Zucker ("Zucker"), and R. Scott Turicchi ("Turicchi") (collectively, "Defendants"). The allegations herein are based on Lead Plaintiff's personal knowledge as to his own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by J2; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former employees of the Company; and information obtainable on the Internet. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to Defendants, or are exclusively within their custody or control. Lead Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired J2 common stock during the period from October 5, 2015 to June 29, 2020, inclusive (the "Class Period"), and were damaged thereby. The action is brought against J2 and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. J2 purports to be a leading Internet information and services company consisting of a portfolio of brands in its two divisions: Digital Media and Cloud Services. It also purports to be an active acquirer of businesses in media, technology, and Internet services, having deployed approximately $3 billion of acquisition capital to acquire 186 businesses since its founding in 1995. J2 relies primarily on acquisitions for growth, and its success requires paying fair market value or less to acquire companies and for those companies to continue to be at least as profitable as when J2 values and acquires them. In other words, J2 is in the business of buying companies that are already generating revenue and combining them with companies in similar or the same industry to effectuate synergies and/or cost savings; J2 is not in the business of buying undervalued companies and adding value to, or otherwise organically operating and growing, those individual companies.

3. However, Defendants have misled investors about the strength of J2's core business of acquiring and integrating companies. Many of J2's acquisitions actually just enriched insiders, including "independent" board members and senior executives, by tens of millions of dollars, all to the detriment of J2's shareholders.

4. Furthermore, Defendants obfuscated the terms of those acquisitions as well as any of the individual acquired companies' ongoing value and growth – or lack thereof. Normally, a company publicly reports goodwill as an asset in relation to an acquisition or other business segment. If that acquisition or segment subsequently suffers and loses value, the company would report an impairment to the goodwill. J2, however, does not break out the goodwill for each of its hundreds of acquisitions individually and instead reports a single consolidated goodwill for each of its two divisions, without any impairments. In fact, J2 has *never* taken a goodwill impairment.

5. Meanwhile, Defendants portrayed J2's aggressive acquisition strategy as consistently successful. Through this scheme—*i.e.*, concealing losses associated with

individual acquisitions, while publicly touting the success of its zealous acquisition strategy, all while failing to disclose the insider nature of some of these transactions—Defendants misrepresented J2's true health as a business and, in turn, artificially inflated its stock price. In reality, most of its acquisitions involved overpaying for stagnant, hollow, or otherwise unprofitable companies. Simply put, J2 has touted a strategy of acquiring solid companies capable of independent organic growth and succesfully integrating them with companies in the same or similar industry, whereas the truth is that J2 frequently acquired junk, to enrich Defendants, corporate insiders and other of their associates tied to that junk.

6. The Class Period starts on October 5, 2015, when J2 announced in a press release that it had completed nine acquisitions in the third quarter of 2015 ("3Q15"), including the intellectual property of "VDW (Netherlands)" (the "VDW Acquisition"). What J2 failed to disclose was that the VDW Acquisition was of an 11-month-old consulting business registered to the personal residence of a long-time corporate insider, former Vice President ("VP") of Corporate Development Jeroen **v**an **d**er **W**eijden, and had no other employees, but cost J2 approximately $900,000. In May 2014, van der Weijden had become a director of J2 Global UK Ltd. ("J2 UK"), an arm of J2 Global Ireland Limited ("J2 Ireland"), which was ultimately owned by J2. He started VDW just six months later and proceeded to orchestrate the VDW Acquisition ten months later, while working for J2. No conflict was disclosed. As subsequently revealed, van der Weijden sourced and handled dozens of acquisitions by J2 – to the tune of over 135 of J2's 186 Mergers and Acquisitions ("M&A") transactions. But his incentive package was based on the number of deals he closed, rather than on the substance. Consequently, he was incentivized to close deals. Regardless of whether J2 overpaid, the acquisition enriched van der Weijden at J2's expense, or was otherwise bad for J2's business. While Defendants touted a strategy of successful acquisitions of profitable companies posing organic growth, van der

Weijden focused solely on the number of deals, as well as insider transactions for personal profit.

7. But van der Weijden was just one component of J2's rampant, improper insider dealings. In 2017, J2's Board of Directors (the "Board") authorized the use of shareholder funds to invest $200 million in a fund associated with Orchard Capital Corp. ("Orchard Capital").[1] Orchard Capital is an investment venture founded by Richard S. Ressler, J2's Board Chairman. It has also paid Brian Kretzmer, a J2 Board member and chair of its Audit Committee ("AC"), to do M&A work. As part of the deal, J2 provided nearly 77% of the fund's equity. Yet Ressler remains Orchard Capital's majority equity owner and has "continue[d] to oversee companies in which Orchard" Capital or its affiliates invest. Furthermore, J2 paid an Orchard Capital affiliate – the principals of whom are Defendant Zucker, Ressler and Zohar Loshitzer (J2's Executive Vice President ("EVP") of Corporate Strategy) – over $65 million in management fees across 2018 and 2019. Multiple J2 insiders enriched themselves in connection with Orchard Capital and that transaction with J2.

8. Yet, there was no business justification for J2's investment. The Orchard Capital affiliate that received $65 million was in the same business as J2—investing in and acquiring companies—but it had a thin investing record comprised of primarily failed companies. And those companies also had Defendant Zucker, Ressler, Loshitzer and/or their associates in executive or Board positions. J2's transaction, therefore, had no observable benefit to J2's shareholders but enriched J2 insiders.

9. In addition to obfuscating the web of related parties who stood to benefit from its acquisitions, J2 has concealed the underperformance of acquired assets – particularly international ones. J2's goodwill should rise and fall with the value of those acquired businesses, yet J2 steadfastly refuses to take impairments or otherwise

[1] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).

disclose the underperformance of those acquired businesses in its financial statements – notwithstanding how they perform. The lack of impairments misleadingly signals to investors that the acquisitions were properly valued and are performing well.

10. For example, J2 Ireland took a €22.1 million charge in 2015 and subsequently saw its revenue decline 27% over the following three years, with operating income plummeting from €5.2 million to ***negative*** €11.5 million.[2] Yet J2, as the parent company, has taken no related goodwill charge and has made no related disclosures in its financial statements. Instead, Defendants maintain that J2's"organizational approach to M&A is very solid" and its "track record has been remarkable," and have not conveyed to investors that the acquisitions integrated into J2 Ireland were bad deals that are hurting J2's bottom line.

11. Similarly, the revenue of J2's largest acquisition ever – Everyday Health Group ("Everyday Health") – tanked over 32% in the first year after being acquired, from $254 million to $171 million. It has yet to reach pre-acquisition levels despite five subsequent acquisitions – and their revenues – being folded into the division. But J2 still has not written off any of the $27 million in now worthless goodwill that it recorded at the time of the Everyday Health acquisition.

12. Instead of providing the truth owed to investors, J2 has obscured the real performance of acquired companies and, in turn, the holes in J2's acquisition system. Using writeoffs, divestures, and acquisitions at the subsidiary or division level, J2 has concealed information about the specific performance of any individual acquisition, leaving the market in the dark about the true strength of J2's acquisition system –

[2] Hindenburg Research, J2 Global: Troubling Related Party Transactions, Looming Impairments And A Suspicious History Of Insider Enrichment Spanning Decades (June 30, 2020), https://hindenburgresearch.com/j2-global/ (last visited Nov. 18, 2020).

touted by Defendant Shah as the Company's "single great competitive advantage."[3] Indeed, what Defendants portrayed as a strong system of vetting, acquiring and integrating organically growing businesses was actually a scattershot approach of purchasing anything for any price while enriching insiders and banking on the success of enough of the acquired companies to conceal the enormous failure of the others. This actual strategy was never disclosed to investors.

13. The truth began to be revealed when, before the market opened on March 10, 2016, Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)!" (the "Citron Report").[4] The Citron Report revealed that J2, among other issues, (i) "no longer wants acquisitions, it needs acquisitions" (emphasis in original) (ii) "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or usless assets that have all been acquired with terms undisclosed;" and (iii) "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating."

14. On this news, shares of J2 plummetted $14.09 per share, or nearly 20%, to close at $56.90 per share on March 10, 2016 on unusually heavy trading, damaging investors.

15. Then, before the market opened on June 30, 2020, Hindenburg Research published a report entitled "J2 Global: Troubling Related Party Transactions,

---

[3] YouTube, Vivek Shah talks about what he looks for when searching for a successful acquisition (Feb. 13, 2020), https://www.youtube.com/watch?v=g5hakF4CABQ&feature=youtu.be&t=232 (last visited Nov. 18, 2020).

[4] Citron Research, *Citron Exposes Dirty Secrets of j2 Global (JCOM)!* (Mar. 10, 2016), https://citronresearch.com/wp-content/uploads/2016/03/JCOM-final-b20.pdf?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link (last visited Nov. 18, 2020).

Looming Impairments and A Suspicious History of Insider Enrichment Spanning Decades" (the "Hindenburg Report").[5] The Hindenburg Report revealed that J2 had, among other issues: (i) misrepresented and/or failed to disclose that its "opaque acquisition approach has opened the door to egregious insider self-enrichment," including Defendant Zucker, and "found obvious red flags" which called into question "every one of the 135 deals" that van der Weijden oversaw; (ii) "masked" the underperformance of acquisitions by utilizing "tricky accounting" such as "multiple material goodwill impairments [in subsidiary filings] that don't appear to coincide with parent financials" and "[o]bfusact[ing]" the financials of J2's largest acquisition, Everyday Health "Through A Series of Acquisitions and Divestures;" and (iii) failed to disclose "decades of intertwined financial interests between board members and executives," which called their "independence into question."

16. On this news, shares of J2 fell $6.29 per share, or over 9%, to close at $63.21 per share on June 30, 2020 on unusually heavy trading, damaging investors.

17. Throughout the Class Period, Defendants made materially false and misleading statements regarding J2's business, operations and internal controls. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) J2 has been engaging in a secret pattern of enriching corporate insiders, including Defendant Zucker, through its acquisitions, of which approximately 73% were sourced and handled by a corporate insider whose only incentive was the number of deals – not their quality or suitability; (ii) J2 has been hiding unsuccessful acquisitions by not breaking out the financials of acquired companies within its consolidated financial statements, thereby allowing Defendants to mislead investors about the strength of its acquisition system; and (iii) as a result of the foregoing, J2's public statements were materially false and misleading at all relevant times.

---

5 Supra note 2.

18. As a result of Defendants' false and/or misleading statements, J2 common stock traded at inflated prices during the Class Period. After disclosure of Defendants' false and misleading statements and/or materialization of Defendants' concealed risks, J2 stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Lead Plaintiff and the Class.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

21. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, J2 is headquartered in this Judicial District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

23. Lead Plaintiff Espy acquired J2 common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged disclosures and/or materialization of Defendants' concealed risk.

24. Defendant J2 is incorporated in Delaware and headquartered in Los Angeles, CA. J2's common stock trades on the NASDAQ under the ticker symbol "JCOM."

25. Defendant Shah has served as the Company's Chief Executive Officer ("CEO") since January 2018. Prior to being promoted, he had been the CEO of Ziff Davis LLC, J2's digital media business. Prior to J2's acquisition of Ziff Davis, LLC ("Ziff Davis") in 2012, Shah had partnered with a private equity firm to purchase it himself. He holds a Bachelor of Arts degree in political science from Tufts University.

26. Defendant Zucker co-founded the company in 1996. He served as the Company's CEO from May 2008 until December 2017. Prior to that he had served in various management roles including as J2's President, Chief Operating Officer ("COO"), CMO and Chief Financial Officer ("CFO"). During his tenure, Zucker purportedly executed over 160 acquisitions, making J2 one of the U.S.'s most acquisitive tech companies and growing J2's revenue to over $1.1 billion. He holds a Bachelor of Arts degree in Economics from Tel Aviv University.

27. Defendant Turicchi joined J2 in March 2000 as EVP of Corporate Development. Since August 2014, he has served as the Company's President and CFO. Prior to that, he held various management roles at J2, including CFO, co-president and president. Turicchi holds a bachelor's degree in Mathematics and Economics from Claremont McKenna College. During the Class Period, he oversaw all of J2's finance, M&A activity, and public matters.

28. Defendants Shah, Zucker, and Turicchi are collectively referred to hereinafter as the "Individual Defendants."

29. Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about J2's business, operations, operational trends, controls, markets, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate

officers and employees, attendance at management and Board meetings and committees thereof, including the Executive Committee.

30. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, are the collective actions of the narrowly defined group of Defendants identified above. Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, controls, growth, products and present and future business prospects as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and/or misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

31. As officers and controlling persons of a publicly-held company whose shares are registered with the SEC pursuant to the Exchange Act and trade on the NASDAQ which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, products, markets, management, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded shares would be based upon truthful and accurate information. Defendants' false and/or misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. The Individual Defendants, because of their positions of control and

authority as Officers and Directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance or had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

33. Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of J2 shares by disseminating materially false and/or misleading statements and/or concealing material adverse facts.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Company Background

34. J2 purports to be a leading Internet information and services company consisting of a portfolio of brands across its two divisions: Digital Media and Cloud Services.[6]

35. The Cloud Services business entails business that offer services like online fax, online backup, e-mail, encryption and other subscription-based cloud services. The Digital Medial business focuses on advertising and sponsorships, subscription and usage fees, performance marketing and licensing fees.

36. J2 also purports to be an active acquirer of businesses in media, technology and Internet services, having deployed approximately $3 billion of acquisition capital to acquire 186 businesses since its founding in 1995.[7]

37. Because J2's business model relies heavily on acquisitions for growth, its

---

[6] J2 Global, Inc., Quarterly Report (Form 10-Q), at 16 (May 11, 2020).

[7] J2 Global, Inc., https://www.j2global.com/about/ (last visited Nov. 18, 2020).

success requires paying fair market value to acquire companies and for those companies to continue to be at least as profitable as when J2 values and acquires them. As Defendant Shah stated on February 6, 2018, "[b]eing able to acquire established brands at attractive prices is a main component of our M&A program." In other words, J2 is not the business of buying undervalued companies and adding value, or otherwise organically growing, those companies.

38. Despite conducting unrelenting acquisitions since 1995, J2 has *never* taken a goodwill impairment related to any of its acquisitions, thereby indicating to investors that it has either never overvalued goodwill at the time of purchase and/or the aquired assets have never underperformed their expectations.

**B. Relevant Accounting Policies and Principles**

**1. GAAP requirements generally**

39. Generally Accepted Accounting Principles ("GAAP") are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, against which financial presentations should be measured. GAAP are the official accounting standards and have been codified and are primarily promulgated by the Financial Accounting Standards Board ("FASB").

40. The SEC requires public companies present financial statements in accordance with GAAP. SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.

41. Regulation S-X also requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. § 210.10-01(a).

**2. Materiality**

42. As a publicly traded company, how J2 should apply materiality to its financial statements is guided by SEC Staff Accounting Bulletin: No. 99 – Materiality ("SAB 99"). Materiality is based on whether a reasonable person relying upon J2's public statements would have been changed or influenced by the inclusion or correction of the information at issue. According to SAB 99, qualitative and quantitative factors should be considered in determining materiality.

43. The Financial Accounting Standards Board ("FASB") Amendments to Statements of Financial Accounting Concepts No. 9 ("Concept No. 9") issued in August 2018 clarified the concept of materiality. Concept No. 9 states that "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

**3. Related party transactions**

44. J2 was required, under GAAP and SEC Regulation S-X, to make specific disclosures pertaining to related party transactions.

45. SEC Regulation S-X requires:

> (1) ***Related party transactions…should be [identified and the amounts] stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows***.[8]
>
> (2) In cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries[, separate disclosure shall be made in such statements of the amounts in the related consolidated financial statements which are (i) eliminated and (ii) not eliminated. Also,] any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed.

[8] Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

17 C.F.R. § 210.4-08(k).

46. In addition, FASB Accounting Standards Codification ("ASC") 850 applies. Related parties are said not to be acting at arm's length because of the special inherent relationship between them. Because this special relationship can create a conflict of interest that can benefit related parties, withholding information about material related party transactions makes financial statements unreliable and prevents the true picture of an entity from being represented. Thus, disclosure is required so users of financial statements can evaluate the significance of these transactions and make an informed decision

47. FASB ASC 850, requires companies to disclose the following for material related party transactions:

- The nature of the relationships involved;
- A description of the transactions, including transactions where no amounts or nominal amounts are involved, for each of the reporting periods where income statements are presented; additionally, other information deemed necessary to gain an understanding of the effects of the transactions on the financial statements should be disclosed;
- The dollar amounts of the transactions for each of the reporting periods where income statements are presented along with the effects of any change in the method of establishing the terms of the transactions when compared to the method used in the preceding reporting period;
- Amounts due to or from related parties as of each financial statement date and, if not otherwise apparent, the terms and manner of settlement related to those amounts.

**C. Statements by Former Employees**

48. Former Employee ("FE") 1, joined J2 as a General Manager in January 2015 and was made Managing Director, Australia & New Zealand at the end of 2015,

which FE1 remained until FE1 left in April 2017. FE1 had total responsibility for all aspects of the cloud business for Australia and New Zealand, including the operations, budgets, and sales for eFax, eVoice, Zintel, Fonebox, Keep it Safe, and Web24. FE1 had 12 direct reports in marketing, sales, and operations as well as an indirect report in finance, Tony Pizzardi, who reported to FE1 everyday. After the Fonebox acquisition, FE1 oversaw around 120 employees. FE1 was based in Melbourne, Australia but traveled to local offices around Australia and New Zealand and attended video conferences with J2's Hollywood, California office. FE1 initially reported to VP of International Marketing & GM, Tim McLean, until McLean was forced out. FE1 then reported to Zucker for a short time before reporting to Harmeet Singh who was made President of Cloud Services. FE1 confirmed that Singh reported to Zucker, and that based on conversations with McLean, McLean also reported to Zucker.

49. FE1 had weekly Zoom calls with Singh and attended calls with Zucker if an acquisition in Australia was being discussed. According to FE1, before the two deals FE1 was involved in were done, a call with senior executives including Zucker, Singh, and Ressler would be held to discuss whether the deal was a "go or no-go." FE1 had no reason to believe J2's process for acquisitions was different in Australia versus elsewhere.

50. FE1 provided Zucker and Singh weekly reports that contained standard form performance results including revenues, expenditures, e-sales and other metrics such as churn rates (customers who signed up/who left), revenue impact, and marketing (measuring the times ads were presented, clicked through, *etc.*). Each business in Australia and New Zealand ran on a different system; there was no central platform. Thus, in order to generate the reports for Zucker and Singh, FE1 had to consolidate into a spreadsheet raw data received from FE1's direct reports.

51. FE1 met and worked with van der Weijden when van der Weijden came to Australia for meetings. FE1understood that van der Weijden "was responsible for

globally identifying potential acquisitions to add on the core business" and "head[ed] the M&A function." In or around March/April 2015, McLean specifically informed FE1 that van der Weijden had an incentive package that was based on the number of deals he brought in that closed; the deals did not have to be good or make sense, but they had to be approved by the Board. FE1 had held a similar role at another company and explained that out of 20 deals you look at, one might be of value, so if you chase after the other 19, the company will end up buying "stupid things." FE1 stated that van der Weijden's incentives did not always line up with J2's goals as a company, but it was well known around the Company that this was his role and he was doing exactly what Zucker wanted him to do.

52. FE1 stated that this incentive structure was concerning because at J2, information flow from acquisition to integration was limited and the practice was to just hand the acquired company to the person responsible for that area. In FE1's opinion, J2 was "atrocious" about buying businesses and not integrating them at the global level. FE1 confirmed that J2 followed some of the methods and approaches of private equity firms when acquiring companies, but not when it came to the integration. So, people in similar roles as van der Weijden at private equity firms are typically required to take more of an operating role in the newly acquired company so that they are involved in the integration, ensuring the knowledge obtained while conducting due diligence on the business and competition is retained by the new business. But at J2, van der Weijden did not have to be around to clean up the mess if an acquisition did not work out.

53. Until FE1 joined J2, no one else at the Company had any experience in the web-hosting industry. Furthermore, FE1 came to J2 with 15 years of experience buying businesses in Asia and Australia. Specifically when FE1 was with Caledonian Investments (part of PA Spencer Group in New Zealand) from 2004 through 2013, FE1 was responsible for the identification of web-hosting businesses to buy in

Australia, New Zealand, and Asia. This responsibility required FE1 to identify potential target companies, actively go and meet with companies, review their financial statements, and determine how much to pay for their business – day in and day out for nearly ten years. During that time, FE1 worked hands-on conducting the preliminary due diligence and lead valuation on over 100 companies and full diligence on around 15 potential acquisitions, of which five or six were ultimately acquired.

54. J2 acquired at least three businesses in the Australia/New Zealand market, the first of which was Web24 Group Pty Ltd. ("Web24").[9] Based on FE1's knowledge of the hosting industry and experience actively acquiring hosting firms for six years prior to joining J2, it was FE1's opinion that J2 paid too much for Web24. The second acquisition was of a small Sydney-based hosting company, AUSweb, for under a million dollars.[10] FE1 believed van der Weijden overvalued AUSweb because the income van der Weiden reviewed at the time he was vetting the deal was several months out of date as the company had been moving its customer base, and the income was not re-reviewed at the time of the acquisition. FE1 was just told the deal was done and to integrate it, which FE1 did and only learned that revenues were not what van der Weijden said they were when they hit FE1's P&L (profit and loss statement) at a much lower starting point than had been expected. FE1 made the decision to shut down the AUSweb brand after tracking customer revenues and subscription revenues for 12 months using a billing platform through a vendor called Parallel and integrating

---

[9] Press Release, Business Wire, *J2 Global Acquires Web24 Group Pty Ltd.* (Sept. 22, 2014), https://www.businesswire.com/news/home/20140922005050/en/j2-Global-Acquires-Web24-Group-Pty-Ltd. (last visited Nov. 18, 2020).

[10] Press Release, Business Wire, *J2 Global® Completes Four Acquisitions in Q4 of 2015 – 24 Acquisitions in FY 2015* (Jan. 14, 2015), https://www.businesswire.com/news/home/20160114005016/en/j2-Global%C2%AE-Completes-Four-Acquisitions-in-Q4-of-2015- (last visited Nov. 18, 2020).

everything into Web24. The shutdown of the AUSweb business was always part of the plan at the time of the acquisition; the 12 months was to enable the transfer of AUSweb customers to Web24. Based on FE1's understanding, the financial integration was done at the J2 Australia subsidiary level and even though J2 Australia was reported into the United States, there was no visibility or transparency outside of J2 as to specific transactions.

55. FE1 was told not to talk publicly about new acquisitions, how much was paid for them, or how they were performing. Singh told FE1 that not publicly talking about new acquisitions was intentional and deliberate by the Board because, then, analysts could not track individual entities andwould have to track the consolidated entity. FE1 recalls this information in the context of an article that came out in which Fonebox's founder, Jordan Grives, stated his company had been acquired for more than J2 had actually paid.[11] FE1 received a video call from Singh within days, if not 24 hours, of that article coming out during which Singh informed FE1 of J2's position.

56. FE2, J2's former Global Head of Human Resources from July 2006 to December 2016, was based in Los Angeles, California and worked directly with van der Weijden to conduct approximately 100 mergers and acquisitions during that time. FE2 led teams within multiple divisions and business lines, managing human resources, benefits and leave administration for over 2,000 employees, including van der Weijden.

57. FE2 recalled that van der Weijden was compensated based on the number of firms he acquired, not the quality of the firms or the success of the subsequent mergers. As a result, he was incentivized to purchase as many firms as possible without conducting the proper due diligence necessary to ensure the new firm added

---

[11] James Harkness, *Fonebox founder Jordan Grives sells telco service provider for a reported $30 million*, Dynamic Business (Oct. 21, 2016), https://dynamicbusiness.com.au/leadership-2/entrepreneur-profile/fonebox-founder-jordan-grives-sells-telco-service-provider-for-a-reported-30-million.html.

value to J2. FE2 further stated that FE2 constantly pressured van der Weijden to conduct more research into potential acquisitions, but he refused to heed that advice. FE2 clarified that, while FE2 ensured that J2 conducted rigorous human resources due diligence, J2 did not conduct strong accounting due diligence. FE2 added that van der Weijden was unconcerned with uncovering if the target company was profitable or if the merger was ultimately successful.

58. FE2 went on to say that van der Weijden reported directly to Zucker, Turicchi, and Ressler and that they signed off on "every" acquisition. FE2 further stated that Zucker and Turicchi were aware of van der Weijden's lack of due diligence and that FE2 was present at meetings where acquisitions through van der Weijden were discussed amongst the executives referenced above.

59. According to FE2, van der Weijden initially worked for J2 as a consultant and his compensation was a percentage of each sale, but joined J2 as a full-time employee in 2015 and was given a salary, stocks, and an annual performance bonus. FE2 explained that at the time van der Weijden joined J2 as an employee, he wanted to bring his longtime girlfriend with him from The Netherlands to the United States but was unable to obtain a work visa for her and "refused to marry her." According to FE2, instead van der Weijden made his girlfriend an employee of his personal consulting firm, VDW, and insisted that J2 acquire VDW so that his girlfriend could come to the United States as an employee of J2. FE2 stated that J2 acquiesced to van der Weijden's demands and acquired VDW for $900,000, which J2 considered to be a bonus to van der Weijden. FE2 added that FE2 was present at meetings with van der Weijden, Turicchi, and Zucker where van der Weijden's compensation structure and his girlfriend's visa status were discussed. FE2 relayed that van der Weijden threatened to leave J2 unless Turicchi and Zucker accommodated his demand to bring his girlfriend to the United States, at which point the discussions became private and FE2 no longer participated.

60. FE2 stated that J2's Board dictated that van der Weijden hit a target of six acquisitions per quarter from 2012 through December 2016 when FE2 left. FE2 stated that van der Weijden therefore had a great deal of sway at J2. FE2 further stated that van der Weijden's demands were always met because otherwise he threatened to "turn off the spigot." FE2 confirmed that van der Weijden directly threatened FE2 that he would "turn off the spigot."

61. In addition, FE2 stated that Zucker was "obsessed with numbers" and that "budgets ruled J2." FE2 added that the accounting team sent "a ton of reports" to Zucker and Turicchi and that department heads had weekly meetings with Zucker after receiving weekly reports from each of their team leaders. FE2 recounted that Zucker preferred a "red light, yellow light, green light" structure to meetings while Turicchi's style was more informal. FE2 went on to say that the accounting systems used to generate reports varied by business segment, but that the final reports were always sent either as an Excel file or Word document.

62. According to FE2, J2 overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry. FE2 stated that after the acquisition, J2 discovered that most of Web24's labor was already cheaply outsourced. FE2 explained that Web24 was thus already run too cheaply to make it profitable without significant innovation – which J2 did not do based on its strict "no innovation" policy, *i.e.* its strategy of cutting operating costs of newly-acquired companies rather than significantly overhauling operations. FE2 further explained that "there is no money" in the internet domain industry and internet domain companies like GoDaddy turn a profit by selling other services.

63. FE3, a former Senior Financial Analyst for J2 from July 2017 until February 2018, was a member of the Financial Planning, Reporting & Analysis group at J2 and was responsible for consolidating user data, analyzing revenue streams and reconciling financial data.

64. FE3 stated that J2 operated on "paper-thin" margins and that it was difficult to ascertain J2's precise financial condition since each new company that J2 acquired had its own unique accounting system. According to FE3, since there were "hundreds of companies" and several different accounting systems, it was difficult to "line up the numbers" and verify the financial data.

65. FE3 further stated that J2 operated newly acquired businesses "as leanly as possible" and, as a rule, did not reinvest in those companies. As a result, according to FE3, there were many missed opportunities for J2 to reinvest in and grow certain of its acquired businesses – including a cloud software services company from Australia which was purchased at a time when J2 could have been a major player in the cloud services sector.

66. FE4 worked as part of J2's Financial Planning and Analysis ("FP&A") organization until mid-2015. As part of the Company's FP&A organization, FE4 was in the reporting line of Vice President Milton Rodriguez, who reported to Defendant Turicchi. According to FE4, J2 experienced "zero organic growth" from their core digital fax business and survived by acquiring as many competitors and smaller companies as possible. FE4 recalled that van der Weijden would source companies and purchase as many as six companies per quarter. FE4 stated that J2 performed "very little due diligence" on the companies they purchased. FE4 elaborated that due diligence at J2 consisted of running a simple compound annual growth rate (CAGR) model to forecast revenue on an annual basis, a process that took "a week or two."

67. FE4 stated that Turicchi and Zucker received regular financial reports about J2's financial condition, including a daily report detailing customers added and lost. FE4 stated that the daily report was "highly used" at J2 and that Turicchi and Zucker occasionally responded to the circulated report to ask about declines in revenue. Specifically, FE4 recounted that if a specific business unit was "plus or

minus" 5%, executives, including Zucker and Turicchi, would ask questions as to "what happened."

68. FE4 recalled that J2 experienced zero organic growth from their core digital fax business because FE4, as part of the Company's FP&A organization, had access to all revenue information, including a monthly product revenue report that was sent to Defendant Turicchi.

69. On October 12, 2017, J2 announced the sale of its Australian hosting business, which had integrated AUSweb and other small hosting companies into Web24.[12] Because the terms of these acquisitions have never been disclosed to the market, investors have no idea whether and how successful J2's integration efforts were and what savings and synergies, if any, were created by J2.

70. Without providing more information about how J2 Australia has been performing in J2's financial statements, the market has been unable to accurately gauge the strength of J2's acquisition system or strategy.

### D. Acquisitions Enriching J2 Insiders

#### 1. The Pre-Class Period Jump Acquisition

71. Based on his LinkedIn page, van der Weijden was the VP of Corporate Development of J2 from September 2009 to August 2018. During his tenure, he purportedly "[m]anag[ed] client relationships at the ***C-level***, including the identification and pursuit of new business opportunities via existing networks, as well as through developing new relationships and providing technical valuation advice."[13]

---

[12] Press Release, Business Wire, *J2 Global Completes Two Acquisitions in Q3 2017; Announces Two Additional Divestitures; Updates 2017 Guidance* (Oct. 12, 2017), https://www.businesswire.com/news/home/20171012005480/en/j2-Global-Completes-Acquisitions-Q3-2017-Announces (last visited Nov. 18, 2020).

[13] Jeroen van der Weijden, LINKEDIN, https://www.linkedin.com/in/jeroen-van-der-weijden-2331a7/ (last visited Nov. 18, 2020.)

72. Van der Weijden also purportedly "[s]ourc[ed] and handl[ed] over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow-up and reporting."[14] Based on J2 having purportedly acquired 186 businesses since 1995, van der Weijden has sourced and handled nearly 73% of the Company's acquisitions.

73. In March 2004, J2 paid $1 to $2 million to acquire Jump B.V., a Netherlands-based provider of fax-to-email and unified messaging services founded by van der Weijden.[15]

74. In March 2014, Jump was reorganized as J2 Global (Netherlands) B.V. and registered to van der Weijden's personal residence (Pieter Pauwstraat 2 A-I 1017ZJ Amsterdam). Dutch real estate records confirm that the 400 square feet residence belonged to van der Weijden.

**2. The VDW Acquisition**

75. During 3Q15, J2 then acquired the intellectual property of "VDW (Netherlands)," at which time van der Weijden was its sole employee[16] and was barely in the process of commencing its licensing program. J2's only disclosure regarding the VDW Acquisition was a press release on October 5, 2015 announcing the acquisition of nine business which "will grow the Company's global customer base, provide access to new markets and expand j2's product lineup." The press release simply listed "VDW (Netherlands)" under "Intellectual Property."[17] There was no

---

[14] *Id.*

[15] J2 Global Communications, Inc. Quarterly Report (Form 10-Q), at 8 (Aug. 9, 2004); The Globe and Mail, *J2 Global to acquire Electric Mail* (Jan. 22, 2004), https://www.theglobeandmail.com/technology/j2-global-to-acquire-electric-mail/article20427196/#:~:text=22%20%2D%20The%20Electric%20Mail%20Company,Global%20will%20pay%20to%20Electric (last visited Nov. 18, 2020).

[16] *Supra* note 4.

[17] Press Release, BusinessWire, *J2 Global Raises Guidance* (Oct. 5, 2015), https://www.businesswire.com/news/home/20151005005526/en/j2-Global%C2%AE-Raises-Guidance (last visited Nov. 18, 2020).

mention of the conflict.

76. J2's Form 10-K for fiscal year ("FY") 2015 did not identify, provide the purchase price, or otherwise give any additional color on the VDW Acquisition. In its June 30, 2020 response to the Hindenburg Report ("J2 Response")—*i.e.*, five years after the acquisition—J2 for the first time confirmed that it had paid van der Weijden approximately $900,000 for his "Intellectual Property."[18]

77. Based on Dutch corporate records, the full name of the company was Van der Weijden M&A Consultancy BV and it had been set up just eleven months earlier (December 2014) under van der Weijden's name and registered to his personal residence (Pieter Pauwstraat 2 AH 1017ZJ Amsterdam). Those same records confirm the company had zero "Working people," *i.e.*, employees, that its activities included the "[m]anagement and operational management consultancy," and that it was dissolved in October 2019, shortly after van der Weijden left J2.[19]

78. Approximately one month after the VDW Acquisition, van der Weijden purchased a "Studio City Hills Estate" in California for $2.5 million which came with a solar heated saltwater pool, tennis court, gym and steam room.[20]

79. Despite van der Wieijden's LinkedIn profile and the Dutch corporate records demonstrating otherwise, J2's Response on June 30, 2020 claimed that van der Weijden was a consultant for J2 from 2004 until his consulting business was

---

[18] Press Release, Business Wire, *J2 Global Responds to False Claims and Distortions in Short-Seller "Research" Report* (June 30, 2020), https://www.businesswire.com/news/home/20200630006133/en/J2-Global-Responds-False-Claims-Distortions-Short-Seller (last visited Nov. 18, 2020).

[19] Van der Weijden M&A Consultancy BV, https://www.oozo.nl/bedrijven/amsterdam/de-weteringschans/frederikspleinbuurt/1066039/van-der-weijden-m-a-consultancy-b-v (last visited Nov. 18, 2020).

[20] Zillow, https://www.zillow.com/homedetails/11920-Laurel-Hills-Rd-Studio-City-CA-91604/20030283_zpid/ (last visited Nov. 18, 2020).

acquired by J2 in 2015, after which time he became a full-time employee of J2. Coincidentally, 2004 was when J2 acquired Jump.[21]

80. Furthermore, publicly available documents in the UK show that from May 2014 to January 2016, van der Weijden was a director of J2 UK, an arm of J2 Ireland, which was ultimately controlled by J2.[22] Indeed, van der Weijden signed the company's statement of director responsibilities on March 6, 2015 "on behalf of the board" of J2 UK.[23]

81. Thus, indisputable public records show that van der Weijden set up his consulting company just six months after becoming a director of a J2 subsidiary, and that—just 11 months later— and while still a director of that J2 subsidary, sold that new business, with no employees, and no office, to J2 for $900,000.

82. Because, *inter alia*, Defendants chose to disclose the VDW Acquisition, they had a duty to fully disclose that a related party was involved in the transaction. But they failed to do so.

**3. The $200 Million Investment in Orchard Capital[24]**

83. Ressler has been the Board Chairman and a director of J2 since 1997. He also served as J2's CEO from 1997 to 2000.

---

[21] *Supra* note 17.

[22] Steve Goldstein, Under attack from short seller, J2 Global says it bought company from a consultant – documents indicate there's more to the story, MARKET WATCH (July 7, 2020), (https://www.marketwatch.com/story/under-attack-from-short-seller-j2-global-says-it-bought-company-from-a-consultant-documents-indicate-theres-more-to-the-story-2020-07-06?mod=newsviewer_click (last visited Nov. 18, 2020).

[23] J2 Global UK Limited, *Abbreviated Financial Statements*, **Accounts for a small company** made up to 31 December 2013 (Mar. 25, 2015), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=1 (last visited Nov. 18, 2020).

[24] For the Court's convenience Plaintiff has appended a summary of the long and complex relationships between these allegedly "independent directors" and incorporates it herein. *See* **Appendix A.**

84. Ressler is the majority equity holder of the investment fund OCV Fund I, LP's ("the Fund") General Partner, OCV I GP, LLC ("OCV I"). He is also the majority equity holder of the Fund's manager, OCV Management, LLC ("OCV") located at 4700 Wilshire Blvd., Los Angeles, CA 90010.[25]

85. Ressler is also the founder and President of Orchard Capital, an investment fund, and uses OCV as an affiliate through which he oversees companies in which Orchard Capital or its affiliates invest.

86. On September 25, 2017, the Board and AC authorized J2 to invest $200 million in the Fund ("Orchard Investment"). At that time, Defendant Zucker was J2's CEO, Ressler was J2's Board Chairman, and Loshitzer was an EVP at J2.[26] J2 made paltry limited disclosures that Ressler and Zucker held significant equity and management powers in OCV and OCV 1 GP. As detailed below, however, these disclosures were nowhere near sufficient, failed to disclosue the true extent of the relationships, the board's lack of independence, and the true extent of the plan to eventually take this money for themselves.

87. Loshitzer has served as J2's EVP of Corporate Strategy since 2001 and had served as J2's Chief Information Officer from 1997 to 2001. Loshitzer has also been a principal of OCV since 2005.[27]

88. Just three days after J2 made the Orchard Investment, on September 28, 2017, J2 named Defendant Shah CEO of J2 and announced that Defendant Zucker

---

[25] Bloomberg, OCV Management LLC, https://www.bloomberg.com/profile/company/1491771D:US (last visited Nov. 18, 2020); OCV Team, http://ocvpartners.com/team/ (last visited Nov. 18, 2020).
[26] J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).
[27] Presbia.com, *Zohar Loshitzer, Executive Chairman and Executive Officer*, https://presbia.com/presbia-team/#direct (last visited Nov. 18, 2020).

would be joining OCV as a co-managing principal – both effective January 1, 2018.[28] Shah's incredible compensation, granted nearly simultaneously with the $200 million being diverted from J2 to insiders, is a major red flag. Specifically, inaddition to Defendant Shah's $1 million annual salary, the Company's Compensation Committee established the "Shah Equity Award", awarding Mr. Shah an upfront long-term equity award, consisting of 400,000 stock options, 400,000 performance-based restricted shares, and 200,000 time-based restricted shares "to incentivize Mr. Shah during his tenure as [CEO]." Through this promotion, Defendant Shah realized a ***total compensation of more than $45 Million*** for 2018. For perspective, Defendant Zucker only saw a total compensation of just over $5 Million for 2017.

89. Pursuant to an agreement between J2 and the Fund (the "Investment Agreement"), the Fund has purportedly invested in or acquired other companies on behalf of J2 – using the funds provided by J2.[29] As detailed below, many of these subsequent investments and acquisitions have involved insiders, but contained none of the required disclosures. In essence then, J2's commitment of $200 million to OCV (where there was some limited, but deficient disclosure) appears to have been a patent attempt to hide how that $200 million account would later be used to enrich insiders. Defendants rationale being, apparently, that once the money left J2 in the OCV transaction, subsequent use of the money wouldn't be scrutinized.

90. In addition to this $200 million "investment," J2 has been required to pay OCV millions of dollars in management fees each year pursuant to an agreement

[28] Press Release, Business Wire, *J2 Global Announces Vivek Shah to Become Chief Executive Officer in January 2018* (Sept. 28, 2017), https://www.businesswire.com/news/home/20170928005358/en/j2-Global-Announces-Vivek-Shah-Chief-Executive (last visited Nov. 18, 2020); J2 Global, *Vivek Shah, Chief Executive Officer*, https://www.j2global.com/about/leadership/vivek-shah/ (last visited Nov. 18, 2020).

[29] J2 Global, Inc., Quarterly Report (Form 10-Q), at 21 (May 11, 2020).

between J2 and OCV. Specifically, J2 paid OCV over $36 million in 2018 and $29 million in 2019.[30]

91. The AC, comprised of Chairman Kretzmer and committee members Stephen Ross, Jon Miller, and Scott C. Taylor, approved the Investment Agreement. Kretzmer and Ross, published by J2 to be "independent" directors, both had multiple overlapping business relationships with Ressler and each other.[31]

92. Kretzmer was elected to the Board in July 2007 and held out as an "independent" director. *Id*. Despite this alleged "independence," his firm, Kretzmer Consulting, did M&A consulting for Orchard Capital between 2016 and 2017. That work consisted of identifying acquisition opportunities and assisting with acquisition due diligence/agreements. Further, in February 2018, mere months after approving the Orchard Investment, Kretzmer became an independent director for CIM Real Estate Finance Trust Inc., a company founded by Ressler.[32] None of this was ever disclosed by J2.

93. Kretzmer also shared a long business history with Ressler, Loshitzer, and Ross. Specifically, Kretzmer was the CEO of MAI Systems Corporation ("MAI") from 1999-2006 while Ressler was Chairman and Loshitzer and Ross were directors. This wasn't disclosed by J2.

94. Ross, also held out to be "independent," wasn't either. Beyond being a director at MAI, Ross also chaired a special committee that approved a reverse stock

---

[30] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); OCV Fund I, L.P., *Second Amended and Restated Limited Partnership Agreement, Exhibit 10.9*, https://www.sec.gov/Archives/edgar/data/1084048/000108404818000001/jcom20171231ex-109.htm (last visited Nov. 18, 2020).

[31] Press Release, Business Wire, *J2 Global Names Two Additional Independent Directors* (July 30, 2007), https://www.businesswire.com/news/home/20070730005210/en/j2-Global-Names-Additional-Independent-Directors (last visited Nov. 18, 2020); Mai Systems Corp., Schedule 14C, at 9 (Mar. 24, 2004).

[32] Mai Systems Corp., Annual Report (Form 10-K), at 19 (Apr. 15, 2002).

split deal which explicitly benefited Ressler. The deal increased Orchard Capital's ownership in MAI at the expense of public investors by decreasing liquidity. Further, when the reverse stock split deal was approved, Ross's son, Avidan Ross, was employed at CIM Group, Inc. ("CIM Group"), another company co-founded by Ressler. After the approval, Ross's son became CIM Group's Chief Technology Officer. CIM Group manages CIM Commercial Trust Corp. ("CMCT"), where Ressler is the Chairman, two J2 Directors (Douglas Bech and Robert Cresci) are also directors, and its headquarters are registered to the same address as Ressler's other company, OCV (4700 Wilshire Blvd., Los Angeles, CA, 90010).[33] Unsuprisingly, J2 has never disclosed these relationships either.

95. As principals of OCV, Defendant Zucker, Ressler, and Loshitzer have, and continue to, profit handsomely from the management fees J2 pays OCV each year.[34]

96. There was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies, so investing in another private equity company doesn't seem to serve much purpose.

97. That's expecially the case since OCV had a sparse, indeed poor, track record of investing in companies – many of which, unsuprisingly continued the incestuous pattern of self-enrichment described above. Indeed, OCV had just been formed a year prior to J2's $200 million funding commitment.

98. For example, one of the companies Orchard Capital had invested in was Universal Telecom Services, Inc. ("Universal Telecom"). Universal Telecom, however, had already been dissolved by December 2016. Further, Defendant Zucker

---

[33] Mai Systems Corp., Schedule 14C, at 9 (Mar. 24, 2004); OCV Management, LLC, Contact, http://ocvpartners.com/contact/, (last visited Nov.18, 2020).

[34] J2 Global, Inc., Annual Report (Form 10-K), at 88 (Mar. 2, 2020); OCV FUND I, L.P., Second Amended and Restated Limited Partnership Agreement (Exhibit 10.9), at 2 (Jan. 19, 2018).

was the failed company's President and CEO, Loshitzer was an officer, and Kretzmer's consulting firm had consulted for it.[35] Another example is Orchard Capital's investment in Presbia PLC ("Presbia"), which went public in 2015,[36] but filed for delisting and registration termination in 2019. Unsuprisginly, Presbia's board included Ressler and Loshitzer as well as Cresci (a J2 board member) and Mark Yung (OCV's managing principal). It didn't end there. Defendant Zucker was a board member and the CEO of Presbia's parent company (Presbia Holdings). And Loshitzer was the CEO of two entities related to Presbia: (i) PresibiBio, LLC, (which had the same address as J2); and (ii) Presbia Coopertief, U.A., (which used van der Weijen's personal residence at its address).[37]

99. As a final example, Orchard Capital invested approximately $12M into Red Carpet Home Cinema ("Red Carpet"). Unsurprisingly, Red Carpet was a new startup formed by Ressler's nephew (Benjamin Black) where both Defendant Zucker and Ressler served as board members. Even more strikingly, however, is that Orchard Capital's substantial investment was made on the same day Red Carpet was founded and before it had any revenue at all.[38] This violated OCV Fund's own guidelines, which states that it invests $5 million to $20 million in companies that "***[d]emonstrate revenue traction of $5+ million*** with unique intellectual property for information

---

[35] *Supra* note 2.

[36] *Presbia prices IPO at $10, below the range,* NASDAQ (Jan. 20, 2015), https://www.nasdaq.com/articles/presbia-prices-ipo-10-below-range-2015-01-29 (last visited Nov. 18, 2020).

[37] Presbia Brochure, https://presbia.com/media/LBL-50-009-F-MICROLENS-PATIENT-BROCHUREOUS-ENGLISH-compressed.pdf (last visited Nov. 18, 2020).

[38] Secretary of State, *Application to Register LLC,* https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=201827510259-24932229 (last visted Nov. 18, 2020); Red Carpet Home Cinema, https://www.redcarpethomecinema.com/how-it-works (last visited Nov. 18, 2020); J2 Global, Inc., Quarterly Report (Form 10-Q), at 45 (May 10, 2018).

technology, e-commerce, media and telecommunications, and clean technology."[39] Red Carpet's business strategy targets a very narrow market, is quite questionable, and two prior companies offering similar services (Screening Room and Prima Cinema) have failed.[40] Predictably, it likely needed more capital. Which would explain why the first capital call from OCV fund to J2 coincided with Black working for OCV as a Principal and then leaving to be Red Carpet's CFO.[41]

100. One look at OCV's current "portfolio"[42] demonstrates this insider dealing and enrichment hasn't slowed. For example, OCV's "portfolio" of companies include: Techstyle Fashion Group which has Don Ressler as one its Co-CEOs; By Heart, SafeBreach, and Social Native which all include Defendant Zucker on their board of directors. Red Carpet Home Cinema has both Zucker and Ressler on its board.

101. Accordingly, unbeknownst to investors, the Orchard Investment heavily benefitted Defendant Zucker and corporate insiders Ressler and Loshitzer through the millions of dollars in management fees J2 has been required to pay as well as the continued funding of Defendant Zucker, Ressler, and Loshitzer's ventures.

102. Because Defendants chose to disclose the Orchard Investment and were paying OCV millions of dollars in management fees, they had a duty to fully disclose that related parties were involved not only in the Orchard Investment, but that related parties were involved in the companies OCV was investing in. Their failure to do so appears to have been a clear attempt to siphon off a fund of $200 million into a personal slush fund that would not be subject to the transparency required of J2's

---

[39] OCV Strategy, http://ocvpartners.com/strategy/ (last visited Nov. 18, 2020).

[40] Brandon Katz, *Will Hollywood Ever Allow Us to Stream New Theatrical Releases at Home?*, OBSERVER *(Apr. 18, 2019)*, https://observer.com/2019/04/streaming-vs-movies-box-office-screening-room/ (last visited Nov. 18, 2020).

[41] J2 Global, Inc., Quarterly Report (Form 10-Q), at 45 (May 10, 2018).

[42] OCV Portfolio, http://ocvpartners.com/portfolio/ (last visited Nov. 18, 2020).

funds. Plaintiff has attached a chart reflecting the web of related parties to this complaint as **Appendix B** and incorporates it herein.

**E. Hiding Underperforming Acquisitions**

103. J2 has been able to hide underperforming acquisitions – particularly international ones – by building in liabilities at the time of the acquisition and by not taking impairment charges even after the acquired companies failed to generate the financial results expected of them at the time of purchase.

104. J2 has been able to get away with this scheme for years because as Defendants well know, the market can only analyze what they have disclosed, which is the Company's consolidated, rolled up financials. Defendants have purposefully provided very few disclosures regarding the Company's acquisitions on an individual level and have never broken out any acquired companies' financials. Any potentially impaired assets or losses on any individual acquisition may not technically be material on its own and thus would not be disclosed.

105. As an investor relations representative of J2 informed Hindenberg Research, "[a]ll these tuck in acquisitions, they kinda just get shoved in to the broader J2 umbrella, within the business unit, within the division – and they don't really get tracked anymore. It's impossible to track the revenue that derives from 'Acquisition Y' versus what was there before. And the costs of course get blended together. It's really hard to track some of these tuck-in M&A."

**1. The material underperformance of J2 Ireland**

106. On May 15, 2014, while van der Weijden resided in the Netherlands, he was appointed to be a director of J2 UK, an arm of J2 Ireland, which was ultimately controlled by J2.[43] He remained a director until January 13, 2016.[44]

107. Based on international filings, J2 Ireland was a wholly owned subsidiary of J2 Holdings, which was an Irish company ultimately controlled by J2.

108. In 2015, J2 Ireland took a €22.1 million charge, but J2 Holdings took zero impairments that year. Nor did J2 disclose anything regarding this goodwill impairment charge in its financial statements for 2015.

109. Subsequently, J2 Ireland showed significant declines in both revenue and operating income from 2016 to 2018:

| J2 Ireland | 2016 | 2017 | 2018 |
|---|---|---|---|
| Total Revenue ($USD)[45] | $101,693,900 | $103,806,820 | $82,379,151 |
| *y/y growth* | | *2.1%* | *(20.6%)* |
| Operating Income | $5,556,217 | ($11,879,064) | ($13,298,722) |

110. This decline in revenue and operating income reflects the deterioration in value of European assets in subsidiaries of J2 Ireland:

| Revenue - $USD | 2016 | 2017 | 2018 |
|---|---|---|---|
| Livedrive | $25,388,640 | $25,588,840 | $23,838,984 |

[43] J2 Global UK Ltd., **Appointment** of Jeroen Clemens Maria Van Der Weijden as a director (June 13, 2014), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=2 (last visited Nov. 18, 2020).

[44] J2 Global UK Ltd., **Termination** of Jeroen Clemens Maria Van Der Weijden as a director (Jan. 13, 2016), https://find-and-update.company-information.service.gov.uk/company/03721601/filing-history?page=1, (last visited Nov. 18, 2020).

[45] Converted to US dollars from Euros.

| | | | |
|---|---|---|---|
| Comendo | $8,474,978 | $6,303,502 | $4,799,112 |
| Callstream | $7,348,775 | $10,065,193 | $8,354,168 |
| WeCloud | $4,915,197 | $5,878,372 | $3,614,333 |
| Stay Secure | $4,589,518 | $4,019,575 | $4,699,162 |
| City Numbers | $4,054,081 | $4,279,035 | $4,641,225 |
| Keepitsafe | $1,589,128 | $1,012,470 | $740,162 |

111. Yet as of December 31, 2018, J2 Holdings still had a goodwill balance of $4.3 million (calculated based on the cost of goodwill being $24.6 million with a provision for diminution in value of $20.3 million). J2 Holdings has not disclosed what, if any, of that goodwill is associated with assets of J2 Ireland's subsidiaries. Nor has J2 made any disclosures about the material underperfomance of J2 Ireland from 2016 to 2018.

112. Without providing more information about how J2 Ireland had been performing in J2's financial statements, the market has been unable to accurately gauge how successful J2's acquisitions have been in Europe.

**2. The material underperformance of Everyday Health**

113. In December 2016, J2 made its largest acquisition ever – Everyday Health for $493 million. Everyday Health was a publicly traded digital media company with the ticker EVRY which owned various websites and produced content relating to health and wellness.

114. As of September 30, 2016, Everyday Health's revenue over the prior twelve months ("LTM") had been $254 million. But in the first year after J2 acquired Everyday Health, that division's revenue declined precipitously by approximately 25% to $171 million. Everyday Health's revenue slightly improved to $175 million in 2018 and then to $211.3 million in 2019, but has still not reached pre-acquisition

levels despite J2 folding five subsequent acquisitions – and their revenues –into the division.

115. Despite Everyday Health's material underperformance, J2 has still not taken a goodwill impairment. Instead, J2 has made two divestitures and five acquisitions in its Everyday Health division, effectively obfuscating the true value of the Everyday Health acquisition as profits and losses of six acquisitions have been commingled in the division and two parts of the original Everyday Health company have been sold off. Currently, approximately one-third of Digital Media's goodwill balance relates to the Everyday Health purchase.

116. While J2 explained the 2017 drop in revenue by characterizing it as a period of "shrink to grow" where it was divesting assets from the Everyday Health division, even after factoring the two divestures from 2017, year-over-year ("YOY") revenue in the division declined by an estimated $65 million, or 25%.

117. In addition, based on the "material level of unexplained liabilities assumed relative to the size of Everyday Health's operations" at the time of the acquisition, J2 appears to "have built in, or springloaded, outsized reserves for future use" so it does not need to take a goodwill charge later.[46] As of September 30, 2016 (the last quarter Everyday Health was public), its balance sheet listed accounts payables and accrued expenses at $45.1 million. But just two months later, this account was listed at $59.1 million in J2's 2016 10-K – "31% ($14.0 million) higher when there doesn't appear to be any seasonality or corresponding revenue growth to go with it." This "unexplained amount of acquired liabilities ($14.0 million) was equivalent to 89.1% of [Everyday Health's trailing twelve month] TTM operating profit ($15.7 million) generated through 09/30/16."

---

[46] GlassHouse Research, *Accounting Concerns Finally Catch up with the Roll-Up j2 Global* (Dec. 12, 2018) http://www.glasshouseresearch.com/uploads/8/9/6/9/89690703/jcom_final_-_copy.pdf (last visited Mar. 19, 2021).

118. Rather than disclosing that J2 overpaid for Everyday Health by taking a goodwill charge, Defendants have done nothing but defend the success of the Everyday Health acquisition.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS[47]

119. Defendants should have made additional disclosures about the VDW Acquisition and the Orchard Investment as related party transactions and the underperformance of J2 Ireland and Everyday Health because such information would have had an impact on the decision making of J2 investors. In addition, Defendants should have made additional disclosures about how van der Weijden was compensated based on the number of deals versus their quality when touting any acquisition that he had sourced and managed. The only basis for Defendants not to have made additional disclosures is if they had concluded that information about the related parties and the underperformance would have had ***no*** impact on investors' decision-making with respect to their ownership interests.

120. The Class Period begins on October 5, 2015 when J2 announced in a press release that it had completed nine acquisitions in the third quarter of 2015 ("3Q15") that "will grow the Company's global customer base, provide access to new markets and expand j2's product lineup," including the "***Intellectual Property***" of "***VDW (Netherlands)***."

121. The statement referenced in ¶120 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, which was known to Defendants or recklessly disregarded by them, that the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of

---

[47] For ease of reference, Plaintiffs have attached hereto a chart of the statements alleged to be false and/or misleading as **Appendix C**. The particular portions of the statements alleged to be false and misleading are bold and italicized in this Section as well as in **Appendix C**.

commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2.

122. On November 3, 2015, during J2's third quarter 2015 ("3Q15") earnings call, Turicchi stated that "[w]e're extremely proud of the accomplishments of our teams during this outstanding quarter where ***a number of records were set***…***this continues to validate our overall strategy***" and that "***part of the art of the teams that we have built is that whether the markets are strong or weak or the economy is strong or weak, [we know] where to look to find the right kind of deals that will fit our model***."

123. The statements referenced in ¶122 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (iii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business;

and (iv) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

124. In addition during the 3Q15 call, Turicchi stated "[o]ur IP Licensing revenue was roughly flat at $1.1 million. Our contribution of 57% in terms of EBITDA margin I would note that as we've talked about it in the past ***we continue to make investments in some additional portfolios of intellectual property, which are now actually in the process of commencing their licensing program***."

125. The statement referenced in ¶124 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, which was known to Defendants or recklessly disregarded by them, that the intellectual property purchased as part of the VDW Acquisition for $900,000 was of an 11-month-old consulting business which had no employees and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2.

126. On February 10, 2016, during J2's fourth quarter 2015 ("4Q15") earnings call, Turicchi stated that "fiscal year 2015 provided stellar operating results, ***validating our business strategy of…utilizing M&A to more rapidly build these businesses to scale***" and that "[o]ur ***M&A strategy continued to drive both revenue and margin expansion***."

127. The statements referenced in ¶126 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company

belonging to insiders without adequate disclosures; (ii) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was just now in the process of commencing its licensing program, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (iii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iv) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

128. Defendant Turicchi further stated on the 4Q15 call that:

> [Y]ou heard us talk about for several quarters after we bought Web24 that we've been attempting to do a small follow-on acquisition consistent with what we did, we bought KeepItSafe and with that matter when we got Campaigner out of protest. And it took a little longer than we would have liked, but ***the idea is to do a small transaction that is financially inconsequential. So it's very tiny in terms of its revenue, recall that Web24 itself is only about $5 million of revenue, so it's not very big.***
>
> ***But that transaction closed and it's important in that it allows us the opportunity to go through as we do in each new business segment or business unit.*** What are the real stress points or issues in integration? Because for our model – the way our model works, there is a lot of key variables, but one of them is what is a fair expectation for the time of integration.
>
> If it's 30 days versus a year that may very well influence, what you are willing to pay for the business and your ultimate return on invested capital. ***So having the Web24 business under our ownership for about a year or over a year, we're able to finally acquire an asset. It is in the process of being integrated*** as we speak in fact likely by the end of this fiscal quarter if not early Q2, it should be integrated.

129. The statements referenced in ¶128 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following

adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) J2 had overpaid for Web24 due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability.

130. In addition, during the 4Q15 call, Defendant Zucker stated that "[w]e have a ***healthy acquisition pipeline***," and that "J2 ***from an M&A standpoint*** and from media acquisitioning versus the market ***will do very good in stress environment or economy***."

131. The statements referenced in ¶130 about J2's "healthy acquisition pipeline" and "M&A" doing "very well in stress environment or economy" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

132. On February 29, 2016, J2 filed with the SEC its annual report for the period ended December 31, 2015 (the "2015 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2015 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zucker and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

133. The statement referenced in ¶132 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; and (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

134. As to transactions with related parties, the 2015 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2015 Proxy Statement."

135. J2 subsequently filed its 2015 Proxy Statement with the SEC on March 23, 2016, which stated that "***[d]uring 2015, j2 Global was not a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K***."

136. The statement referenced in ¶134-35 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following

adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; and (ii) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

137. On May 5, 2016, during the first quarter 2016 ("1Q16") earnings call, Defendant Turicchi stated that "Q1 2016 continued to provide ***outstanding operating results, which continue to validate our overall business strategy of***…***utilizing M&A to more rapidly build these businesses to scale***."

138. The statement referenced in ¶137 about J2's "outstanding operating results" validating its use of "M&A to more rapidly build these businesses to scale" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that

J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

139. Later during the 1Q16 call, Defendant Turicchi specifically noted in response to a question from Shyam Vasant Patil of Susquehanna Financial Group LLLP ("Susquehanna") about the "typical timeframe to clearly synergize acquisitions in terms of getting them to the optimized margins" that:

> It will vary[.] So ***take Web24, web hosting in Australia that we bought 18 months ago or so. If it is a follow-on transaction, depending upon the number of integrations that a business unit has and its own priorities, you're talking usually six months to nine months. And most of that integration, as Hemi mentioned, on some of the deals done in Q1, deal with things like office consolidation, changing the sales and marketing strategy, maybe changing things in R&D because we've already got R&D teams. So that can generally be done in six to nine months.***

140. The statements referenced in ¶139 about optimizing margins for Web24 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them: Web24 was already running cheaply because most of its labor was outsourced to India, so J2 could not and did not make Web24 more profitable by simply cutting operating costs. Instead, J2 had to acquire more companies in the web-hosting industry, like AUSweb, and integrate it into Web24 to make it more profitable, which took longer than 6-9 months.

141. In addition, during the 1Q16 call, Defendant Zucker stated: "The ***M&A pipeline for this business and for the Backup business continues to be healthy***."

142. The statement referenced in ¶141 about the "M&A pipeline" being "healthy" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded

disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

143. During the second quarter 2016 ("2Q16") earnings call on August 3, 2016, Defendant Zucker stated that, "[s]o ***basically our Rolodex of M&A helps us***. And ***sometimes the prices that we see are very attractive because we do know the business, we don't know the people, we can promise them a fast transaction and reliable transaction without whole base***."

144. The statement referenced in ¶143 about the "Rolodex of M&A" helping them obtain "attractive pricing" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

145. In addition, Defendant Zucker stated during the 2Q16 call that "***we have bought a company called Web24 in Australia***, which is web hosting. ***We have not done other deals so far***."

146. The statements referenced in ¶145 about Web24 and J2 not having other deals in Australia were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) J2 had overpaid for Web24 mainly due to

lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability.

147. During the fourth quarter 2017 earnings call on February 9, 2017, Defendant Turicchi stated that "[o]ur ***M&A strategy was critical to the overall success of this year***. As you know, we completed ***22 acquisitions in 2016***, spent nearly $600 million, although the crown jewel of the M&A program this year was the acquisition of Everyday Health in December."

148. The statement referenced in ¶147 about J2's "M&A strategy" being "critical to the overall success" in 2016 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) J2's deals were not performing well and thus keeping the M&A strategy was only "critical to the overall success" because it allowed J2, in combination with misleading accounting, to keep up a false appearance of good performance.

149. In addition, Defendant Zucker stated during the 4Q16 earnings call that

"2011 to 2016, our last five years, ***we achieved approximately 20% compounded revenue growth***, and in the Digital Media division and combined, ***achieved 70% compounded EBITDA growth***. We believe that ***this validates our strategy of*** focusing on EBITDA, EBITDA generation, ***utilizing our organic and M&A to build our business***."

150. The statements referenced in ¶149 about J2's growth "validatin[ing] our strategy" which included "utilizing our organic and M&A to build our busiess" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; amd (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

151. Defendant Zucker specifically stated during the 4Q16 call that "all the acquisitions were of a relatively smaller companies, ***when we eliminated a number one cost***, which is the platform and the engineers. Therefore, ***we are generating high margins***. Also we have – our service is very fully featured. So most of the time when we acquire a company, they are exposed to the new features. And once we take them, the marginal cost to us is not very high."

152. The statements referenced in ¶151 about J2 "eliminated" costs and "are generating high margins" were materially false and/or misleading because

Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

153. Defendant Zucker also stated during the 4Q16 call that "we are eliminating negative margin revenues as we did in the past. ***If we don't believe a certain revenue has good margin potential, we will just walk away from it and focus on the profitable parts of the business.*** We've already reduced the combined workforce of Ziff Davis and Everyday Health by 7%. We have been steadily terminating or restructuring vendor agreement, which will add several points to the margin already now in 2017. ***We are undertaking many positive and profit-enhancing changes that we will continue to talk about in the next quarters***."

154. The statements referenced in ¶153 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year.

155. Defendant Turicchi further stated during the 4Q16 call that:

> [W]e're not going to be breaking out Everyday Health just as we don't break out IGN or the tech vertical or Ookla. But what I will say is – and remember, this is very important on the Shrink to Grow concept, it has nothing to do with Cambridge and Tea Leaves. ***So if you looked at Everyday Health in its totality, it had a revenue guidance/expectation last year around $250 million. We will be shrinking that revenue base by up to about $20 million based on some of the comments Hemi made earlier, where we're not finding that there is either any margin in some of those revenue streams or margins consistent with our approach***.... [W]e would expect that ***off of that reset lower base to experience close to double digit growth with that set of assets***.

156. The statements referenced in ¶155 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year.

157. On March 1, 2017, J2 filed with the SEC its annual report for the period ended December 31, 2016 (the "2016 10-K"), signed by Defendants Zucker and Turicchi. Attached to the 2016 10-K were SOX certifications signed by Defendants Zucker and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

158. The statement referenced in ¶157 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees,

was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (v) Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

159. As to transactions with related parties, the 2016 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2016 Proxy Statement."

160. J2 subsequently filed its 2016 Proxy Statement with the SEC on March 23, 2017, which stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2016 Proxy Statement further stated that "[s]ince January 1, 2016, ***j2 Global has not been a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K***."

161. The statements referenced in ¶¶159-60 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; and (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

162. During J2's first quarter 2017 ("1Q17") earnings call, Defendant Zucker stated that "[w]e also successfully launched disaster recovery service and ***we have a strong M&A pipeline***."

163. The statement referenced in ¶162 about the "strong M&A pipeline" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

164. In addition, Defendant Zucker stated during the 1Q17 call that "[a]t our newest properties, ***Everyday Health***, Media Page Today and What to Expect, we had very productive quarter with new product launches and features. Focus on productivity and profitability, ***we continued execution of our shrink to grow strategy***.

This is done by ***eliminating negative margin activities and eliminating low potential activities***. ***This will result in higher EBITDA against reduced revenue***."

165. The statement referenced in ¶164 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year.

166. Likewise, Defendant Turicchi stated during the 1Q17 call that:

> [W]***e would be in line to slightly ahead of our plans in terms of cost reduction***. ... Then there's a second piece, which is a little bit less tangible or less quantifiable, and that is evolving the understanding of how the business is going to operate on a going-forward basis. And I'd say that's a process that takes time. ... I'd say in the second – or the second piece of it, ***we're probably tracking, but it's something that takes – it takes months.***

167. The statements referenced in ¶166 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

168. Further, Defendant Turicchi stated during the 1Q17 call that:

> [I]n terms of our mix of M&A, it is correct. The last few quarters, with the exception of Everyday Health, most of the businesses we have bought have been very small. Part of that, I'd say, in the last five or six months has been a function that ***larger transactions, which we've looked at outside of Everyday Health, have been too expensive. And a lot of that has to do with the correlation to the stock markets either approaching or at all-time highs. So we've tended to focus on smaller deals."***

169. The statement referenced in ¶168 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the "focus on smaller deals" was to avoid disclosures about the specific transaction and hide underperforming assets as: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) J2 regularly overvalued acquisitions so with larger transactions, any underperformance would have a more material impact on its financials.

170. Defendant Turicchi also stated during the 1Q17 call that:

> Generally ***in the cloud, it is the goal not to grow the revenues***. In fact, as Hemi will talk about or has talked about, ***there'll be cases where we'll actually shrink the revenues or we know there'll be revenue decline because of either expected customer attrition or customer attrition upon migration***.
>
> ***In the Digital Media business, it usually is the concept of taking the asset, initially shrinking it down to its core, and then from that point growing its revenues***.

171. The statements referenced in ¶170 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was

known to Defendants or recklessly disregarded by them, that the shrink to grow concept conveniently explained away underperforming assets that J2 inevitably purchased due to the deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

172. During the second quarter 2017 ("2Q17") earnings call, Defendant Zucker stated that "Email security and email marketing.… We are seeing in this business the ***renewed organic growth, increasing margins and M&A***."

173. The statements referenced in ¶172 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

174. Defendant Zucker also stated during the 2Q17 earnings call, "[t]he ***integration of Everyday Health and the execution of our strategy remains on target***. We are continuing to develop products and building capabilities across the 3 core businesses."

175. The statement referenced in ¶174 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the

Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

176. In addition, analyst Walter Pritchard of Citi and Defendant Zucker had the following exchange during the 2Q17 call:

> Pritchard: [Y]ou entered Australia in the Backup market. That market is, organically, not really growing. As we think about sort of your confidence and it feels like you are buying more, maybe not at the rate you were a year ago there, but is that market a market you think can organically grow for the company?
>
> Zucker: So ***on the M&A side, we had … 2 to 3 companies, each of them were $10 million revenue and they were bought by prices that we would never think are in our range***.

177. The statements referenced in ¶176 about J2 acquiring companies in Australia at "prices that we would never think are in our range" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; and (ii) J2 had also overpaid for the asset that J2 was integrating into Web24, AUSweb, as it was a deal sourced and managed by van der Weijden who was being paid for the number of deals he closed, not their quality or suitability and who had caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

178. Defendant Turiccihi added during the 2Q17 call that:

> [**I**]***n the Cloud Backup business***, we're – it's an art, not a science. But $50 million to $60 million away and the view and ***the premise has been that, that will come from M&A***. ***So there's been less an emphasis on the organic growth potential of that business or of that space and a much heavier focus on M&A***. If you go back just a few quarters, I think ***from September of 2015 through probably Q3 of 2016, the Backup business had at least a dozen transactions around the world that acquired and then was in the process of integrating***.

179. The statements referenced in ¶178 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) J2 had overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden. J2 overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia.

180. Defendant Turicchi also stated during the 2Q17 call that "[t]he ***Everyday Health business, as you know, is in sort of in a shrink to grow mode*** so the numbers are really not comparable because you'd have to go back and pro forma into Q2 of 2016 revenue streams that we've now eliminated. So I'd say ***it's down a little bit on an actual year-over-year basis, but on a pro forma basis, would be up. And I think that once we finished the shrink to grow there and we get it down to the core, then we view it as being a consistent grower*** with the rest of Ziff Davis.

181. The statements referenced in ¶180 were materially false and/or

misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 regularly overvalued acquisitions and Everyday Health was no different, but because it was a larger transaction, its underperformance would have a more material impact on the Company's financials – to the tune of over $83 million, or 25%, less revenue than it had generated the prior year – and would still not reach pre-acquisition levels over three years later despite five subsequent acquisitions – and their revenues – being folded into the divisions.

182. During the third quarter 2017 earnings call on November 2, 2017 ("3Q17"), Defendant Turicchi stated that "the M&A in Q3 was rather light. A lot of our focus not that we weren't focused on M&A, but ***the divestitures of Web24 and Tea Leaves were very important*** even though Tea Leaves actually closed in the fourth fiscal quarter, a lot of the work was done in Q3. So, the ***M&A transactions on the Cloud side that were done in Q3 will offset to a very modest way some of that $35 million***."

183. The statements referenced in ¶182 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) J2 had overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden. J2 overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any

experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia.

184. In response to analyst Jon E. Tanwanteng of CJS Securities, Inc. asking during the 3Q17 call, "[c]ould you just talk about the investment rationale in OCV. Do you think you can get a better return there that you can otherwise get in your core M&A strategy, just a little bit more about the decision to go that route?" Defendant Zucker responded:

> ***[T]here was an opportunity through this related entity called OCV for us to make an investment and with Hemi moving over into that capacity to also give us confidence of two things, that one, there would be a focus as I'm sure that would have been anyway on delivering high returns and returns consistent with the returns that we are used to experiencing at j2, but giving us greater diversity in terms of the types of transactions that we invest in***.
>
> * * *
>
> We think that there's going to be – it will occur of course over time because their investments will have different maturity timeframes, but I think, yes ***we're going to get those kinds of similar returns and we're going get exposure to other types of transactions that j2 would not find appropriate to do within the j2 structure.***

185. The statements referenced in ¶184 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

186. Defendant Turicchi added during the 3Q17 call that the Orchard Investment is:

> [G]oing to be funded as OCV finds transactions and makes capital calls. So although it's an eight-year fund, ***we have assumed the more front-end loaded amount of funding you know in the tune of $50 million to $60 million dollars a year on average over the next call it four years to five years***. That would exhaust the $200 million commitment. So ***we look at our estimated free cash flows, obviously looking out a couple of years, the dividend, and feel comfortable that that given the cash balances we already have, will be sufficient to make those capital calls and still do our M&A program***.

187. The statements referenced in ¶186 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

188. In addition, Defendant Zucker stated during the 3Q17 call that "***[w]e made cash-on-cash more than 20% a year on the Web24. So all in, it was a profitable test***."

189. The statements referenced in ¶188 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 could have been more profitable when it divested of the Web24 Division if it had not overpaid for Web24

as well AUSweb, which was a deal sourced and managed by van der Weijden. J2 overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia.

190. Defendant Turicchi also stated during the 3Q17 call that "***all of the smaller businesses in the Cloud***, but led by the Backup have been premised on and ***they've been tasked with almost a purely M&A driven growth***," but "there's been a very little M&A done for the Cloud Backup."

191. The statements referenced in ¶190 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them: that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

192. During the fourth quarter 2017 ("4Q17") earnings call on February 6, 2018, Defendant Shah stated that: "[o]ur ***track record has been remarkable***, given the number of deals we've done" and "[o]ur ***organizational approach to M&A is very solid***" as "[t]his design allows for a ***very robust pipeline across the enterprise***, while ***ensuring we maintain our discipline***."

193. The statements referenced in ¶192 regarding J2's "remarkable" track record of deals and "solid" approach to M&A that allowed J2 to keep a "very robust pipeline" while "ensuring we maintain our discipline," were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were

known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

194. In addition, Defendant Shah stated during the 4Q17 call that:

> [W]e will be getting quarterly updates from OCV as to their activity, and that will be available – or at least some of that will be available directly on their website, which you can access. I think ***in the scheme of j2, it's actually a relatively small investment***. So, if you've heard us talk about these 12 business units, the revenue they're driving and the EBITDA, that's where our focus and attention is going to be as it relates to updates. But there will be information available from time-to-time on the various investments that they are making.

195. The statements referenced in ¶194 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

196. On March 1, 2018, J2 filed with the SEC its annual report for the period ended December 31, 2017 (the "2017 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2017 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of

any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

197. The statement referenced in ¶196 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (v) Everyday Health was significantly underperforming after being acquired in December 2016 such that its 2017 revenue would be over 25% less than it had been the prior year.

198. As to transactions with related parties, the 2017 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2017 [sic] Proxy Statement."

199. J2 subsequently filed its 2017 Proxy Statement with the SEC on March 23, 2018, which stated that the "RPT Policy prohibits all Related-Party Transactions

unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2017 Proxy Statement stated that J2 had entered into the following related party transaction:

> On September 25, 2017, ***the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition,*** Mr. ***Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder***. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.*** In February 2018, the Company received a capital call notice from the management of OCV for approximately $12.2 million, inclusive of certain management fees.

200. The statements referenced in ¶¶198-99 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der

Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

201. During the second quarter 2018 ("2Q18") earnings call on August 9, 2018, Defendant Turicchi stated that:

> ***[F]or the most part we do the tuck-in deals***. I wouldn't say, they are completely immune, but I would say ***they are more or less immune from the market dynamics, because often there are other drivers that are influencing the sale of the assets, and there is intangible benefits that the sellers want beyond just the economic dollars, it may be an asset in a portfolio that isn't performing to the PE or VC's liking***. And so, for them to be able to get it out of their portfolio of stock allocating time and money to it, is a real benefit, beyond just what's the highest bid, and we've won deals like that, where we're not necessarily the highest bidder, we're still in obtain market multiples, but we are bringing in intangible value to the equity owners.

202. The statements referenced in ¶201 regarding J2's "tuck-in deals" were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid

for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) because J2 did not disclose the terms of its small acquisitions, it was able to, and did, utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

203. In addition, Mr. Turicchi stated during the 2Q18 call:

> ***[W]e're looking at the M&A a little bit differently maybe that we did in the past***, where we are looking into portfolios where we can bring unique and differentiated value to the table, either as it relates to the seller and or is it relates to how we integrated within our existing business units. And so, we can extract value that is unique to us. so, we're not paying a bad multiple from the seller's perspective, it's just we're synergizing it down to that five times EBITDA multiple when the work is done.

204. The statement referenced in ¶203 regarding J2's "looking at the M&A a little bit differently maybe that we did in the past" was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (ii) because J2 did not disclose the terms of its small acquisitions, it was able to, and did, utilize positive financial results as reflective of it successful integration of the acquired business even if it actually did not add anything to the acquired business.

205. Defendant Turicchi also stated during the 2Q18 call that "On the Cloud side, ***we divested Web24 which was our smaller web hosting business in Australia***. That had about $1.3 million in revenues in Q2 of 2017. So, combined for the company

as a whole, about $11.8 million of revenues from the divested assets were present in Q2, 2017 and not in 2018."

206. The statements referenced in ¶205 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that J2 could have been more profitable when it divested of the Web24 Division if it had not overpaid for Web24 as well AUSweb, which was a deal sourced and managed by van der Weijden. J2 overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia.

207. Before the market opened on November 6, 2018, J2 held its third quarter 2018 ("3Q18") earnings conference call. During the call, as part of his prepared remarks, Defendant Shah stated that:

> ***j2's approach has proven and will continue to prove to be our most important and sustainable competitive advantage***.
>
> * * *
>
> When we consider transactions, we look for fair businesses at great prices and great businesses at fair prices…***we typically look to improve the company's margins through our strength through our shrink to grow program, where we identify products, initiatives and activities that are either money losing or have little to no future profit potential. We generally either sunset or sell-off those money losing components.*** Once we get a business to its most profitable core, we look to develop new monetization streams consistent with what we've accomplished in our other businesses. With great businesses at fair prices, we're focused on helping those businesses accelerate sales and product development. ***Provide access to our capital for development and tuck in acquisitions and we help them leverage our marketing assets and customer basis***.

208. The statements referenced in ¶207 regarding its "proven" approach to acquisitions were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that (i) the shrink to grow concept conveniently explained away underperforming assets that J2 ineveitably purchased due to the deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures and (ii) because J2 did not disclose the terms of its small "tuck-in" acquisitions, it was able to, and did, tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business.

209. Likewise, Defendant Turicchi stated during the 3Q18 call that:

> ***[O]nce we get through this period where we have got the shrink to grow on some of the assets of mid-single digit***. And then I think probably in equal or maybe somewhat greater amount, but on the margin of M&A for the digital media business. But as you know, ***a lot of those growth rates as it relates to M&A is really a function of the timing of deals and in which side of the two businesses they fall***.

210. The statements referenced in ¶209 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that the shrink to grow concept conveniently explained away underperforming assets that J2 ineveitably purchased due to the deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

211. In addition, during the 3Q18 call, Defendant Shah stated that "[a] great illustration of ***how we create value is the Everyday Health acquisition we made almost two years ago to the date. We purchased the business for $465 million, then we sold off two non-core and marginally profitable assets for $120 million***."

212. The statements referenced in ¶211 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

213. In response to a question from analyst, Rishi Jaluria at DA Davidson, Shah further explained during the 3Q18 call that "I walk[ed] through in the prepared remarks, our experience with Everyday Health, because I thought it was important because I was beginning to get a sense from some shareholders and prospective shareholders that it was a feeling that Everyday Health wasn't working out well, and I couldn't disagree more. We are at 6.6 times EBITDA for a great asset in a great vertical, and we've done it with some real cyclical pressures. So from my point of view, ***the business has performed very, very well***."

214. The statements referenced in ¶213 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that

underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

215. Before the market opened on February 13, 2019, J2 held its fourth quarter ("4Q18") earnings conference call. In response to a question from analyst James Breen at William Blair & Co., Defendant Turicchi noted that "if you look at 2017 versus 2016 [cash flow], ***there was a big jump up in large part, because of Everyday Health***."

216. The statement referenced in ¶215 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

217. On March 1, 2019, J2 filed with the SEC its annual report for the period ended December 31, 2018 (the "2018 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2018 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

218. The statement referenced in ¶217 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees,

was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in Asia and Australia; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (v) Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues; and (vi) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

219. As to transactions with related parties, the 2018 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2018 Proxy Statement."

220. J2 subsequently filed its 2018 Proxy Statement with the SEC on March 22, 2019, which stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction,

the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2018 Proxy Statement stated that J2 had entered into the following related party transaction:

> ***On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder.*** As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.*** In 2018, the Company received six capital call notices from the management of OCV for approximately $36.8 million, inclusive of certain management fees.

221. The statements referenced in ¶¶219-20 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) any deals sourced and managed

by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

222. Before the market opened on May 8, 2019, J2 held its 1Q19 earnings conference call. In response to a question from analyst, Daniel Ives at Wedbush Securities ("Wedbush"), Defendant Turicchi stated that "we've seen ***continuing strength and firmness out of everyday health***, which has a large chunk of display advertising in terms of its total monetization."

223. The statement referenced in ¶¶222 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

224. Before the market opened on August 7, 2019, J2 held its second quarter 2019 ("2Q19") earnings conference call. During the call, Shah touted:

> I'm not sure of how many companies can make that claim to have grown revenues for 23 consecutive years. Yet, in the seven years that I've been here, and in the 20 years Scott's been here, we still get questioned about the viability of our model, questioned about our

> ability to sustain the j2 acquisition system, and therefore, our overall growth. I believe ***the past 20 years should resolve for any rational observer these questions.*** My favorite indicator of our success is the five times ratio of our accumulative acquisition spend divided by our annual adjusted EBITDA.
>
> ***It demonstrates our ability to stand capital intently and wisely as well as the means to properly integrate these assets once they are in j2's portfolio.***

225. The statements referenced in ¶224 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures.

226. Defendant Shah also stated during the 2Q19 call that, "***we're certainly willing to entertain offers that value these businesses in excess of what the market may be valuing and where we may not feel it's strategic or where we way may not feel we have future growth opportunities or where we may not feel we can execute the M&A program*** as well. So we're open to it. We get calls from time to time. So we're certainly -- and ***I do think that's a little bit of a shift***."

227. The statement referenced in ¶226 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one

company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

228. Before the market opened on November 1, 2019, J2 held its third quarter 2019 ("3Q19") earnings conference call. In response to a question from analyst, James Breen at William Blair and Company, Defendant Shah states "we have a number of high-quality, organically growing businesses where we see runway…. It's ***our Everyday Health group, which continues to grow organically, high single digits, possibly low double digits*** on the corporate fax side, on VPN."

229. The statement referenced in ¶228 was materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them: that Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues, but that underperformance was effectively obfuscated as profits and losses of six acquisitions were commingled in the division and two parts of the original Everyday Health company were sold off.

230. In addition, Defendant Shah stated during the 3Q19 call, "***Our ability to transact efficiently, transparently and reliably and to see and create value where others cannot has allowed us to succeed in an M&A environment that can at times seem frothy***."

231. The statement referenced in ¶230 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse fact pertaining to J2's business, operational and financial results, which was known to Defendants or recklessly disregarded by them, that: (i) a material number of deals

were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability, and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (ii) because J2 did not disclose the terms of its small acquisitions, it was able to tout the successful results of the acquired business as based on its value-add even though it actually did not add anything to the acquired business; and (iii) that J2's deals were not performing well and only appeared to be doing well through Defendants' misleading accounting.

232. On March 2, 2020, J2 filed with the SEC its annual report for the period ended December 31, 2019 (the "2019 10-K"), signed by Defendants Shah and Turicchi. Attached to the 2019 10-K were SOX certifications signed by Defendants Shah and Turicchi attesting to the ***accuracy of financial reporting***, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

233. The statement referenced in ¶232 was materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) J2 Ireland took a €22.1 million charge in 2015 and was significantly underperforming; (iii) J2 had overpaid for Web24 mainly due to lack of pre-acquisition research and understanding of the internet domain industry as no one at the Company had any experience in the web-hosting industry until FE1 joined J2 with 15 years of experience buying businesses in

Asia and Australia; (iv) a material number of deals were sourced and managed by van der Weijden and they all potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; (v) Everyday Health significantly underperformed after being acquired in December 2016 such that its 2017 and 2018 revenues were over 25% less than its 2016 revenues; and (vi) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

234. As to transactions with related parties, the 2019 10-K stated that the "information required by this item is incorporated by reference to the information to be set forth in our 2019 Proxy Statement."

235. J2 subsequently filed its 2019 Proxy Statement with the SEC on March 26, 2020, which further stated that the "RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Corporate Governance and Nominating Committee. If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction." The 2019 Proxy Statement stated that J2 had entered into the following related party transaction:

> ***On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Zucker, who resigned from the position of Chief Executive Officer of the Company***

> ***effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 has become a co-managing principal of OCV and a significant equity holder.*** As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. ***The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy***. In 2019, the Company received nine capital call notices from the management of OCV for approximately $29.6 million, inclusive of certain management fees. The also Company received approximately $10.3 million in distributions from OCV in 2019.

236. The statements referenced in ¶¶234-35 were materially false and/or misleading because Defendants misrepresented and failed to disclose the following adverse facts pertaining to J2's business, operational and financial results, which were known to Defendants or recklessly disregarded by them, that: (i) the $900,000 VDW Acquisition was of an 11-month-old consulting business which had no employees, was barely in the process of commencing its licensing program when it was acquired, and was registered to the personal residence of long-time corporate insider van der Weijden who, at the time of the VDW Acquisition, was a director of J2 UK, an arm of J2 Ireland which was ultimately owned by J2; (ii) any deals sourced and managed by van der Weijden potentially had questionable value and/or fit because he was being paid for the number of deals he closed, not their quality or suitability and he caused J2 to acquire at least one company belonging to insiders without adequate disclosures; and (iii) while Defendant Zucker, Ressler, and Loshitzer would all profit handsomely from the management fees J2 had to pay, there was no business justification for the Orchard Investment because J2 was already in the business of investing in and acquiring other companies and OCV had a sparse, indeed poor, track record of

investing in companies involving related parties, including Defendant Zucker, Board members and corporate insiders, that would be continuing.

## VI. THE TRUTH WAS REVEALED

237. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members he represents.

238. The truth began to be revealed when, before the market opened on March 10, 2016, Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)!" (the "Citron Report"). The Citron Report revealed that J2, among other issues, (i) "no longer wants acquisitions, it needs acquisitions" (emphasis in original) (ii) "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or usless assets that have all been acquired with terms undisclosed;" and (iii) "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating."

239. On this news, shares of J2 plummetted $14.09 per share, or nearly 20%, to close at $56.90 per share on March 10, 2016 on unusually heavy trading, damaging investors.

240. The market attributed the March 10 stock drop to the Citron Report as seen in an article published on Nasdaq by the leading investment research firm, Zacks, on March 11, 2016.[48] Notably, the article noted that the Company's recently acquired business is "making losses," and raised concern about how J2 does not reveal the

---

[48] Zacks, *j2 Global: Citron Report Attacks Business Model, Stock Down*, NASDAQ (Mar. 11, 2016), https://www.nasdaq.com/articles/j2-global%3A-citron-report-attacks-business-model-stock-down-2016-03-11 (last visited on Nov. 19, 2020).

terms and conditions of its acquisitions, "which has created quite a lot of uncertainity among investors."

241. Then, before the market opened on June 30, 2020, Hindenburg Research published a report entitled "J2 Global: Troubling Related Party Transactions, Looming Impairments and A Suspicious History of Insider Enrichment Spanning Decades" (the "Report") revealing, *inter alia*, that "[t]he opaque nature of J2's M&A program has…left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of underlying businesses." Specifically, the Report states that "J2's opaque acquisition approach has opened the door to egregious insider self-enrichment" to the tune of "$98 million to $128 million." One such acquisition was of "a newly formed entity based out of [J2's] own VP of Corporate Development's personal residence for $900 thousand" which had "undefined 'intellectual property' and no employees or apparent assets," yet "**[n]o conflict was disclosed**." (Emphasis in original). That VP "handled 135 of J2's acquisitions, representing ~73% of the company's acquisitions to date." In addition, the Report revealed that J2's recent commitment of "$200 million of shareholder cash" was "to a newly-formed investment vehicle run by its Chairman, who has a track record of venture investment failures," as well as "other J2 execs and insiders." "That investment vehicle, in turn, made its first investment of an estimated $12 million into a newly formed home video business established by the Chairman's nephew," but "**again, no conflict was disclosed**." (Emphasis in original). Further, the Report found it "uncanny that [Defendant] Shah was awared a ludicrous pay package" ($45 million in total compensation in 2018) "precisely when related party transactions diverted assets to other key insders."

242. Next, the Report noted that J2's "underperformance has been masked by tricky accounting," including "never tak[ing] a goodwill impairment, yet subsidiary filings report multiple material goodwill impairments that don't appear to coincide

with parent financials." For example, "J2's European business (13% of revenue in 2016), which was overseen by the aforementioned VP of Corporate Development, has seen its revenue decline 27% in the subsequent 3 years with operating income swinging from $5.5 million to negative $13 million." And while "a key J2 subsidiary [in Europe] recorded an €22 million impairment," "zero goodwill impairment [was] recognized at the parent corporation." In addition, "Everyday Health, J2's largest acquisition, saw an immediate post-acquisition revenue drop of ~25%, yet no impairment was recorded. Instead, J2 went on a spree of asset disposals/acquisitions that obfuscated the entity's financial position." The Report estimated that in total, "[a]pproximately $700m of acquisitions for which we have visibility are seeing revenue declines, appear to be underperforming, or have been outright dissolved…yet we have seen no impairment of goodwill to date."

243. Lastly, the Report revealed that "[d]espite J2's proxy describing all but one of its board members as 'independent,' we found decades of intertwined financial interests between board members and executives, calling that independence into question." Specifically, J2's "audit committee simply cannot be relied upon, as a majority of the committee has worked together for years prior to serving on the board of J2 in roles that reveal conflicts of interest," including the AC chair, "long time Ressler associate Brian Kretzmer" who "has a work history with J2 Chairman Richard Ressler dating back nearly three decades." Kretzmer even "consulted for the OCV affiliate Orchard Capital," which "is a flagrant conflict of interest, given that as chair of the audit committee Kretzmer then approved the $200 million commitment of J2 Capital to OCV." Likewise, "'**[i]ndependent director and audit committee member, Stephen Ross**, has a 20-year history with J2 Chairman Ressler and director/audit committee chair Kretzmer." Yet they, along with the rest of the Board – the "majority of [whom] had multiple overlapping business ties with Ressler, were

responsible for providing the approval of $200 million in J2 cash being directed into Ressler's newly-formed investment entity."

244. The Report then proceeded to provide substantial, detailed "evidence" supporting its claims regarding J2's: (1) "Related Party Transactions and Insider Self-dealing;" (2) "Tricky Accounting: J2's Public Entity Has Never Recognized Any Goodwill Impairments;" (3) "Corporate Governance Vacuum;" and (4) "Legacy Businesses In Decline."

245. On this news, shares of J2 fell $6.29 per share, or over 9%, to close at $63.21 per share on June 30, 2020 on unusually heavy trading, damaging investors.

246. The market recognized the Report's impact on J2's stock price as seen in the *Marketwatch* article titled, "*Under attack from short seller, J2 Global says it bought company from a consultant—documents indicate there's more to the story.*"[49] The article noted that while the Company said Mr. van der Weijden was not a related party, "publicly available documents in the U.K., however, show that van der Weijden was a director of J2 Global UK Ltd…an arm of J2 Global Ireland, which ultimately is owned by J2 Global Inc."

## VII. ADDITIONAL SCIENTER ALLEGATIONS

247. As alleged herein, Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public. Defendants substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal

---

[49] Steve Goldstein, *Under attack from short seller, J2 Global says it bought company from a consultant—documents indicate there's more to the story*, MARKETWATCH (July 7, 2020), https://www.marketwatch.com/story/under-attack-from-short-seller-j2-global-says-it-bought-company-from-a-consultant-documents-indicate-theres-more-to-the-story-2020-07-06 (last visited Nov. 19, 2020).

securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding J2, their control over, and/or receipt and/or modification of J2's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning J2, participated in the fraudulent scheme alleged herein.

248. The Individual Defendants had actual knowledge of J2's acquisition strategy and the quality of the companies it was acquiring as "small but crafty acquisitions [have been] the ***key to the success***" of the Company from the start of the Class Period.[50] J2's own Form 10-Ks during the Class Period stated with regard to its growth strategy:

> Acquisitions and investments in our business have historically played a significant role in our growth and we anticipate that they will continue to do so.
>
> We ***must*** acquire additional or invest in new or current businesses, products, services and technologies that complement or augment our service offerings and customer base in order to sustain our rate of growth.

(Emphasis in original).[51]

249. As such, the Individual Defendants were highly focused on the number and quality of acquisitions as well as the process and timing of maximizing the acquired company's margins to contribute to J2's bottom line. Indeed, while Defendant Zucker was at the helm of J2, "M&A was more centralized with the M&A team and ***the parent [which included the Individual Defendants] driving the***

---

[50] Bram de Haas, *J2 Global: Sound Capital Allocation Leads To Excellent Results*, SEEKING ALPHA (Nov. 4, 2015 08:37 AM ET), https://seekingalpha.com/article/3643376-j2-global-sound-capital-allocation-leads-to-excellent-results.

[51] J2 Global Communications, Inc. Annual Report (Form 10-K) (Mar. 1, 2017); J2 Global Communications, Inc. Annual Report (Form 10-K) (Mar. 1, 2018); J2 Global Communications, Inc. Annual Report (Form 10-K) (Mar. 1, 2019).

***pipeline***."[52] Accordingly, according to FE1, before any acquisition involving FE1 was done, Zucker participated in the discussion that was held regarding whether the acquisition was "go or no-go." Corroborating FE1, FE2 stated that van der Weijden reported directly to Defendants Zucker and Turicchi, and Chairman of the Board Richard Ressler and that they signed off on "every" acquisition.

250. Defendants' Class Period statements further corroborate that the Individual Defendants were aware and approved of the Company's acquisition strategy and acquisition targets. For example, in J2's October 5, 2015 press release announcing the VDW Acquisition, Defendant Zucker specifically touted that "[o]ver the years, j2 has developed a ***core competency of identifying, negotiating and integrating acquisitions*** to enhance our global growth." Likewise, Defendant Turicchi not only noted that "[s]ince the beginning of the year, we have completed twenty acquisitions, deploying approximately $265 million of capital," but also that "our M&A pipeline remains full as we continue to pursue our ***long-term acquisition strategy***."[53] Based on this press release, analysts at Susquehanna noted that management (including Zucker and Turicchi) had attributed J2's ability to raise its 2015 revenue and EPS guidance in part "to ***strong M&A activity*** in 3Q (***closed nine deals*** [which included the VDW Acquisition])."[54]

251. During the subsequent 3Q15 earnings call on November 3, 2015, Defendants Zucker and Turicchi made it clear that they personally looked at and were involved in the Company's acquisitions:

- Zucker: "So we are basically, with our discipline and our reputation, are

---

[52] JMP Securities LLC ("JMP"), *j2 Global, Inc. (JCOM) Investor meetings in Canada Provide Additional Color on M&A strategy* (July 15, 2019).
[53] *j2 Global® Raises Guidance*, BUSINESS WIRE (Oct. 05, 2015 07:00 AM ET), https://www.businesswire.com/news/home/20151005005526/en/j2-Global%C2%AE-Raises-Guidance.
[54] Susquehanna Financial Group, LLLP, *j2 Global, Inc.: M&A Led Growth Can Work If Done Right* (Nov. 4, 2015).

getting deals that – ***I can tell you so many times when I get involved in the deals and I usually get involved with the deals, either larger size or are new to us and I want to make sure that we are comfortable with geography, with the people, with the business***."

- Turicchi: "***We have to look at scores of deals to find the five deals to 10 deals that we do a quarter.*** So we're throwing a lot back because in many instances it's not that we don't like the asset, but we don't like the price associated with the asset. It doesn't work for our model, at least at this moment in time. ***So educating the deal teams of where to look and how to find and create value in these deals is very important*** because we can't have our M&A program be subject to market conditions."

252. As Seeking Alpha analysts who "listen[ed] to the earnings call[s] and read the filings" by the Company noted on November 4, 2015, J2's "management team is real skilled at capital allocation" and is "working like a well oiled machine; the company executed 9 acquisitions last quarter."[55] In particular, Defendants "***Zucker and Turic[c]hi, President and CFO, look at scores of deals every quarter*** but only manage to execute on 10 or so because they often don't like the price associated with the asset. They are however quite flexible in what they will buy although they are eager to capture synergies and scale-up potential." Then on November 16, 2015, Seeking Alpha analysts further believed that J2's "management has been disciplined about not overpaying for acquistions" and "has done a good job monetizing these acquired assets" based on "[m]anagement commentary [which wa]s typically focused on growing ARPU" or average revenue per user.[56]

253. Because Defendants Zucker and Turicchi had actual knowledge of the VDW Acquisition, they knew or recklessly disregarded and failed to disclose what

---

[55] Bram de Haas, *J2 Global: Sound Capital Allocation Leads To Excellent Results*, SEEKING ALPHA (Nov. 4, 2015 08:37 AM ET), https://seekingalpha.com/article/3643376-j2-global-sound-capital-allocation-leads-to-excellent-results.

[56] *j2 Global: Growth At A (Semi)-Reasonable Price*, SEEKING ALPHA (Nov. 16, 2015 10:03 AM ET), https://seekingalpha.com/article/3687586-j2-global-growth-semi-reasonable-price.

van der Weijden and J2 each got out of the deal. According to FE2, in addition to the $900,000 van der Weijden received as part of the VDW Acquisition, van der Weijden made his longtime girlfriend an employee of VDW and therefore after the acquisition, she became an employee of J2. Through that arrangement, she could come to the United States without him needing to marry her.. In addition to acquiring van der Weijden's "Intellectual Property" and his girlfriend's employment, the Company also maintained its acquisition machine running. Van der Weijden kept "the spigot" on, as long as his demands were met.

254. In the Company's January 14, 2016 press release announcing its acquisition of "Ausweb (Hosting, Australia)," Defendant Zucker again focused on "j2's M&A program" which "ended 2015 on a very high note" and the Company's "***commit[ment] to driv[ing] growth globally, in part through acquisition,*** and complet[ion of] twenty-four acquisitions in 2015 with that objective in mind."[57]

255. Defendant Turicchi also expressed knowledge and approval of the J2's approach to acquisitions throughout 2016:

- 1Q16 earnings call (5/5/16): J2's "goal [for a transaction] has been and continues to remain that we target 20% cash-on-cash returns" and the continuing trend is "deals that are somewhat larger in size than the ***traditional small tuck-in deals that were the sort of historical bread and butter of primarily the Cloud business*** ... things that have $10 million, $20 million, $30 million, $40 million, $50 million, sometimes $100 million or more in revenue," but "[g]enerally not much larger than that."
- 2Q16 earnings call (8/3/16): "[A]s we become more visible and ***our appetite for acquisitions*** is better known ... we're also becoming active in, what I'll call, mid-size deals ... more and more we're seeing deals that have $15 million to $50 million, in some cases, up to $100 million of revenue. Now, that's almost a new pipeline that has been building for – we've been building

[57] *j2 Global® Completes Four Acquisitions in Q4 of 2015 – 24 Acquisitions in FY 2015*, BUSINESS WIRE (Jan. 14, 2016 07:00 AM ET), https://www.businesswire.com/news/home/20160114005016/en/j2-Global%C2%AE-Completes-Acquisitions-Q4-2015-%E2%80%93.

over the last few quarters.... But I actually believe and ***I polled our own M&A teams***, I think that's really the next wave for us at j2.... And so, there's a big focus in that area..."

- After hosting investor meetings in November 2016 with Turicchi, JMP analysts noted that "[g]iven the ***importance of M&A to j2 Global's business model*** (we estimate that j2 Global has acquired 141 companies in its history, not including EVDY), the other major topic of conversation was j2 Global's M&A strategy and understanding the competitive landscape. The average acquisition price for those acquisitions has been between 2-3x EV/revenue and j2 Global targets a 20% cash-on-cash return, which ***Mr. Turicchi believes is 'an easy rule of thumb'*** to protect the company against mistakes in the diligence process, higher-than-expected integration costs, and small variations in the interest rate environment." Turicchi had further stated that "[t]he cloud business…is expected to have continued tuck-in acquistiions, but no major acquisitions, as ***'all hands are on deck' from a corporate level with the Everyday Health acquisition***."[58]

256. Defendants Zucker and Turicchi continued to be intimately involved in acquisitions throughout 2017:

- Zucker: "Yeah, so ***we definitely see acquisitions***, and ***we are talking with some of them already***." (4Q16 earnings call; Feb. 9, 2017).

- Turicchi: "***We looked at the deal***. We thought that certainly the total purchase price was fair and good. And we like the fact that we have a fairly meaningful back-end upside in what we think is a very powerful, exciting company in the health IT space. So we'll keep those securities, those are j2 to be clear." (3Q17 earnings call; Nov. 2, 2017).

- After hosting investor meetings in October 2017 with Turicchi, JMP analysts noted that "[t]he other big topic of conversation was M&A, which is fully expected given the ***importance of acquisitions to j2 Global's business model***."[59]

257. In addition, Defendant Turicchi frequently held investor meetings and post-earnings callbacks with analysts during the Class Period in which he

---

[58] JMP, *On the Road with j2 Global: Greater Clarity on Everyday Health and Understanding j2 Global's M&A strategy* (Nov. 21, 2016).

[59] JMP, *On the Road with j2 Global: Fax, M&A, and Everyday Health* (Oct. 5, 2017).

demonstrated his detailed knowledge and active involvement in the Company's M&A strategy, acquisitions, and performance of the underlying business. For example, in order to specifically assuage concerns raised about the opacity of the Company's consolidated financials raised by *Citron*, Defendant Turicchi disclosed the Company's "organic" growth rate following 1Q16 earnings and highlighted details of current acquisitions and the Company's acquisition strategy generally.[60] These investor meetings and callbacks with analysts corroborate Defendant Turicchi's deep knowledge of the Company's M&A strategy, acquisitions, and performance of the underlying business.[61] Indeed, JMP maintained the Company's Market Outperform rating and price target following a meeting with Defendant Turicchi in which JPM noted they continued to like the Company because of its "M&A strategy and disciplined approach to identifying investment opportunities."[62]

258. Neither J2's focus on growth through acquisitions nor its executive management's active involvement in acquisitions changed when Defendant Shah became CEO in January 2018. He repeatedly spoke about those precise issues:

- 4Q17 earnings call (2/6/18): "I think ***we have far more capacity today, management capacity than we've ever had I think in j2's history in terms of our ability to source, evaluate, integrate, and make acquisition successful***."
- 3Q18 earnings call (11/6/18): "This is all to say that ***acquisition is part of our DNA and runs deep inside of the company, it's not just me and Scott [Turicchi] waving a magic M&A wand. It's fundamental to what we do and who we are*** and we recruit talent that can succeed in our environment.

---

[60] Citi Research, *Takeaways from Q1 Callback with CFO Turicchi* (May 6, 2016).

[61] *See, e.g.*, Citi Research, *Takeaways from Callback with CFO Turicchi* (Aug. 3, 2016) (discussing interesting takeaway from callbacks relating to webservices market in Australia / New Zealand); Citi Research, *Takeaways from Callback with CFO / President Turicchi* (Nov. 2, 2016) (providing additional detail on Everyday Health acquisition).

[62] JMP, *On the Road with J2 Global: Fax, M&A and Everyday Health* (Oct. 5, 2017).

While we believe, what we built as an acquisition system is valuable. We're not alone. The marketplace refers to companies like ours with different labels, that the term often used is a 'serial acquirer,' it's a group of public companies who are frequent buyers of companies and generally have a goodwill to asset ratio of over 50%."

- 3Q18 earnings call (11/6/18): J2's M&A "***approach has proven and will continue to prove to be our most important and sustainable competitive advantage***."
- 4Q18 earnings call (2/13/19): "When you think about all the Divisional Presidents, all of the General Managers; ***Scott [Turicchi], myself*** and a few folks in corporate, you now have a number of people ***engaged in sourcing, evaluating, diligencing, ultimately transacting and integrating acquisitions.*** So I think ***it's vital to what we're doing***."
- 3Q19 earnings call (11/1/19): "***Our ability to transact efficiently, transparently and reliably and to see and create value where others cannot has allowed us to succeed.***"
- Takeaways from a "fireside chat at Citi's Global Technology Conference" with Defendant Shah in September 2019 included that "***M&A continues to be the core of the growth story*** and is fairly widespread inside of the organization."[63]
- Wedbush (11/26/18): "the next few years is about finding the right assets that fit into the ***strategy for Vivek [Shah] & Co.*** to expand its product footprint…. ***Management continues to see*** a robust pipeline of potential acquisition targets with a target post-synergy EBITDA multiple in the range of 5 to 6 times with the company very focused on its strict deal criteria of 20% cash-on-cash returns."[64]

259. Defendant Turicchi continued to be actively involved in J2***'s*** acquisition machine after Shah became CEO. As Wedbush analysts noted after hosting an investor dinner with Shah and Turicchi in November 2018, they expected J2's "***M&A strategy under the helm of longtime President and CFO Scott Turicchi*** will enable the company to focus on ROIC and growing its product arsenal which ***will ultimately***

---

[63] Citigroup Global Markets Inc., *J2 Global (JCOM) Alert: 2019 Global Tech Conference Takeways* (Sep. 5, 2019).

[64] Wedbush, *Takeaways from the Road; M&A Trends Humming into 2019* (Nov. 26, 2018).

***be the biggest swing factor in the name looking ahead***."[65] In additional Wedbush meetings with Turicchi later that month, "***M&A*** discusson was a hot topic…as this ***remains at the epicenter of the company's core strategic vision*** over the coming years" so "***[i]t's all about the right M&A for JCOM***…."[66] During investor meetings hosted by JMP in October 2019, Turicchi further confirmed that acquisitions of new divisions like Everyday Health were "***[s]ponsored by J2 corporate leadership***," which included the Individual Defendants.[67]

260. Even after J2's "management flipped the M&A model" with Defendant Shah at the helm so that "business unit management and division presidents are more influential in the M&A process and tasked with driving the pipeline in order to add value to their business units," Turicchi explained during investor meetings hosted by JMP in July 2019 that he and Shah were still actively involved in acquisitions as J2's "M&A strategy is [still] a collaboration between the M&A team, the parent, and the Bus (business units). The BUs deal with the operational elements of the deal, while ***the parent deals with legal, HR, and tax implications of the transaction***. The M&A team focuses specifically on deal mechanics, negotiation, and acts as a deal filter. The capital allocation decision happens centrally as ***the parent decides which acquisitions to pursue, after receiving approval from the board***."[68]

261. Based on these and other statements by Defendants Shah and Turicchi, analysts continued to express confidence in the acquisition strategy put forth by the Company's management:

---

[65] Wedbush, *j2 Global (JCOM) M&A and Subscriptions = 1-2 Punch for Success in 2019 and Beyond* (Nov. 7, 2018).

[66] Wedbush, *j2 Global (JCOM) Takeaways from the Road; M&A Trends Humming into 2019* (Nov. 26, 2018).

[67] JMP, *j2 Global, Inc. (JCOM) "How Lots of Small M&A Deals Add Up to Big Value"* at 3 (Oct. 3, 2019).

[68] JMP, *j2 Global, Inc. (JCOM) Investor meetings in Canada Provide Additional Color on M&A strategy* (Jul. 15, 2019).

- Wedbush (8/8/19): "***The company's underlying acquisitive growth strategy*** of diversifying its core services beyond fax into cloud and media ***is the key ingredient in its formula for success and will continue to be the linchpin going forward*** as evidenced again this quarter."[69]
- Seeking Alpha (11/29/19): "In Q3, we believe that the company has made four strong acquisitions in BabyCenter, Spiceworks, SaferVPN, and OffsiteDataSync. Overall, we feel positive about the ***management's strong approach and thought process in all these deals***."[70]
- Seeking Alpha (1/22/20): "I will state for the record that company ***management is aware of the Rule of 40 and acquires companies that meet or are capable of meeting this metric***."[71]
- Piper Sandler (5/12/20): "M&A opportunities remain abundant, and ***most of the reported growth historically comes from M&A***."[72]

262. After acquisitions were completed, the Individual Defendants kept track of how much acquired companies contributed to J2's bottom line as part of their acquisition-driven growth strategy. As Susequehanna analysts explained at the beginning of the Class Period, "***Accretive M&A is a key part of j2's value creation strategy*** where the company acquires under-optimized assets (either under-monetized or with subscale margins or both) at attractive valuations (usually around 2x revenue) and ***synergizes them accordingly***."[73]

263. Defendant Turicchi detailed how J2's strategy worked with regard to the Everyday Health Acquisition during J2's 3Q16 earnings call on November 1, 2016:

---

[69] Wedbush, *j2 Global (JCOM) Healthy Execution and M&A Strategy Laying the Groundwork for a Strong 2H* (Aug. 8, 2019).

[70] Tech and Growth, *j2 Global: No Slowdown Anytime Soon*, SEEKING ALPHA (Nov. 29, 2019 01:44 PM ET), https://seekingalpha.com/article/4309781-j2-global-no-slowdown-anytime-soon.

[71] Steve Auger, *J2 global Keeps on Growing*, SEEKING ALPHA (Jan. 22, 2020 09:01 AM ET), https://seekingalpha.com/article/4318287-j2-global-keeps-on-growing.

[72] Piper Sandler, *J2 Global, Inc. (JCOM) The M&A Machine Hits a Bump in the Road, but Long-Term Thesis Remains* (May 12, 2020).

[73] Susquehanna, *j2 Global, Inc.: M&A Led Growth Can Work If Done Right* (Nov. 4, 2015).

> [T]he process by which we came to the health care vertical did encompass and does encompass other verticals. ***We've talked about some of these in the past that meet this similar profile of the content being very influential in aiding and decision making***.
>
> And I think to follow-up on Hemi [Zucker] said, what's interesting about this asset is, ***when we bought it***, which is now coming up on two years, ***the core thesis was to continue to grow the advertising revenue***, which was the primary source of revenue at the time of acquisition, and then to add on to it this whole data-as-a-service business, the data that would be important in this case to broadband providers. And we had – ***we actually had a multi-year plan for that***. And ***we've been tracking very nicely in the first two years against that plan***.

264. Despite providing only consolidated financials to investors, the Individual Defendants were well aware of when acquired companies did not perform as expected. Specifically, according to FE1, Defendant Zucker received weekly performance reports from FE1, including revenues, expenditures, e-sales, and other metrics such as churn rates, revenue impact, and marketing metrics. Further, according to FE3, the Individual Defendants regularly received financial data which showed that the Company was consistently operating on "paper-thin" margins and thus had to operate newly acquired companies "as leanly as possible" rather than reinvest in those companies. As further corroborated by FE4, Turicchi and Zucker received regular financial reports about J2's financial condition, including a daily report detailing customers added and lost. The daily report was "highly used" at J2, and if a specific business unit was "plus or minus" 5%, executives, including Zucker and Turicchi, would ask questions as to "what happened." FE2 also stated that the accounting team sent "a ton of reports" to Zucker and Turicchi and that J2's department heads had weekly meetings with Zucker after receiving weekly reports from their team leaders. Indeed, according to FE2, Zucker was "obsessed with numbers" so "budgets ruled J2."

265. Defendants have made a deliberate decision to provide investors with only consolidated financials, rather than breaking out the financials of acquired companies or otherwise disclosing additional details of how J2's acquisitions perform at an individual level. As FE1 explained, the Board intentionally and deliberately chose that Defendants refrain from publicly talking about new acquisitions. That choice prevented analysts from tracking individual entities, and instead, they would have to track the consolidated entity. The Individual Defendants themselves acknowledged that they had transaction-specific information during the Class Period even though they did not disclose it to investors:

- Turicchi (2Q16 earnings call): "We think that there are opportunities to both improve the top-line performance as well as the bottom line, but ***I'm not going to give any more specific than that at this time***."
- Turicchi (2Q18 earnings call): "I will tell you as Humble Bundle did grow sequentially from Q1 to Q2. So, those numbers we gave you last quarter are higher on both an actual and a run rate basis. But ***we don't intend to break those out***.
- Shah (1Q19 earnings call): "So ***we're not going to break out each [acquired asset] in terms of contributions and price*** but I can say that the VPN assets, IPVanish, et cetera, the ones that we carved out from a company called StackPath are the largest."

266. Even though analysts were not able to track the individual entities that J2 acquired, they trusted that Defendant Turicchi, as the CFO, was monitoring those entities:

- Wedbush (4/21/20): "the current operating structure of the JCOM business model with unit CEOs and ***a disciplined/veteran CFO overseeing the overall business*** should enable the company to ***maintain Cloud EBITDA margins*** in the mid to high 40% range during this dark economic storm."[74]

---

[74] Wedbush, *j2 Global (JCOM) Walking Through JCOM in a COVID-19 Environment; M&A Could Heat Up* (Apr. 21, 2020).

## VIII. LOSS CAUSATION

267. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members he represents.

268. During the Class Period, Plaintiff and Class members purchased J2 common stock at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

269. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of J2 common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about J2's business, operations, and financial performance, as alleged herein.

270. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. Defendants made or caused to be made materially false and/or misleading statements about J2's financial results, internal controls and related financial metrics and the reliability of their reported results. These material misstatements and/or omissions had the cause and effect of creating in the market a false positive assessment of the Company and its financial performance, internal controls and related well-being, thus causing the Company's securities to be overvalued and the price of its common stock to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Plaintiff

and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in part on March 10, 2016 and in full on June 30, 2020, causing the trading price of J2 common stock to materially decline and removing the previously embedded artificial inflation.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

271. Plaintiff brings this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities that purchased or otherwise acquired J2 common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

272. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, J2 common stock was actively traded on the NASDAQ. As of November 4, 2020, there were over 45 million shares of J2 common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by J2 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

273. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

274. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

275. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of J2;

c. whether the Individual Defendants caused J2 to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of J2 common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

276. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

277. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. J2 common stock is traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiff and members of the Class purchased, acquired and/or sold J2 common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

278. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

279. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**Violations of § 10(b) of the Exchange Act and Rule 10b-5**
***Against All Defendants***

280. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-279 as if fully set forth herein.

281. This Count is asserted against Defendants is based upon § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

282. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

283. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes and artifices to defraud;
b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
c. engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of J2 common stock during the Class Period.

284. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of J2 were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as

primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of J2, their control over, and/or receipt and/or modification of J2's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning J2, participated in the fraudulent scheme alleged herein.

285. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other J2 personnel to members of the investing public, including Plaintiff and the Class.

286. As a result of the foregoing, the market price of J2 common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of J2 common stock during the Class Period in purchasing J2 common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

287. Had Plaintiff and the other members of the Class been aware that the market price of J2 common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased J2 common stock at the artificially inflated prices that they did, or at all.

288. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

289. By reason of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and

the other members of the Class for substantial damages which they suffered in connection with their purchase of J2 common stock during the Class Period.

**COUNT II**
**Violations of § 20(a) of the Exchange Act**
***Against the Individual Defendants***

290. Plaintiff repeats and realleges each and every allegation contained in ¶¶1-279 as if fully set forth herein.

291. During the Class Period, the Individual Defendants participated in the operation and management of J2, and conducted and participated, directly and indirectly, in the conduct of J2's business affairs. Because of their senior positions, they knew the adverse non-public information about J2's current financial position and future business prospects.

292. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to J2's business practices, and to correct promptly any public statements issued by J2 which had become materially false or misleading.

293. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which J2 disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause J2 to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of J2 within the meaning of § 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of J2 common stock.

294. Each of the Individual Defendants, therefore, acted as a controlling person of J2. By reason of their senior management positions and/or being directors of J2, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, J2 to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of J2 and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

295. By reason of the above conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act for the violations committed by J2.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED: April 19, 2021

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

Kyle Roche (*pro hac vice* forthcoming)
99 Park Avenue, 19th Floor
New York, NY 10016
Telephone: (646) 350-0527
Emails: kyle@rcfllp.com

*Lead Counsel for the Class*

**LABATON SUCHAROW LLP**
David J. Schwartz (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 883-7070
Email: dschwartz@labaton.com

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Jonathan Espy*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 19, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By: *<u>/s/ Ivy T. Ngo</u>*
Ivy T. Ngo